```
 1

 2                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEW JERSEY
 3
   _____
 4                                   CIVIL ACTION NUMBER:
   STRIKE 3 HOLDINGS, LLC,
 5                                   18-14114
        Plaintiff,
 6                                   MOTIONS
     v.
 7                                   Pages 1 - 189
   JOHN DOE SUBSCRIBER ASSIGNED
 8 IP ADDRESS 73.160.162.60,

 9      Defendant.
   _____
10      Mitchell H. Cohen Building & U.S. Courthouse
        4th & Cooper Streets
11      Camden, New Jersey  08101
        Friday, May 31, 2019
12      Commencing at 10:15 a.m.

13 B E F O R E:           THE HONORABLE JOEL SCHNEIDER,
                          UNITED STATES MAGISTRATE JUDGE
14
   A P P E A R A N C E S:
15
        THE ATKIN FIRM, LLC
16      BY:  JOHN C. ATKIN, ESQUIRE
        55 Madison Avenue, Suite 400
17      Morristown, NJ 07960
            and
18      THE LAW OFFICES OF LINCOLN BANDLOW PC
        BY:  LINCOLN BANDLOW, ESQUIRE
19      1888 Century Park East
        Los Angeles, CA 90067
20      For the Plaintiff

21

22
           Karen Friedlander, Official Court Reporter
23              friedlanderreporter@gmail.com
                     (856) 756-0160
24
          Proceedings recorded by mechanical stenography;
25       transcript produced by computer-aided transcription.
```

1 | **A P P E A R A N C E S: - CONTINUED**.

2 |     PAUL H. SCULL, JR., ESQUIRE
       151 North Broadway
3 |     Pennsville, NJ 08070
       For the Defendant

4 |

5 | ALSO PRESENT:

6 |     General Counsel for Strike 3 Holdings
       Emilie Kennedy, Esquire

7 |

       John Pasquale
8 |

       Steven Bunting
9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1          THE DEPUTY CLERK:  All rise.

2          (OPEN COURT, May 31, 2019, 10:15 a.m.)

3          THE COURT:  Good morning, everybody.  Please be

4     seated.  On the record in Strike 3 Holdings versus John Doe,

5     Docket No. 18-14114.  And the other case is listed in the

6     Court's order to show cause.

7          You'll have to excuse me, counsel, I sound worse than

8     I usually do because I'm fighting allergies, and I think I

9     could make it through this hearing, but that's why I sound

10    worse than usual.

11         So let's start by getting the entries of appearance

12    on who's present here.  I know there's two general issues

13    we're dealing with; one, the motion to quash, filed in this

14    particular case, and the order to show cause that the Court

15    issued.

16         So let's start with the entries of appearance.

17         MR. BANDLOW:  Good morning, Lincoln Bandlow, Law

18    Offices of Lincoln Bandlow on behalf of plaintiff, Strike 3

19    Holdings, LLC.

20         MR. ATKIN:  John Atkin of the Atkin Firm on behalf of

21    plaintiff, Strike 3 Holdings, LLC.

22         THE COURT:  Do you want to introduce your client?

23         MR. ATKIN:  And this is my client, general counsel

24    for Strike 3 Holdings, Emilie Kennedy.

25         MS. KENNEDY:  Good morning, Your Honor.

 1          THE COURT:  Ms. Kennedy, welcome.

 2          MR. BANDLOW:  Your Honor, with us in the room are

 3  also the witnesses John Pasquale and Steven Bunting.

 4          THE COURT:  Can you just explain their roles, while

 5  they're standing?  Mr. Bunting and -- what each of them does

 6  and their significance.

 7          MR. BANDLOW:  Mr. Bunting is a forensics expert.  He

 8  provided a report in this matter.  He tested the technology

 9  that was used to detect infringers and he'll testify about the

10  accuracy of that technology.  He'll also testify about some of

11  the speculations by Judge Lamberth and his opinion as to why

12  this technology might not work, and then Mr. Pasquale double

13  confirmed the PCAPs that captured the specific evidence at

14  issue in the case and he'll testify as to authenticating that

15  evidence.

16          THE COURT:  Did Mr. Bunting work on this particular

17  case, Docket No. 18-14114?

18          MR. BANDLOW:  He did not work -- he did do not

19  perform the investigation relevant to the particular cases.

20  He tested the investigation methodology and technology to

21  confirm its accuracy and ability to detect infringers.

22          THE COURT:  How about Mr. Pasquale, did he work on

23  this particular case?

24          MR. BANDLOW:  He did work on these particular cases,

25  yes.

1          THE COURT:  Thank you.

2          Counsel.

3          MR. SCULL:  Good morning, Your Honor.  May it please

4    the Court, Paul Scull on behalf of John Doe Subscriber

5    Assigned IP Address 73.160.60.

6          THE COURT:  Thank you, counsel.  I have to confess, I

7    was a little perplexed about how we should proceed today,

8    whether to let Strike 3 present its witnesses, cross-examine,

9    ask any questions, or do it some other way.  What I would

10   suggest we do is, I have some general questions.  If we could

11   just go through those general questions and then we can really

12   bore down on the issues that the Court and defense counsel is

13   most concerned with.

14         Defense counsel, I know you said in your papers

15   you've never had an opportunity to question plaintiff's

16   witnesses.  Well, here we are.

17         So, if you'll just again bear with me with these

18   allergies and I just have some general questions.  Mr. Atkin,

19   Mr. Bandlow, are you national counsel for Strike 3 Holdings?

20         MR. BANDLOW:  For myself, Your Honor, I am -- well, a

21   sort of yes and no.  I primarily handle the California and

22   Colorado lawsuits, but I also oversee aspects of all of the

23   national lawsuits.  To the extent they get into sort of more

24   granular detail or necessity for hearings such as this nature,

25   I generally tend to be involved in those.

| | |
|---|---|
| **1** | MR. ATKIN:  Your Honor, I'm local counsel for Strike |
| **2** | 3 in New Jersey, the Eastern District of Pennsylvania, and |
| **3** | part of the Eastern District of New York and I work closely |
| **4** | with Mr. Bandlow, so when cases like this come up that require |
| **5** | court intervention, we often pro hac him in to assist me with |
| **6** | them. |
| **7** | THE COURT:  Does Strike 3 file these cases in all 50 |
| **8** | states? |
| **9** | MR. BANDLOW:  No, Your Honor.  And that's primarily a |
| **10** | function of where we can find counsel for them.  But we're |
| **11** | generally in a substantial number of them. |
| **12** | MR. ATKIN:  I'm sorry. |
| **13** | THE COURT:  Mr. Atkin? |
| **14** | MR. ATKIN:  We have here with us -- I should have |
| **15** | introduced her more.  Ms. Emilie Kennedy is here to also |
| **16** | testify generally about Strike 3's litigation across the |
| **17** | country and she might be able to provide every state that |
| **18** | we're in, every district that we do, if you want to know a |
| **19** | specific -- |
| **20** | THE COURT:  Okay.  Ms. Kennedy, if you think it's |
| **21** | appropriate that you answer the questions, it's perfectly fine |
| **22** | with the Court. |
| **23** | MS. KENNEDY:  Sure. |
| **24** | THE COURT:  I didn't say this, let me say this at the |
| **25** | outset of this hearing.  The Court is not coming into this |

 1   hearing with any preconceived notion about what to do.  I just

 2   would like to get to the bottom of these cases.  I will

 3   confess that, obviously, the record speaks for itself how many

 4   orders this Court has entered granting this ex parte motion

 5   for discovery, but it's no secret that there's different

 6   courts around the country, especially recently, who have

 7   really bored down on this issue and certain issues have come

 8   to the top that this Court did not give sufficient

 9   consideration to when it issued its orders.  I just want to

10   get to the bottom of the facts.

11            So in no way, shape, or form am I coming into this

12   hearing with any preconceived notion about whether we're going

13   to grant a motion, deny a motion, or what to do.

14            Second, and I don't mean to take wind out of your

15   sails, but it's really of no concern to the Court the business

16   that the plaintiff is in.  It's a legal business, and there's

17   First Amendment issues and I'm not interested that the owner

18   of the company has this great creative design.  I think it's

19   irrelevant to the legal issues that we have to deal with, so

20   I'm not going there, and I can save you time, you don't have

21   to go there.

22            MS. KENNEDY:  Okay.

23            THE COURT:  I'm interested in the legal issues, and

24   not -- I know some courts have gone off on some prurient

25   interest or -- I'm not going there, okay?

1          MS. KENNEDY:  Thank you, Your Honor.

2          THE COURT:  So with that clarification, let me see

3    if, in fact, I can just get some background information.

4          MR. ATKIN:  Of course, Your Honor.

5          THE COURT:  Aside, Strike 3 appealed, I think, Judge

6    Lamberth's opinion.

7          MS. KENNEDY:  Yes, Your Honor.

8          THE COURT:  That's going to the Court of Appeals in

9    the District of Columbia, I guess?

10          MS. KENNEDY:  Yes.

11          MR. BANDLOW:  Fully briefed.

12          THE COURT:  Is there any other Court of Appeals -- is

13   there any Court of Appeals decision that Strike 3 is involved

14   in?

15          MS. KENNEDY:  No, not at the moment.

16          THE COURT:  There are some jurisdictions we know,

17   Minnesota, Brooklyn, where some courts have issue opinions

18   denying Strike 3 the relief it requested.  Strike 3 has not

19   appealed those decisions, correct?

20          MS. KENNEDY:  In the District Court of Minnesota, the

21   opinions that denied us the relief were done by magistrate

22   judges and we did appeal to District Court level.

23          THE COURT:  Was it affirmed by the District Court?

24          MS. KENNEDY:  In one case it was affirmed and in

25   one case it was reversed.  And also, I believe, three, maybe

1   four other magistrate judges in that district went against it,

2   went the other way and granted us leave to subpoena the

3   internet service providers.

4           THE COURT:  That was one of my questions.  In the

5   jurisdictions where there are decisions that don't grant the

6   relief Strike 3 requests, does Strike 3 continue to file cases

7   in that district?

8           MS. KENNEDY:  Most often, yes.

9           THE COURT:  Okay.  You're familiar with the recent

10  decision by Judge Orenstein in Brooklyn, right?

11          MS. KENNEDY:  I am.

12          THE COURT:  Does Strike 3 continue to file cases in

13  Brooklyn?

14          MS. KENNEDY:  Yes, we just filed about two weeks ago,

15  12 cases in the Eastern District of New York.  Six were

16  assigned to the Islip division and six were assigned to the

17  Brooklyn division.

18          THE COURT:  So some may or may not go back to Judge

19  Orenstein --

20          MS. KENNEDY:  I believe he was assigned two of them.

21          THE COURT:  Was his decision appealed?

22          MS. KENNEDY:  It was not, Your Honor, and the reason

23  for that was at the time we were transitioning counsel and it

24  just wasn't practical at that point in time for us to appeal

25  that particular decision.  In the future, I'm not sure that

```
 1   we'll go the same course.  I think --
 2          THE COURT:  Outside counsel, we're talking about?
 3          MS. KENNEDY:  Yes.
 4          THE COURT:  How long have you been general counsel?
 5          MS. KENNEDY:  I've been general counsel for just over
 6   two years.
 7          THE COURT:  How long -- I'm sorry, where is Strike 3
 8   Holdings based?
 9          MS. KENNEDY:  It's based in Studio City, California.
10          THE COURT:  Do you coordinate these cases all over
11   the country?
12          MS. KENNEDY:  Yes.  So Strike 3's general counsel --
13   I oversee the entire legal department for the company, so it's
14   not just litigation, it's also production agreements,
15   licensing, royalties, clearances, everything.  But part of my
16   duties, and I have a staff that assists me, is coordinating
17   the litigation throughout the country and working with outside
18   counsel to make sure that, you know, we're representing the
19   company in the way that, you know, we wish in these cases and
20   to be cautious and careful and protect our copyrights, but
21   also be reasonable.
22          THE COURT:  How long has Strike 3 been in existence?
23          MS. KENNEDY:  It's been in existence since 2015, but
24   just to qualify that, Strike 3 is our intellectual property
25   holding company.  The parent company General Media Systems, I
```

1    believe, was formed in 2014, when our websites were first

2    launched.

3            THE COURT:  I think I saw somewhere -- I could be

4    wrong, I think I saw somewhere that these copyright suits that

5    we're involved in, they started to be filed in or around 2017.

6            MR. BANDLOW:  October.

7            THE COURT:  Am I right about that?

8            MS. KENNEDY:  That's correct, yes.

9            MR. BANDLOW:  October of 2017.

10           THE COURT:  So I take it, you were -- were you on

11   board at that time as general counsel?

12           MS. KENNEDY:  Yes.  I started in late May, early June

13   of 2017.  So about six months before.

14           THE COURT:  So I don't need an exact number, but at

15   the present time, approximately how many cases are pending in

16   the 50 federal courts?

17           MS. KENNEDY:  How many have we filed or how many are

18   pending?

19           THE COURT:  If you have approximate numbers for both.

20           MS. KENNEDY:  I would say pending is probably about

21   200.  I believe we've filed, I want to say, approximately

22   3,000.

23           THE COURT:  Okay.  Do you or does one person approve

24   every single Complaint that's filed?

25           MS. KENNEDY:  I have a team that I work with, but

1    yes.  We -- and we have a -- somewhat of a complex system in

2    place, but we do go through every Complaint and, you know, in

3    the beginning, all we have is an IP address, so we don't have

4    a lot of information, other than the approximate location of

5    the defendant, how many works they've infringed, how long

6    they've infringed and some other data about the other content

7    that they're also infringing, along with their internet

8    service provider.  So we use that information to basically

9    narrow down -- I think approximately every month we have about

10   200 or 3,000 different unique IP addresses that are infringing

11   our content.

12          So we take our data, using different parameters, we

13   narrow it down to basically find the worst 100 to 200

14   infringers in the country.

15          THE COURT:  Okay.  Is the same form Complaint used

16   throughout the country?

17          MS. KENNEDY:  Initially.  Again because, you know, we

18   only have a certain set of information, yes, generally, the

19   complaints are relatively uniform.

20          MR. BANDLOW:  One thing I'd say, Your Honor, is

21   they're a little more uniform now because prior to the Supreme

22   Court's decision on the registration issue, in some

23   jurisdictions simply having filing an application was

24   sufficient.  In other jurisdictions you needed to wait for a

25   registration.  So they would vary in that way across the

 1    country.  It's a little more uniform now.

 2          THE COURT:  But the substantive allegations, are

 3    they --

 4          MS. KENNEDY:  Yes.

 5          THE COURT:  -- generally the same?  I don't like the

 6    term "boiler plate."  I'll call it a form Complaint --

 7          MS. KENNEDY:  Yes.

 8          THE COURT:  -- around the country.

 9          MS. KENNEDY:  I will add that in the sort of the

10    second phase of our litigation when we've received the

11    defendant's name and we decide to proceed with the case and

12    serve him with the subpoena, and actually, you know,

13    essentially start the real process of the case, at those times

14    we actually go through and customize every Amended Complaint

15    to fit that case.

16          THE COURT:  Are you the -- does the buck stop at your

17    desk that this Complaint is not being filed unless I, Ms.

18    Kennedy, approve it?

19          MS. KENNEDY:  Yes.

20          THE COURT:  So you approved the particular Complaint

21    in this case.

22          MS. KENNEDY:  Yes.

23          THE COURT:  That's a lot of work.

24          MS. KENNEDY:  I know, I have a -- I will say I have

25    another attorney who also assists me in-house.  But especially

1   for every, you know, Amended Complaint when we're actually

2   serving the defendant moving forward, we do review every case

3   and every detail.

4           THE COURT:  In case you're wondering why I'm asking

5   these questions, again, this is background, but we'll get into

6   some specific allegations because I do want to explore Rule 11

7   concerns --

8           MS. KENNEDY:  Sure.

9           THE COURT:  -- and issues of that sort.  In the

10  particular Complaint we're talking about, I know Mr. Atkin

11  signed it, we'll find out what role he played in the

12  Complaint, does he verify it, or does he simply sign off as

13  local counsel?

14          MS. KENNEDY:  I absolutely work with each one of our

15  attorneys throughout the country.  I don't even like using the

16  word "local counsel" because I consider them my counsel.  And

17  I'm on the phone with John maybe four or five times a week,

18  probably send, you know, dozen or more e-mails a day.  Like,

19  I'm in constant communication with him.  Same with Lincoln, of

20  course.

21          THE COURT:  Again, with the proviso -- this is not a

22  cross-examination.  This is more like --

23          MS. KENNEDY:  I know.

24          THE COURT:  -- just deposition.  I have no

25  preconceived notion about what's going to happen at the end of

1    this.

2            MS. KENNEDY:  Sure.

3            THE COURT:  So how did defendant counsel's client

4    originally come to Strike 3's attention?

5            MS. KENNEDY:  It first came to our attention -- we

6    have an investigator named IPP and their job is to --

7            THE COURT:  Where are they located?

8            MS. KENNEDY:  They're located in Germany.

9            They're job is to track the infringement and they

10   have like a certain software and system in place that monitors

11   the infringement across the BitTorrent network, tracks it and

12   records the IP addresses.  Then they give the data to us, and

13   once we receive the data from them, again, using specific

14   parameters I've given to my team, we sort through the data and

15   find the worst of the worst the infringers who are doing it

16   over a long period of time in jurisdictions where we have

17   counsel, and who we also have a lot of other evidence of the

18   infringement that's going on, that we can use to build our

19   case.

20           THE COURT:  So IPP sends you reports of alleged

21   infringers?

22           MS. KENNEDY:  Yes.

23           THE COURT:  Daily, weekly, monthly?

24           MS. KENNEDY:  And just to take a step back, when I

25   say "reports," it's mostly data.  So the data that they can

1    record based on capturing the IP addresses on the internet,

2    and they send it, I'd say, approximately once a month.  Also

3    just to add -- sorry, and stop me --

4         THE COURT:  No, go ahead, go ahead.

5         MS. KENNEDY:  In terms of IPP

6    being located in Germany, you know, when we first sat down at

7    the company and started considering whether we wanted to go

8    this route, we wanted to find a forensic company that was

9    located in the U.S. that could do this, you know, do this

10   investigation for us, and we even, you know, we spoke with a

11   number of different firms that we thought could do it and no

12   one could do it as well as IPP could.  At the end of the day,

13   I felt that their technology and their data was the best, so

14   that's why we went with them, but it is somewhat of an

15   inconvenience for us to have them in Germany, which is why we

16   brought in 7 Rivers and John Pasquale here to double verify

17   the PCAPs before we file a Complaint.

18        THE COURT:  What does IPP actually do?

19        MS. KENNEDY:  So IPP has the software and system in

20   place that crawls the BitTorrent network and it basically

21   receives part of our infringing file from the various

22   defendants, or various infringers that are out there

23   distributing our content, and it records their IP addresses

24   and it records the BitTorrent software that they're using, and

25   the date and time and some other data and sends it to us.

1      THE COURT:  Are there written instructions that IPP

2  follows, or protocol that IPP follows?

3      MS. KENNEDY:  Yes.  I don't know if there's any sort

4  of, you know -- you know, I didn't necessarily write a memo

5  for them, but I'm in constant communication with them and, you

6  know, we certainly have -- and we have a contract as well.

7  But there's certain things like, you know, they're never

8  allowed to distribute our content.  That's, you know, not

9  okay.  They can't in any way, shape, or form contribute to the

10 infringement that's going on out there.

11     They have to record everything in a PCAP, which is

12 like our forensically sound wave capturing the evidence.  They

13 have to be available to testify during depositions or attend

14 hearings.  What else.

15     You know, we put on them a lot of pressure to

16 constantly update their system and develop new technologies as

17 they come out so that we're getting the best state-of-the-art

18 technology.  I'd say off the top of my head, that's the

19 general rules with them.  But again, you know, I speak to them

20 quite often, so -- they certainly know that we want to do this

21 the right way, we want to do this ethically and we expect the

22 best out of them.

23     THE COURT:  Presumably -- let me just say the

24 Complaint in this case was filed on September 20, 2018.

25     MS. KENNEDY:  Okay.

1        THE COURT:  Presumably, sometime before that, you got

2   -- or Strike 3 got a report from IPP with information

3   regarding the defendant's ISP address, right?

4        MS. KENNEDY:  The IP address, yes.  So what we

5   received was ongoing data.  So when we file these cases,

6   again, it's not just one movie or two movies and it's not just

7   like a snapshot or once.  You know, we're really trying to

8   stop the worst infringers.  And I say that because when you

9   sue them, they stop infringing and you take them off of

10  BitTorrent, so they stop distributing the most amount of our

11  movies.

12       So oftentimes, you know, we will receive data from

13  IPP over the course of six months containing the IP address's

14  information, you know, and the hit dates and the infringement

15  that's taking place.  But eventually, it gets to a point where

16  it's like, okay, we've seen this IP address going for a long

17  time now, it's not going to stop, you know, I don't know what

18  else to do except file a lawsuit, and 99.9 percent of the

19  time, when you file a lawsuit, the infringement does stop.

20       THE COURT:  The dates of the alleged infringement in

21  this case extends over a year or so, so does that mean that

22  there were different monthly reports where this particular ISP

23  address was on it?

24       MS. KENNEDY:  Yes, that's correct.

25       THE COURT:  And is there some sort of computer

```
 1   program you use to search for ISP addresses who frequently

 2   appear?

 3          MS. KENNEDY:  Yes.  It's not necessarily a computer

 4   program.  We work with a very sophisticated data analytics and

 5   management team that stores this data and is able to monitor

 6   and sort it.

 7          THE COURT:  In-house?

 8          MS. KENNEDY:  Yes.  They're independent contractors,

 9   but we work with them in-house.

10          THE COURT:  Okay.  So are they given instructions

11   about how often they have to find hits or how often someone

12   has to download something to bring it to your attention?

13          MS. KENNEDY:  Yes.  Generally, it's a minimum usually

14   of about 25 works, and it's over at least a couple of months.

15          THE COURT:  Okay.

16          MS. KENNEDY:  Because again, if someone is just

17   infringing our movies once or twice or even three or four

18   times, we are not going to go to the effort to file a court

19   case over that, because that's just -- there's just so much of

20   it out there and there's just, you know, it's not worth our

21   time, their time.  But when we see someone who is constantly

22   doing it and they're continuing to do it, then it is actually

23   is going to affect our revenue and, you know, we've got a lot

24   of subscribers.  We've got almost a hundred thousand

25   subscribers and we want to encourage them to continue
```

1    subscribing to our content.  And if they can just get the

2    entire library on the internet, it's, you know, it's going to

3    hurt our company.

4            MR. BANDLOW:  The other thing, Your Honor, I would

5    just add, is that by looking at a lot of works being infringed

6    over a period of time, you also have a better sense that it is

7    probably, in fact, the subscriber.  If you just sued somebody

8    off a one-time hit, maybe it's a visitor to the house that

9    day.  But the long period of time and lots of works, gives you

10   a better idea that it's much more likely it is the subscriber.

11           THE COURT:  Let's explore that a little bit.  Why do

12   you conclude that if there's a lot of downloads, it's the

13   subscriber?  That's an assumption you make, right?

14           MR. BANDLOW:  It's an inference that you can make

15   from the evidence because if, you know, you have guests come

16   to your house and they say, oh, I want to use the Wi-Fi and

17   they use the code and they can tap in and, sure, they might do

18   some downloading.  But if you have it over a long period of

19   time and lots of works, it's very unlikely that it's a casual

20   guest.  It's very unlikely it's a Wi-Fi freeloader, as has

21   been alleged.  It's much more likely that it's either the

22   subscriber or someone in the house.

23           Clearly, we understand that there are often going to

24   be circumstances in which, you know, mom is the subscriber on

25   it, but it's dad, or adult son or something of that nature

1    that's actually doing the infringing, that is correct.

2         THE COURT:  Suppose I subscribe in this area,

3    Comcast.  So they have my name on file and I have -- my kids

4    are grown, they're not in the house, but suppose I had three

5    children and a wife.  Why is it more likely if there's 31

6    downloads that it's the subscriber who's downloading it rather

7    than one of the kids?

8         MR. BANDLOW:  As I said, it's more likely that it's

9    the subscriber or somebody in the house, and that's -- that's

10   the point, is we start a lawsuit with a fairly good reason to

11   believe that it is the subscriber or someone in the house,

12   that's why getting that early subpoena, that will give us the

13   name and address, we can take that additional information, do

14   our separate investigation looking at social media and things

15   of that nature and we oftentimes will say, oh, this looks like

16   a 25-year-old in the house, this looks different.

17        THE COURT:  I know, but that's not what you said.

18   Hold on.  You said that if there's a lot of downloads, the

19   reasonable inference is it's the subscriber that's downloading

20   it, and I question that.

21        MR. BANDLOW:  Yeah, I meant to say the subscriber or

22   someone in the household.  I apologize, Your Honor.

23        THE COURT:  Okay.  You clarified your answer.

24        MR. BANDLOW:  Yes.

25        THE COURT:  Is it equally as -- like 31 downloads, is

1   it equally as likely that the subscriber downloaded than

2   someone who resides in that house downloaded it?

3        MR. BANDLOW:  I'm not sure there's much difference

4   between the likelihoods of that.  I don't know what the

5   empirical -- maybe Emilie knows a little bit further.  I think

6   it's certainly more directly tiable to somebody in the house.

7        THE COURT:  Okay.  Why, then -- okay.  Let me ask

8   this question.  When Strike 3 files a Complaint against the

9   John Doe, does it know who lives in the house?

10        MR. BANDLOW:  No, not at all.  We only know an IP

11  address.

12        MR. ATKIN:  Sorry, Your Honor, I want to interject.

13  One problem with the hypothetical with the wife and three

14  children is Strike 3 doesn't know who the subscriber is, what

15  their exact address is.  They also don't know that there's a

16  wife and three children.  So it's entirely possible that a

17  single person is alone in the house.  The only piece of

18  information we have is we know there's "a" subscriber.

19        THE COURT:  It's equally as likely that it's

20  one person, or three people, or five people.  Counsel just

21  said Strike 3 doesn't know who lives in the house, right?

22        MR. ATKIN:  Correct.

23        THE COURT:  But when you file your Complaint, what do

24  you allege in your complaint?

25        MR. BANDLOW:  We're alleging that an IP address has

1    been associated with fairly rampant copyright infringement.

2              THE COURT:  Who is the named defendant?

3              MR. BANDLOW:  It's IP address with whatever the

4    numbers are.

5              THE COURT:  No?

6              MR. BANDLOW:  Subscriber that has --

7              THE COURT:  It's the subscriber to that IP address,

8    right?

9              MR. BANDLOW:  Yes.

10             THE COURT:  That's the defendant.  The subscriber is

11   the defendant, right?

12             MR. BANDLOW:  For the purposes of at the very

13   beginning until we can get the information to see who we may

14   want to amend and actually name, yes.

15             THE COURT:  So here's my question.  We're going to go

16   through this.  Look at the Complaint in this case.  It says:

17   The defendant downloaded.  The defendant is the owner of the

18   IP address.  What basis do you have to -- not you.  What basis

19   does Strike 3 have to say that?  What basis does it have to

20   say that the owner of the IP address downloaded as opposed

21   to -- let's forget the visitor to the house, okay -- the kid

22   who lives there, or, you know, the roommate, you know.

23             I don't know if you have children, but my kids have

24   roommates in certain houses that they live, three or four guys

25   or girls live together.  You don't know who it is, right?

```
 1          MR. BANDLOW:  My children are constantly on the
 2   internet, Your Honor, yes.
 3          THE COURT:  But I guess -- we will get to --
 4          MR. BANDLOW:  I'm fairly certain they're just playing
 5   Fornite, but who knows.
 6          THE COURT:  We'll get to this.  We'll get to this in
 7   more detail.  We're going to bear down on this but --
 8          MR. BANDLOW:  I understand what Your Honor is saying.
 9   I think we're saying in our initial Complaint that the
10   subscriber is going to get us to that infringer.
11          THE COURT:  No, that's not what you say, counsel.
12   That's not what you say.
13          MR. BANDLOW:  And if -- we may need to look at our
14   Complaint and perhaps tweak what we're saying.  I do
15   understand your point.
16          THE COURT:  Do you have the Complaint?
17          MR. BANDLOW:  I don't have that one in front of me
18   right now, Your Honor, but I do agree with you.  We do say
19   it's the subscriber because that's what we're going to need
20   the subpoena to help us get the further investigation.
21          THE COURT:  So what's the basis for saying it?  What
22   is the Rule 11 basis for saying in your Complaint, in black
23   and white, the defendant, owner of the IP address, or the
24   registered owner, downloaded.  That's what it says.
25          MR. BANDLOW:  Well, there's two things and then I'll
```

```
 1   let Ms. Kennedy elaborate.  But two things I'd say, Your

 2   Honor.  A, the length of time and the amount of infringements

 3   gives us a reasonable inference that it could be the actual

 4   subscriber who's controlling --

 5            THE COURT:  Could be.

 6            MR. BANDLOW:  Yes.  And B, even the subscriber, if

 7   they are not the actual infringer, may have the ability to

 8   stop the infringement, there maybe contributory or vicarious

 9   theories that you could rely on, but you at least have a good

10   faith basis that they're under some level of control of the

11   acts of infringement.  But -- and I know Ms. Kennedy wants to

12   add to that.

13            THE COURT:  Look at the Complaint in this case.

14            MR. BANDLOW:  I do understand that, Your Honor.

15            THE COURT:  Mr. Atkin, could you pull up the

16   Complaint on your computer?

17            MR. ATKIN:  I'm trying to, Your Honor.  I don't know

18   the Wi-Fi code for the court.  I printed out everything but

19   the Complaint.

20            THE COURT:  Give that to Mr. Atkin.

21            MR. ATKIN:  May I approach, Your Honor?

22            THE COURT:  I want to pull up the Complaint.

23            And I'm not -- I just don't want you to think I'm

24   surfing the internet on Facebook.  I have the documents on my

25   iPad, so that's what I'm pulling up.
```

```
 1          MR. SCULL:  Your Honor, I'm going to let the record
 2   reflect I'm handing them a copy of my Compliant.
 3          THE COURT:  Fantastic, counsel.  So you have the
 4   Complaint.
 5          MR. BANDLOW:  I do, Your Honor.
 6          THE COURT:  There's one count in that Complaint,
 7   right?
 8          MR. BANDLOW:  Yes.
 9          THE COURT:  It's direct infringement, right?
10          MR. BANDLOW:  Yes.
11          THE COURT:  There's no allegation about vicarious
12   liability, right?
13          MR. BANDLOW:  There's no contributory or vicarious
14   claim in the complaint, Your Honor.
15          THE COURT:  Who's the named defendant in this case?
16          MR. BANDLOW:  The named defendant is John Doe,
17   Subscriber Assigned IP Address 73.160.162.60.
18          THE COURT:  That's whoever the registered owner of
19   that IP address, right?
20          MR. BANDLOW:  The subscriber of that address, yes.
21          THE COURT:  So if I am a Comcast customer, when I
22   move to the house, I signed up with Comcast, I'm the
23   subscriber, right?
24          MR. BANDLOW:  Yes.
25          THE COURT:  Okay.  So go to Paragraph 27.
```

```
 1          MR. BANDLOW:  I have it, Your Honor.

 2          THE COURT:  Let me read it into the record, quote --

 3          MR. BANDLOW:  "Defendant downloaded, copied, and

 4  distributed a complete copy of each of plaintiff's works

 5  without authorization."

 6          THE COURT:  The defendant is the IP owner, right?

 7          MR. BANDLOW:  The subscriber, yes.

 8          THE COURT:  What basis does Strike 3 have to make

 9  that allegation?

10          MR. BANDLOW:  Again, the length of time and amount of

11  infringement, reasonable inferences that come from such a

12  downloading, and if you want to add, I mean, I think that

13  that's the basis for us to at least have the ability to think

14  it's plausible that it was a subscriber and obtain further

15  information to confirm that suspicion.

16          THE COURT:  I'm giving you the hypothetical

17  situation; married couple, three kids in the house.  Is it

18  just as plausible that the wife or one of the three children

19  download -- they all live in a house.  Is it just as plausible

20  that the wife or three children downloaded the material as it

21  is the owner of the IP address?

22          MR. BANDLOW:  It may be less plausible that it's the

23  children because our research will show us the times when

24  things are being downloaded.  So you can make some inferences

25  based on children are probably not downloading at 3:00 a.m.,
```

1   perhaps.

2           THE COURT:  What?

3           (Laughter.)

4           MR. BANDLOW:  So there's other information.  I hope

5   your children are asleep at 3:00 a.m.  Mine, typically, are

6   barely hitting the hay.

7           THE COURT:  But what if they're 20 years old?

8           MR. BANDLOW:  Then maybe there's some inferences it

9   might be them or might not be.  But we start with just a

10  number and we need some further information, there's no

11  question.

12          THE COURT:  So I'm just trying to get this straight

13  in my own head.  Strike 3 knows that 31 works were downloaded

14  at this IP address.

15          MR. BANDLOW:  And the times and dates they were.

16          THE COURT:  Times and dates.  They have no idea who

17  lives there, right?

18          MR. BANDLOW:  We have no idea what the address is.

19          THE COURT:  You have no idea.

20          MR. BANDLOW:  None.

21          THE COURT:  They have no idea if the owner of the IP

22  address lives there.

23          MR. BANDLOW:  No.  I mean, we assume the subscriber

24  lives at the address where the infringement will track to,

25  yes.

```
 1          THE COURT:  That's an assumption you make, but you
 2    don't know that, do you?
 3          MR. BANDLOW:  No.  We don't know our defendant --
 4    much about our defendant.
 5          THE COURT:  If my kid has no credit history and moves
 6    to an apartment and I want to pay for his or her Comcast, I
 7    register it to my name.  I'm not living there, right?  That's
 8    a plausible scenario, right?
 9          MR. BANDLOW:  Plausible, plausible.  I think
10    unlikely.  I think the typical scenario is the subscriber in a
11    home that pays for their cable.
12          THE COURT:  If Strike 3 doesn't know who lives in the
13    residence where this IP address is, how can it allege in
14    Paragraph 27 that the owner or registered owner of that IP
15    address was the person who downloads that copyrighted work?
16    I'm trying to figure out what the basis of the allegation is.
17          MR. BANDLOW:  We think that that's the most
18    reasonable inference at least at that early point, that it's
19    the person in charge of the account, because typically people
20    in charge of accounts monitor activity that's going on on a
21    bill that they're paying for.
22          So we make some reasonable inferences that this
23    substantial amount of infringing activity -- and again, bear
24    in mind, you say 31 infringements or what have you, but
25    they've infringed a lot of other stuff, because we have their
```

1   whole history of every mainstream movie, every song, every

2   book, every video game.  We have a massive amount of

3   information of the substantial amounts of infringement they're

4   doing, so it's beyond just our works.  So it seems plausible

5   that this massive amount of infringement is being done by

6   somebody that's, you know, where the buck stops, and that's

7   usually the subscriber.

8        THE COURT:  Hypothetically, suppose defendant enters

9   their appearance in the case and files a Rule 12 motion.

10  Plaintiff's Complaint does not state a cause of action against

11  me because all the Complaint says is I own the IP address.

12       Is that sufficient under Rule 12 to make out a cause

13  of action against the defendant?

14       MR. BANDLOW:  Yes, I believe so, and numerous courts

15  have held that it is because we're at -- at Rule 12, we're at

16  the plausibility standard.  If the defendant comes in and

17  says, you know, I'm filing a motion because it was my son,

18  you're talking about a summary judgement type thing where

19  you're introducing outside facts and that might change the

20  equation.  But in a Rule 12 stage, we have enough information

21  for it to be plausible for at least -- allow us to go forward

22  and get some more information.

23       Now, certainly if -- in the real world scenario, when

24  the Doe gets the notice from the -- from their cable company

25  and it's not them, or it's the son, we're immediately going to

1    hear from them or their attorney is going to say, here's the

2    evidence that it was not me, it was my son, or it something

3    else, and we're going to go a different route --

4            THE COURT:  We're going off on a tangent, we're going

5    off on a tangent.

6            MR. BANDLOW:  But we have plausibility enough under

7    the standard, under Iqbal Twombly, for us to survive --

8            THE COURT:  Would you agree with me that there's case

9    law that sets a contrary position that merely owning an IP

10   address in and of itself is not enough to make out a cause of

11   action against alleged infringer?

12           MR. BANDLOW:  If that's all you have and have no

13   other evidence, that *Cobbler* does seem to say -- but keeping

14   in mind the procedural posture of *Cobbler*.  *Cobbler* was after

15   the subscriber was identified, name and address.  The

16   subscriber who was the head of an adult care facility was

17   deposed, documents were produced, and then the plaintiff still

18   decided to say, well, all we really know is there was

19   infringement and this guy's name is on the account.  We're

20   going to amend our Complaint and say we still get to go

21   forward, and the Ninth Circuit said, no, that's not enough.

22   That's all you have is infringement and the name, that's not

23   enough.  We'll never be in that circumstance.

24           THE COURT:  Was *Cobbler* a Rule 12 context or summary

25   judgement context?

1          MR. BANDLOW:  It was a Rule 12, but in that strange

2     position of a lot of information being known.

3          THE COURT:  Rule 12, doesn't the Court just look at

4     the four corners of the Complaint?

5          MR. BANDLOW:  It did but it also did look at that

6     procedural history of, you knew very well that all you knew

7     was the name and address.

8          And so I agree with you that we're at the stage in

9     this case, we're in the stage of, can we get the name and

10    address.  Once we get the name and address, there's no

11    question, Your Honor, we have an obligation before we file our

12    Amended Complaint under Rule 11 to make sure that we have

13    more.

14         THE COURT:  You skipped a step.  We didn't get to the

15    amendment yet.  I'm going back to the original Complaint.

16    What's the basis --

17         MR. BANDLOW:  *Cobbler* says you have enough.

18         THE COURT:  I'm sorry?

19         MR. BANDLOW:  *Cobbler* says you have enough at the

20    original Complaint.  *Cobbler* -- if you read *Cobbler* 's

21    decision, *Cobbler* agrees that it was enough for you to get the

22    name and address of the subscriber.  That *Cobbler* says very

23    specifically that that's a piece of the puzzle, that's the

24    words they used, that you're allowed to get.

25         So *Cobbler* -- we hear *Cobbler* mentioned to us in

1  these early stages of the case is a lot, and I love it when

2  it's mentioned, because it's a great case for us at this

3  stage, because *Cobbler* said, you get that information.  You

4  have a Complaint that says, I don't know who this person is,

5  but I know it's a subscriber and I want to know who their name

6  and address is.  *Cobbler* says, okay, you get the name and

7  address.

8          Once you've got that, if you amend and all you've got

9  is, I've got a name and I think infringement is happening, you

10  don't have enough.  We haven't gotten there yet.  We haven't

11  gotten the name and address.

12          THE COURT:  Are there not cases around the country as

13  long as my arm that say merely being a subscriber to an IP

14  address is not enough to make a cause of action for

15  infringement?

16          MR. BANDLOW:  I'm not aware of the length-of-your-arm

17  cases that say that.  I know *Cobbler* addresses facts that

18  relate to that issue, but I don't -- I don't think there are

19  cases that say, at least having reason to believe that

20  infringement may be happening at an IP address that is

21  controlled by a subscriber, that that's not enough to get you

22  past the initial stage to get some minimal level of

23  information.

24          THE COURT:  Would you agree with that, counsel?

25          MR. SCULL:  I wouldn't, Your Honor.

```
 1          THE COURT:  Have you cited those cases in your
 2  papers?
 3          MR. SCULL:  I haven't cited Cobbler.
 4          THE COURT:  No, not Cobbler, but other cases.
 5          MR. SCULL:  I have, Judge, I have, and clearly the
 6  trend in these cases, even the case that was recently decided
 7  in Northern California is to stop it right at the Complaint
 8  stage, because there isn't enough.
 9          Your Honor hit the nail on the head.  Looking at the
10  four corners of the Complaint is simply not enough.
11          MR. BANDLOW:  I'm not aware of any such case.
12          THE COURT:  Okay.
13          MR. BANDLOW:  In this context, in the illegal
14  downloading case, the MPAA the RIAA, we're doing these
15  lawsuits for dozens of years.  These are not new lawsuits.
16  These have been done by Microsoft, they've been done by
17  various other record companies, et cetera.  I'm not aware of a
18  ruling that says you basically can't file these lawsuits.
19          You have to understand, there's no way we know
20  anything more than an IP address, because that's the nature of
21  how BitTorrent works.  We know there's a person out there
22  hiding, masking themselves under their internet address to
23  steal our works.  We need to find out who they are.  We have a
24  reasonable basis to believe that it is the subscriber that's
25  doing it.  It's enough to get us in the courtroom door, and
```

 1   under *Cobbler*, it's enough to get us the name and address to

 2   proceed further.  No question, we have an obligation once we

 3   have that additional information to think carefully about

 4   amending the Complaint if we have enough to proceed.

 5           There is the *Glacier* case, by the way, out of the

 6   Ninth Circuit.  *Glacier* case -- the *Glacier* case, which was in

 7   a mainstream movie context, flat out says, this kind of

 8   litigation with this basic allegation is entirely appropriate

 9   under Rule 12.

10           THE COURT:  While we're on the Complaint, I have a

11   couple of questions --

12           MR. BANDLOW:  Sure.

13           THE COURT:  -- about the allegations in the

14   Complaint.  This is the form complaint that Strike 3 uses in

15   of all of its cases, right?

16           MR. BANDLOW:  Its form, with the exception of,

17   obviously, we change the IP address, the number of works, the

18   period of time, but yes.

19           And by the way, I look at these monthly and we make

20   little tweaks all the time to make sure that we're comfortable

21   with it.

22           THE COURT:  Paragraph 8.  Second sentence, small i.

23   "Defendant comitted the tortious conduct alleged in this

24   Complaint in this state."

25           What is the basis for saying the owner of the IP

1   address did the downloading?

2        MR. BANDLOW:  That is through our investigation using

3   Maxmind.  So when you have an IP address -- and I'm going to

4   let Ms. Kennedy testify about this, because she really does

5   this.  She's the one that actually does this or interacts with

6   people who do this.  Maxmind is a software that once you have

7   an IP address, you can plug it in and it will identify a

8   location within a --

9        THE COURT:  I don't mean the interrupt you, counsel,

10  but I think you're going off on a tangent, because I'm not

11  worried about the venue issue right now.

12       MR. BANDLOW:  Okay.

13       THE COURT:  Okay?  Because I know that's where you're

14  going.

15       It says, "Defendant comitted the tortious conduct."

16  That's what I'm focusing on.

17       MR. BANDLOW:  Um-hum.

18       THE COURT:  What is the basis for saying the owner of

19  the IP address did the downloading?

20       MR. BANDLOW:  I think it's the same answer I've given

21  before, which is the length of infringement -- the length of

22  time of infringement, the amount of infringement of not only

23  our works, but substantially everybody else's works.  It gives

24  us reason to believe it's plausible that it is the subscriber

25  who resides at the household that's doing it.

```
 1          THE COURT:  Is it just as plausible that someone who
 2    resides in the house did the downloading?
 3          MR. BANDLOW:  It maybe is plausible, but I think it's
 4    more plausible that it is the subscriber.  I do think it is
 5    with this significant amount of infringement.
 6          As I said, it's -- you know, I would think the person
 7    that's not on the account knows someone's may be watching the
 8    account, and if they're going to engage in that much
 9    infringement, they'd be aware that someone's going to come to
10    them and say, why am I out of data in three days, et cetera.
11          So it's more likely this massive amount of
12    infringement is the subscriber that's in control of the
13    account.  It doesn't mean it always is and we need more
14    information to confirm, there's no question about that.  I
15    don't want the Court to believe that we're saying, we know
16    slam dunk, hundred percent it's the actual subscriber.  We
17    don't.  We know that it's much more likely that it is, but we
18    need some further information to confirm that.
19          THE COURT:  But that -- but I keep on getting back to
20    Paragraph 27.  But in Paragraph 27 Strike 3 says in black and
21    white, defendant, the owner of the IP address, did the
22    downloading.
23          MR. BANDLOW:  Because we believe that it is likely
24    the subscriber.
25          If you find information that disabuses us of that
```

1    belief, we will go a different direction.

2          THE COURT:  Same paragraph, Paragraph 8:  Defendant

3    resides in the state.  You're assuming -- not "you're" --

4    Strike 3 assumes that because they registered with, say,

5    Comcast?

6          MR. BANDLOW:  Well, yes, because the IP address

7    tracks to the state, yes, and that they've registered with a

8    provider in that state.

9          THE COURT:  Defendant has engaged in business

10   activity in the state.  What's the basis of that, "business

11   activity"?

12         MR. BANDLOW:  That they have a relationship with

13   local carriers, et cetera, of that nature, yes, and that

14   they're, you know, engaging in conduct over the internet

15   within the state.

16         THE COURT:  That's the business you're talking about?

17         MR. BANDLOW:  Yes.

18         THE COURT:  In Paragraph 10, at the end, it refers to

19   defendant or defendant's agent.  This is the first time that

20   the phrase "defendant's agent," is used.  What does that refer

21   to?

22         MR. BANDLOW:  I mean, I believe it refers to the fact

23   that it may be somebody acting on defendant's behalf that's

24   doing the infringement.

25         THE COURT:  That's not what you say in Paragraph 27.

```
 1          MR. BANDLOW:  I agree, Your Honor, and I might be
 2    looking at this one a little closer next week.  I agree that
 3    maybe we should expand to say defendant or someone under
 4    defendant's control or within defendant's household.  That may
 5    be something we would be willing to consider.
 6          Again, we have a reasonable belief that it is
 7    probably the subscriber, but we also know there's a
 8    possibility it could be someone in the household.
 9          THE COURT:  I mean, if you take, you know, say, a
10    typical suburb where -- you know, I don't know what the
11    statistics show, but a family with a wife and a husband, two
12    or three children.  I guess I'm trying to understand the basis
13    for making the reasonable inference that it's the subscriber
14    that is doing the downloading rather than someone else in the
15    house, if you don't know who else lives in the house.
16          MR. BANDLOW:  See, so again, if you -- if you're
17    doing this amount of infringements, this conduct, this
18    information is uniquely in the control of the defendant.  They
19    know this information about who's doing it.  But in
20    particular, you know, if -- again, it's massive amounts of
21    infringement.
22          I've got eight- and ten-year-olds in the house, so I
23    doubt they'd be doing this, but I also have -- there are other
24    kids that are older.  If it's this massive amount of
25    infringement, it's hard to imagine that the subscriber is not
```

1  getting informed about that by their cable company, the

2  massive use of data, you're out of data, et cetera.  It's just

3  hard to believe that this massive amount of infringement would

4  not have somehow come to the attention of the subscriber

5  and/or be the subscriber that's doing it.

6         THE COURT:  Might the exact opposite be true, because

7  if someone is on BitTorrent downloading, I think it's a

8  reasonable inference that they are pretty sophisticated on the

9  computer, they may know that they could be traced, so they're

10 going to make sure that they use an ISP address that can't be

11 traced to them?

12        MR. BANDLOW:  Well, no, they're using their IP

13 address at home.

14        THE COURT:  Yes, but they're not the subscriber.

15        MR. BANDLOW:  Yes.  But that amount of activity will

16 be brought to the attention of the subscriber is what I'm

17 saying.

18        THE COURT:  Question for you:  Is there one ISP

19 address per, say, residence?

20        MR. BANDLOW:  There's one IP address per account, I

21 believe, yes.  Per account, yes.

22        THE COURT:  Okay.  So --

23        MR. BANDLOW:  There could be multiple within a

24 residence --

25        THE COURT:  So if I have a laptop, a desktop, an

 1  iPad, an iPhone in my house, do they all have the same

 2  address?

 3       MR. BANDLOW:  If they're all connected to that same

 4  provider, yes, they would all have that same IP address, yes.

 5  They might have different port numbers might come up.  There

 6  may be a way to distinguish which computer in the house was

 7  being used to do the infringement, because that will have a

 8  different port number in the hash numbers that we get in our

 9  investigation.  So there is maybe a way to determine which

10  computer in the house it's coming from.

11       THE COURT:  Okay.  I'm not sure you're the right

12  person to answer this.

13       MR. BANDLOW:  He's sitting behind me.

14       THE COURT:  I want to get this right, because I think

15  it is an important point.

16       We're still at the early stage.  IPP

17  sends its information to Strike 3 and some report comes to Ms.

18  Kennedy about, this is a frequent flyer, someone who downloads

19  a lot.  Does Strike 3 know if the downloading was done on one

20  device, two device, three device, et cetera?

21       MR. BANDLOW:  Yeah, I think we can look at that data

22  and see some information that will talk about different port

23  numbers that might give us some information about multiple

24  devices.

25       THE COURT:  Ms. Kennedy, I want to get this right.

1    Do you know the answer to this question?

2         MS. KENNEDY:  Can we see the number of devices?  Not

3    necessarily.  The information that we do get is the BitTorrent

4    program that is being used to commit the infringement.  So we

5    can see, you know, over the course of the infringement that

6    it's the same BitTorrent program.  Sometimes they'll update

7    it.

8         So again, based on all of the information before us,

9    we have a good faith belief that it is coming from one

10   computer, because the BitTorrent program stays the same,

11   unless they, you know, go through an automatic update or

12   something, over, you know, eight, nine months.

13        THE COURT:  Is that something that Strike 3 looks at

14   before it decides to file a Complaint, how many devices

15   downloaded a copyrighted works?

16        MS. KENNEDY:  We don't see how many devices but we do

17   see and look for a consistent BitTorrent program over time.

18        MR. BANDLOW:  You have to download a torrent program

19   onto a computer to use BitTorrent.  So it will have its unique

20   identifying information.

21        THE COURT:  So, again, hypothetically, there's a

22   desktop in a house, there's a laptop in a house, and there's

23   an iPad in the house.  Whoever is downloading the copyrighted

24   works would download the BitTorrent program on to the three

25   devices, correct?

1          MS. KENNEDY:  Generally, no, it's not likely that

2     someone would download it on an iPad.  It might be possible,

3     but given the size of our movies because they are filmed in 4K

4     HD and several -- you know, they are large, large files and

5     when you're talking dozens of files, it's a huge amount of

6     data.  So it's not going to be on, like, an iPad or an iPhone.

7     Desktop is -- you know, if they have a desktop, it's likely

8     or, you know, if they have a lot of storage on their laptop.

9          THE COURT:  In your experience, then, the downloads

10    that you're dealing with are mostly on desktops and laptops?

11         MS. KENNEDY:  Yes, I'd say -- I'm not going to say

12    it's completely impossible to do it on the phone or an iPad,

13    but given the amount of infringement in each case, it would be

14    highly unlikely.

15         THE COURT:  All right.  Let's put that aside now.

16         MS. KENNEDY:  Yes.

17         THE COURT:  You have a house with a desktop and two

18    or three laptops with a lot of storage on them.

19         MS. KENNEDY:  Sure.

20         THE COURT:  You get your report from IPP,

21    there's 31 downloads from the same IP address.  They all have

22    the same BitTorrent program.  Do you know how many devices in

23    the house were downloading your Strike 3's copyrighted works?

24         MS. KENNEDY:  No.

25         THE COURT:  Is there a way to find that out?

```
 1          MS. KENNEDY:  Usually, we don't find that out until
 2   we've amended the Complaint, and when we amend the Complaint,
 3   we have -- you know, we take all of the evidence and
 4   information we have, once we have the subscriber's name and
 5   form a good faith belief that either the subscriber or, you
 6   know, maybe someone else is the infringer, we allege all of
 7   that in our Amended Complaint, and once we get into discovery,
 8   we do exchange lists of, you know, hard drives and devices
 9   that could be used for a BitTorrent program, and that's part
10   of the regular course of discovery, just like any lawsuit.
11          THE COURT:  Ms. Kennedy, my goal is not to trick
12   anybody.  I just want the facts.
13          Do you know if there's a way when you get the -- do
14   you know if there's a way for IPP to identify how many
15   different devices downloaded Strike 3's works?
16          MS. KENNEDY:  No, I don't believe that's possible.
17          THE COURT:  Could you confer with the experts behind
18   you, just to confirm that's right?
19          MR. BANDLOW:  We will let Mr. Bunting answer your
20   question to the extent he can elaborate on that --
21          THE COURT:  Mr. Bunting, is that correct?
22          MR. BUNTING:  If you had, let's say, three devices
23   behind one IP address in a home and they all had the same
24   BitTorrent program, that would show, basically, that they were
25   downloads to that same program.  However, there is a client ID
```

1    associated that could be different between those three

2    laptops.  So if there were three different client IDs, then it

3    could show that there were three different devices.  So it's

4    possible.

5           THE COURT:  So again, Ms. Kennedy, my goal is not to

6    trick anyone.  You're saying there is a way to identify how

7    many different devices downloaded, say, in this case, the 31

8    works?

9           MR. BUNTING:  If they had different client IDs for

10   the software, yes.

11          MS. KENNEDY:  And, sorry, just to add on to that -- I

12   am familiar with his testimony.  From my understanding, and

13   correct me if I'm wrong, a lot of the most popular BitTorrent

14   software programs, like uTorrent, they have sometimes in some

15   cases, they have different client IDs, but from my

16   understanding and from my conversations with IPP over the past

17   few years, the clients have actually adapted to make it more

18   difficult to determine the different fine IDs that come out of

19   it.  So a lot of them are uniform now.

20          So I guess my answer to this question is, it may be

21   theoretically possible, but I don't think in every case you

22   can do it and I don't think in most cases you could do it.

23          MR. BUNTING:  That would be correct.

24          THE COURT:  So if I go and download a BitTorrent

25   program today on my laptop and tomorrow I download the same

1   BitTorrent program on my desktop, will they have different

2   identifiers?

3           MS. KENNEDY:  They may or they may not.  It depends

4   on the program and it depends on the version of the program.

5           Again, because these programs -- you know, the

6   creators of these programs, the real main point is to use them

7   for piracy, they're constantly adapting and trying to keep up

8   with ways to make it more difficult to detect the infringers

9   behind it.  And from my understanding, I'd say the growing

10  number -- the growing trend and I don't know if it's 70, 80

11  percent now, have tweaked the program so the same client ID

12  spits out even if it's different versions.

13          THE COURT:  In this particular case, there were 31,

14  during this timeframe, downloads, correct?

15          MS. KENNEDY:  Correct.

16          THE COURT:  Is it fair to state that Strike 3 doesn't

17  know how many different devices those 31 works were downloaded

18  onto?

19          MS. KENNEDY:  That's correct.

20          THE COURT:  Could be one, could be two, could be

21  three, right?

22          MS. KENNEDY:  That's correct.

23          THE COURT:  Would it be relevant to Strike 3's

24  conclusion that it's the IP subscriber who downloaded the

25  works to know how many different devices downloaded Strike 3's

1  works?

2       MS. KENNEDY:  I mean, in the broad definition of

3  relevance -- any information that we can get is absolutely

4  useful, but I will say that generally from my experience, the

5  infringer, who's, you know, is going back for our content over

6  and over again is one person.  You know, you don't often have

7  a situation where there's three people in the house and all

8  three people are downloading our movies.  It's usually

9  one person who likes our content, who's decided not to pay for

10  it, so they're getting it through BitTorrent and, you know, if

11  they're doing it through one or two or three computers, it's

12  useful information because, you know, the more information you

13  have, the better, but it's not necessarily dispositive of

14  whether or not they're the infringer.

15       THE COURT:  Does Strike 3 Holdings ask IPP

16  to try and identify that information, how many different

17  devices downloaded the works?

18       MS. KENNEDY:  Absolutely.

19       THE COURT:  Is that something you asked IPP?

20       MS. KENNEDY:  Yes, yes.  And from my understanding,

21  again, they've said, you know, there's this option where

22  sometimes you can identify it through the BitTorrent program

23  where it spits out a client ID, but because the BitTorrent

24  programs are constantly being updated to avoid detection,

25  they've realized that this is a singular identifier so they've

```
 1   made it more uniform and adopted their --

 2           THE COURT:  What happened in this case?

 3           MS. KENNEDY:  In these four cases, I don't have

 4   the --

 5           THE COURT:  No, no, no, I'm sorry.

 6           MS. KENNEDY:  -- the data.

 7           THE COURT:  Let's just focus on the one case.

 8           MS. KENNEDY:  I don't have the data in front of me.

 9   I apologize, Your Honor.  I'm more than happy to review it and

10   further brief you on it.

11           THE COURT:  Who would have that -- would IPP or you

12   have that data?

13           MS. KENNEDY:  Both IPP would and if I go back to --

14   if I -- I believe we do as well, but IPP

15   definitely does.

16           THE COURT:  Is that some information you regularly

17   get when you decide whether to file a Complaint, how many

18   different devices were used to download Strike 3's works?

19           MS. KENNEDY:  No, because again, it's -- from my

20   understanding, it's only in this one instance, and based on my

21   discussions with IPP over the last two years it's become

22   increasingly more and more unreliable because of the way these

23   BitTorrent programs are being updated.  So, you know, they

24   pretty much told me it's not useful information to rely on,

25   because you just don't know.
```

```
 1          THE COURT:  Okay.  Ms. Kennedy, let's go back to

 2   where we were.  Strike 3 gets this information from IPP,

 3   in-house people analyze the data and they find out that this

 4   particular ISP subscriber downloaded a lot of works, in this

 5   case 31.  What happens next?

 6          MS. KENNEDY:  So at that point, we do a number of

 7   different things, you know, we run the IP address through

 8   Maxmind to determine the approximate location of the IP

 9   address, we look at a few different charts based on the

10   evidence that we do have.  You know, we consider all of the

11   additional evidence that we've recorded that are infringing.

12          THE COURT:  Let's not skip over that too fast.

13          MS. KENNEDY:  Okay.

14          THE COURT:  Is it infringing evidence just as to

15   Strike 3's works?

16          MS. KENNEDY:  No.

17          THE COURT:  So tell me what you're talking about.

18          MS. KENNEDY:  Sure.  So IPP records infringement in

19   two different ways.  For us, you know, we've hired them to do

20   -- the forensically sound capture where they make a direct

21   connection with the defendant, they record forensically sound

22   PCAP evidence of the infringement being transacted and they

23   store that information.

24          They also have another program that is a general scan

25   of everything that's being downloaded on BitTorrent, and it's
```

1  a large database.

2       THE COURT:  From this particular IP address?

3       MS. KENNEDY:  From all IP addresses.  And so once we

4  have an IP address that we know is a serial infringer that

5  doesn't look they're going to stop any time soon, we

6  cross-reference that IP address with their database and we're

7  able to see a list of everything else that they're

8  downloading.

9       THE COURT:  Do they do that simultaneously or only

10 after you've identified --

11      MS. KENNEDY:  It's simultaneously.

12      THE COURT:  Okay.

13      MS. KENNEDY:  And that's important, because, you

14 know, when you're looking at the data, it's not useful.  You

15 know, once you've got an infringer that looks pretty serious,

16 then, you know, it's not very useful to start looking at

17 everything else they're downloading at that point.  You want

18 to be able to go back in time and compare what else they are

19 downloading with the same period of recorded infringement as

20 our works.

21      THE COURT:  So let's talk about the defendant in this

22 case.  Somewhere there's a record of what IPP found, that they

23 downloaded aside from Strike 3's works?

24      MS. KENNEDY:  Correct.

25      THE COURT:  And in this case, what was that?

1      MS. KENNEDY:  Off the top of my head, it's difficult

2  to recite from memory, especially not having the context of

3  knowing who the defendant is.  So really being able to go

4  through and pull out the files that are meaningful, and --

5  but, again, off the top of my head, I think there's several

6  hundred files there.

7      So it's everything from like mainstream movies,

8  software, music, e-books, things like that.

9      THE COURT:  Is this documented somewhere?

10      MS. KENNEDY:  Yes.

11      MR. BANDLOW:  Spreadsheets.

12      MS. KENNEDY:  Yeah, in the database which we pull it

13  out through an API and have it on various different

14  spreadsheets.

15      THE COURT:  So if we get into discovery in this case,

16  if the defendant wanted to request a record of everything that

17  you found, that would be available?

18      MS. KENNEDY:  Yes, absolutely.  And can I just maybe

19  give a better example just for context?

20      THE COURT:  Absolutely.

21      MS. KENNEDY:  So in a different case in the District

22  Court in New Jersey, I believe in front of Judge --

23      MR. ATKIN:  Do you want me to -- it's my case.

24      MS. KENNEDY:  Sure.

25      MR. ATKIN:  We had another case where we have named a

 1   defendant before Judge Mannion and we got into discovery

 2   before it finally settled.  And again, I'm just giving this as

 3   an example.  I don't have the evidence in front of us right

 4   now, but one of the things that IP is able to get are the

 5   different files that are being shared by the Doe.

 6           THE COURT:  I'm sorry?

 7           MR. ATKIN:  The Doe defendant.  So in this particular

 8   case, which is not this defendant, we knew a couple of things,

 9   other than just the IP address and they were located in New

10   Jersey.  We knew this Doe defendant was downloading movies

11   that had Korean language.  We knew the Doe defendant was

12   downloading movies that typically fall on a stereotypical age

13   range of men rather than women, middle aged rather than young

14   or old.  We also with this Doe defendant, we saw they were

15   downloading biomedical textbooks and of particular importance,

16   an ADA manual on how to run a dental practice.  When we got

17   the subpoena response, the subpoena response went to a dental

18   practice.  When we went on a public page doing our follow-up

19   investigation, which *Cobbler* allows, we saw that it was all

20   female employees, they were young, they were receptionists,

21   they were hygienists.  There was one dentist.  He was an Asian

22   American, he ran the company himself, and on that basis we

23   amended our Complaint and in the Amended Complaint we said

24   before what we knew -- and I know we were talking before about

25   equal plausible, equal probability.  As the attorney assigning

1   the first Complaint, I know there is one computer, the rest

2   are hypothetical.  I know there is one subscriber; the family,

3   the children, the wife, hypothetical.  I could guess, maybe I

4   could look at suburban demographics, but I know for a fact

5   there's a subscriber, I know for a fact there's a computer,

6   and when I get this additional name and this additional

7   address, we can connect up the evidence we have, we can look

8   at their social media, we can say, look, we saw they were

9   downloading, the "Avengers: End Game" movie.  We saw they were

10  downloading "Game of Thrones."  This person on their social

11  media liked "Game of Thrones," liked "Avengers: End Game,"

12  they run a dental practice, they downloaded the ADA manual on

13  how to a run a dental practice.

14          They would like mainstream movies.  We would see the

15  same mainstream movies that would be publicly liked by the Doe

16  defendant.  We would have a good faith basis at that point, we

17  believe, to amend the Complaint and proceed.  And once we

18  amend the Complaint, we do get into discovery and we hope to

19  get the hard drives for the computers.  It's likely that he's

20  the only person who is allowed to download adult films at his

21  business and if we find those same adult films on the

22  computer, then we know we have a match.  But that's a

23  discovery issue.  But that's what we use IPP's additional

24  evidence for.

25          We actually don't just get an IP address and we don't

1   just get an approximate location.  We get a profile, sometimes

2   more accurate, this one happens to be very accurate, and we

3   loved when we got that ADA manual because it really, really

4   hit a chord of who else is looking to recreationally decide

5   what a dental practice runs.

6          THE COURT:  There is some sort of profile information

7   on the IP subscriber in this case?

8          MS. KENNEDY:  Yes, Your Honor.  Again, we have the

9   full additional evidence, you know, with all of the different

10  files that they've been downloading.  We can't put together a

11  profile yet because we don't know who they are, but as soon as

12  we do get the name, we immediately look at everything and, you

13  know, do our public investigation and we can say, okay, you

14  know, they're tweeting about this particular concert and I can

15  see, you know, at the same time on the additional evidence

16  that they're downloading the album.

17         THE COURT:  Okay.  You know what was downloaded at

18  this particular IP address?

19         MS. KENNEDY:  Correct.

20         THE COURT:  Not just Strike 3.

21         Before you file a John Doe Complaint, is anything

22  done with that information?

23         MS. KENNEDY:  Yes.  We review it and we make sure

24  that there's enough unique information on there so that once

25  we do get the name of the defendant, we can tie it to the

 1    infringement, or not.

 2            THE COURT:  Who's "we"?

 3            MS. KENNEDY:  Myself, my legal team, and also I work

 4    with my outside counsel on this, as well.

 5            THE COURT:  So, however many thousands of cases you,

 6    your legal team or outside counsel look at, what was the works

 7    that were downloaded from Strike 3, plus a record of what else

 8    was downloaded?

 9            MS. KENNEDY:  That's correct.

10            THE COURT:  And how do you decide whether to file a

11    Complaint or not to file a Complaint based on that

12    information?

13            MS. KENNEDY:  Well, and also just to add to that, one

14    other piece of information we look at is based on the data.

15    We can tell down to about five minutes when they first

16    downloaded the movie and when they stopped distributing the

17    movie and we know that they actually have to be at their

18    computers at that time.  So we can also piece together a

19    pattern of activity where we can tell when they're at home or

20    not at home.  And we used that information as well to

21    determine whether we're going to file a lawsuit.  In terms of

22    the additional evidence, we mostly look for unique identifying

23    factors.  You know, "Game of Thrones" is a great example

24    because a lot of people like to talk about it on social media,

25    but it's also very common.  So, you know, we're looking for

1    more individually unique things like the ADA Guide to Running

2    a Dental Practice was a great example.  You know, we looked at

3    it and we said, we're going to get a dentist or a dental

4    office.

5           In other examples, we found people downloading their

6    car manuals.  So we know, okay, whoever is driving this, you

7    know, 2017 Honda Accord is probably the infringer.

8           THE COURT:  How about this case, offhand, do you

9    know --

10          MS. KENNEDY:  I don't off the top of my head, but

11   again, I'm more than happy to go back and review the evidence.

12          MR. BANDLOW:  We could produce that spreadsheet to

13   you right away that would show everything, if you wanted that,

14   Your Honor.

15          THE COURT:  So someone reviews it --

16          MS. KENNEDY:  Yes.

17          THE COURT:  -- someone reviews the spreadsheet, the

18   list of the Strike 3 works that were downloaded.  Is there

19   some type of check-off form that's used to say, we did this,

20   we did that, I sign off and approve this Complaint?

21          MS. KENNEDY:  Yes.

22          THE COURT:  Does it say why, or just, file or don't

23   file?

24          MS. KENNEDY:  Again, it's number of infringements,

25   length of time, number of references on the additional

1   evidence, types of files, exit and entry swarms.  So, you

2   know, we've got a period and pattern of time.  The BitTorrent

3   program -- not in every case are we going to have, you know --

4   I can't say every case is rigid where, you know, we absolutely

5   have this.  You know, we kind of look at the totality of the

6   circumstances and say, okay, you know, once we've got the name

7   of the subscriber, we can figure out who's the infringer and

8   move forward with our case.

9        THE COURT:  On this form, does it say who approved

10  filing of the Complaint?

11       MS. KENNEDY:  No, we don't have like a form where

12  someone signs off.  We've just got different people who have

13  different job responsibilities and, you know, if there's a

14  problem, they will come to me.  I am -- let's say, 60 to 70

15  percent of the time, I review everything myself, but I also

16  have a couple of other lawyers on my staff who I trust and I

17  have very good, you know, data analytics and paralegal people

18  and it's a team effort.

19       THE COURT:  So hypothetically, somebody might

20  download 50 or 75 Strike 3 works, but because of this other

21  information that the company gets, it decides not to file a

22  Complaint?

23       MS. KENNEDY:  Yeah, that's possible.

24       THE COURT:  Does the situation ever arise where

25  Strike 3 decides to file a Complaint, I don't know, John Doe

1    Complaint, it gets the subscriber information, the identity,

2    does Strike 3, as soon as it gets that name, file the Amended

3    Complaint, or it does additional investigations?

4            MS. KENNEDY:  It always does an additional

5    investigation.  Under no circumstances -- everyone on my staff

6    knows that and I believe that would firmly be a Rule 11

7    violation to just turn around and file the Complaint.

8            THE COURT:  Okay.

9            MS. KENNEDY:  I actually have -- I have at least

10   three, three and a half people that spend more than 40 hours a

11   week investigating and learning all the information they can

12   to make sure that when we amend, it's rock solid.  And we

13   even -- you know, I know the standards, plausibility, and Rule

14   11 has a strong good faith belief, but usually when we amend,

15   it's beyond a reasonable doubt, like, we've --

16           MR. BANDLOW:  We err on the side of caution.  If it

17   looks like this is a close call, we're done.

18           THE COURT:  All right.  So let me ask this question.

19   Are there situations the John Doe Complaint is filed, you get

20   the subpoena, you get the subscriber identity, you get the

21   name of the subscriber, you do your additional investigation,

22   we're not satisfied that the subscriber violates, we're going

23   to dismiss the Complaint?

24           MS. KENNEDY:  Yes.

25           THE COURT:  Are there statistics on how often that

1   happens?

2           MS. KENNEDY:  Yes.  Off the top of my head, I want to

3   say that roughly -- of all the dismissals that we make without

4   prejudice, you know, where we've decided not to move forward

5   with our case, I want to say it's roughly about 35 to 40

6   percent of the time, where it's just, you know what, this

7   isn't a battle that we want to pick, I don't feel comfortable,

8   let's pull back.

9           In most other cases and what's more common is, you

10  know, either opposing counsel will appear or we'll do the

11  research in the investigation and information will come

12  forward that -- it's a category that we call hardship and

13  either the defendant or the infringer is -- doesn't have the

14  resources to go through litigation, they're going through

15  something in their life, where we try to be -- I know, you

16  know, we actually do try to be very empathetic and we listen

17  to all the information that's given to us, so if, you know,

18  for some reason, we don't think that they could afford

19  litigation and they said they're going to stop and we can see

20  that the infringement stopped, so you know what, we're not

21  going to go forward with this.

22          Other times, they might be active duty military or

23  just have some other, you know, unusual circumstance where we

24  just say, okay, you know.

25          So there's that category of cases where we don't

1    move, as well.

2         THE COURT:  Let's take New Jersey.

3         MS. KENNEDY:  Sure.

4         THE COURT:  I think most of the magistrate judges in

5    New Jersey, when they grant the motion for expedited

6    discovery, say, before the information is revealed by -- I'll

7    use Comcast as an example -- they have to notify the

8    subscriber and if they want to object, they can object.

9         MS. KENNEDY:  Right.

10        THE COURT:  Is it true that in most cases, you don't

11   hear from the subscriber?

12        MS. KENNEDY:  No.  I'd say -- I'd say I don't have

13   the statistics off the top of my head, but we hear from the

14   subscriber a lot.  I'd say maybe 50 percent of the time.

15        MR. BANDLOW:  But by "hear from the subscriber," do

16   you mean by their counsel or by them personally?

17        THE COURT:  Either one.

18        MR. BANDLOW:  Yeah.  I mean, I think it's more likely

19   we hear from a counsel.  Very likely that we hear from the

20   actual subscriber themself.  We do get those communications.

21        THE COURT:  Approximately 50 percent of the time?

22        MS. KENNEDY:  Yes.

23        THE COURT:  Okay.  Maybe you can clarify something

24   for me.  This was an issue that came up in the Brooklyn case,

25   and I believe it was inadvertent, but I don't think this was

1    one of the cases that you did a great job notifying us of

2    cases.  I have to believe it was just inadvertent that this

3    case wasn't on the list.  So I'm with you, counsel.

4         MR. ATKIN:  I believe it was after the date of the

5    letter too, Your Honor.

6         MR. BANDLOW:  Yes, that was fairly recent.

7         THE COURT:  This judge talked about statistics that

8    Strike 3 provided in response to the Court's request and it

9    talks about 143 cases were resolved, you settled 49, dismissed

10   94.  Of the 94 cases that were dismissed, it says 50 were due

11   to Strike 3's inability to satisfy itself that Doe was, in

12   fact, the alleged infringer.  Is that a correct statement of

13   what happened in that case?

14        MS. KENNEDY:  That is correct, and just to add on to

15   that, again, we hold ourselves to a higher standard than is

16   necessary to proceed.  We probably could have proceeded in,

17   you know, I don't know how many of those cases, but in a lot

18   more.  But we're -- you know, as a plaintiff, I believe we

19   have an absolute right to decide what cases we move forward

20   with and which ones we don't.  And, you know, as legal counsel

21   for my company, I don't want to move forward with a case

22   unless I have a very, very, very high degree of certainty,

23   which is much more than what the Federal Rules require.

24        I didn't think it was fair to be punished for that,

25   and for the Judge to basically deny our abilities to, you

1  know, protect our First Amendment -- or protect our copyrights

2  and file a lawsuit.  I didn't think that was fair, especially

3  because we were just trying to be very honest and candid about

4  how we operate, and we are very cautious.

5          MR. BANDLOW:  Yeah, and let me elaborate.  He seems

6  to assume that we looked at 50 and went, boy, we got nothing

7  here, we better dismiss.  That's not true.  We looked at 50

8  and said, there's a lot here, but it's not slam dunk, and we

9  want the slam dunk ones.  We don't want to use our time and

10  resources and inconvenience somebody if we don't really feel

11  very strongly about the claim.

12          So it's not 50 that we came back and said, boy, these

13  are just complete misses.  They just didn't have enough.

14          MS. KENNEDY:  And I believe that's every client's

15  right with a lawsuit, particular before you've amended the

16  Complaint and a defendant's answered.  I've always had the

17  belief that there's an absolute right to decide whether to

18  proceed or not.  And, you know, if we chose not to, again, I

19  don't think it's fair that we're punished and we can't, you

20  know, move forward with our claims in the future.

21          THE COURT:  Are these same statistics available for

22  the District of New Jersey?

23          MS. KENNEDY:  Yes, Your Honor.

24          THE COURT:  Has any of these Strike 3 copyright cases

25  ever gone to trial?

1      MS. KENNEDY:  We currently have one in the Western

2  District of Washington, D.C. that's probably the closest to

3  going to trial.  We've -- the Judge just granted an extra

4  month of discovery, but at this point, we've -- I've gone

5  through depositions, expert witnesses.  We're in a very

6  rigorous discovery motion phase.  We're seeking the

7  defendant's hard drive, we've deposed the defendant, our

8  corporate representatives have been deposed, our tech teams

9  have been deposed and I expect it will go to trial in the

10  fall.

11      As for all of the other cases, again, we just started

12  filing these cases in October of 2017, which I know it's 2019

13  right now, it seems like a long time ago, but considering that

14  it often takes, you know, six months or so to even get the

15  name of the defendant and then move forward, a lot of the

16  cases are still in the early stages, so it just hasn't reached

17  the time to go to trial.

18      This Washington case in particular, I think, is one

19  of the first ones we ever filed.  So that's just as an

20  example.

21      THE COURT:  In the 50 cases that the judge in

22  Brooklyn talked about, do I take it that was -- well, you tell

23  me, was it after the Doe Complaint was filed or was it after

24  the amendment?

25      MS. KENNEDY:  No, it was not after the amendment.  We

1    chose not to amend the Complaint.

2            THE COURT:  Okay.

3            MR. BANDLOW:  We take that step very seriously, that

4    Amended Complaint step.

5            THE COURT:  Okay.  Well, what's done -- and I

6    apologize if you already covered this, after you get the

7    subscriber name -- maybe we haven't covered this.  What is

8    done before Strike 3 decides whether to amend because

9    presumably, that was done in this -- no, it wasn't yet done in

10   this case.

11           MS. KENNEDY:  Correct.  So after we get the

12   subscriber's name, we've got three or four different

13   paralegals on staff who take the information.  We use, you

14   know, a database system called Delvepoint, similar to

15   LexisNexis, Accurint, that gives us, you know, basic

16   information on the subscriber.  We do a complete top-to-bottom

17   internet search to get a profile of the person to see what's

18   publicly available, that information.  We never contact them.

19   We know that's not okay, but, you know, we see they are

20   LinkedIn, you see what they've posted on Facebook, Twitter, et

21   cetera, and again, you know, we basically research who they

22   are, we research who else is in the household, and we look at

23   all of our evidence and, you know, so if we've got a LinkedIn

24   profile and we see that they're a senior IT architect that

25   specializes in, say, a list of three different very, very

1    unique types of software.

2           An example, Solar Wind, it's like a high-tech network

3    analytic software.  You see that -- see their profile, we pull

4    up our additional evidence, we look at the software they're

5    downloading and we see if there's any matches.  You know, if

6    we see, oh, look, they're downloading the latest version of

7    Solar Winds, you know, okay, that's a piece of evidence that

8    makes us inclined to believe that it's the subscriber.

9           What else do we have?  And we say, okay, it looks

10   like they work from home, you know, they work remotely.  We

11   can tell that based on their LinkedIn and their job profile.

12   So then we look at the exit and entry swarms and we say, okay,

13   well, whoever is doing the infringement, was doing it during

14   the day, Monday through Friday.  So that's a good -- that's

15   another piece of evidence that we have.

16          We look at their Facebook.

17          MR. BANDLOW:  Their Twitter.  They tweet that they

18   like our movies.

19          MS. KENNEDY:  Yeah, we've had defendants who swear up

20   and down and we've got opposing counsel call us screaming and

21   yelling being, like, how dare you, you've got the wrong

22   person, drop the case now or we're going to destroy your

23   company.  And we get the name and we look at their Twitter and

24   they're tweeting to Greg, our director, saying, Hey, love your

25   movies, but can you add this star and do it, you know, in this

```
 1   way next month.

 2           It's like, all right, well, that's another piece of

 3   evidence that we think we've got the right guy.  So we look at

 4   all of that, we rate our evidence on a scale of 1 to 5.

 5   Before we amend the Complaint we again have an attorney go

 6   through all the evidence again.  We look at the orders, we

 7   look to see if there's a protective order in place, who the

 8   opposing counsel is.  If there's not a protective order in

 9   place and there's an opposing counsel in the case, we reach

10   out to them and we say, hey, we think we've got a good case

11   against your client, can you file a protective order because,

12   you know, we know that you're going to want that.  Now's your

13   time, we're going to amend the Complaint in a week.  Give them

14   the opportunity, and then proceed like we would -- like anyone

15   would a regular case.

16           THE COURT:  In this particular case, one of the

17   arguments that the John Doe makes is that if counsel accepts

18   service of process, you don't need to know the defendant's

19   identity.  I think you made that argument, right?

20           MS. KENNEDY:  I respectfully disagree.

21           THE COURT:  Tell me why.

22           MR. BANDLOW:  We can't do any investigation.

23           MS. KENNEDY:  Because then you're moving forward with

24   the Complaint and you don't know if you're satisfying Rule 11

25   and you don't know if you've got the right guy, and you're
```

1    forcing to litigate blindly which is really, really hard.

2         MR. BANDLOW:  That makes us proceed against someone

3    we may not know we have as good a case against.  It's actually

4    not in the interests of the Rule 11 injustice.  It makes us go

5    forward when what we're saying is we want to make sure it's

6    right to go forward and that information will help us do that.

7         THE COURT:  I didn't say it was a good argument, I

8    said that you made the argument.

9         (Laughter.)

10        MS. KENNEDY:  Your Honor, not once in all of the

11   other cases we've ever filed has there ever been an accusation

12   that we've done anything improper with the information that

13   we've received.  We've had very sophisticated and extreme

14   security measures to look after the data, you know, everyone

15   has access to it is under a confidentiality agreement.  We're

16   very, very careful.  We don't ever contact a pro se defendant,

17   we don't send demand letters, we don't make phone calls, we

18   don't solicit settlements.  All we do with the information is

19   make sure we've got a good faith Rule 11, you know, belief

20   that we can move forward.

21        THE COURT:  Does Strike 3 have data, generally, macro

22   data about how much of its works is downloaded?

23        MS. KENNEDY:  Yes.

24        THE COURT:  Strike 3 has been at this for a couple of

25   years now.

```
 1          MS. KENNEDY:  Correct.

 2          THE COURT:  I think it's fair to assume it's public

 3   knowledge that Strike 3 enforces its copyrights and -- like

 4   the old Napster.

 5          MS. KENNEDY:  Sure.

 6          THE COURT:  When word got out that they were filing

 7   lawsuits, you know, things changed.  Do the statistics show

 8   that these lawsuits have a deterrence effect?  Are you able to

 9   see that the number of downloads is decreasing as time goes

10   on?

11          MS. KENNEDY:  Unfortunately not, and I don't believe

12   it's not because these lawsuits don't have an impact.  I do

13   actually do believe that they have a major impact, but I

14   believe the infringement is increasing still, because our

15   company's popularity is growing and we're becoming more and

16   more mainstream and we've been, you know, with each -- every

17   few months we receive a lot more press and we're opening more

18   websites and we're doing more.

19          So, you know, we can see that our subscriber base is

20   growing, and just like our subscriber base is growing, I think

21   people are becoming more aware of our content so we're getting

22   more and more infringers as time goes on and our company

23   continues to grow.

24          I do believe it is having a deterrent effect because

25   the nature of the way that BitTorrent works.  By downloading
```

```
 1  these movies, you're distributing them at the same time.  So
 2  if I can isolate, you know, a hundred people every month that
 3  are distributing a huge pile of our movies -- and I know for a
 4  fact that when we fill a lawsuit, in almost every case the
 5  infringement stops.  It's the only thing in my entire
 6  experience as an IP lawyer and working for the company
 7  fighting piracy that actually works.  The infringement stops,
 8  and when that stops these people stop distributing our
 9  content.  And so I know that we're taking them off of
10  BitTorrent.
11          Is it the most perfect ideal situation in the world?
12  No.  But is it the best option that we have right now?  Yes.
13  And I do believe it is helping try to at least contain the
14  piracy that we have.
15          THE COURT:  Are you only getting downloading
16  statistics from the United States?
17          MS. KENNEDY:  Yes, IPP -- IPP monitors worldwide, but
18  the monthly data that I receive from them is for the United
19  States only.  I could ask them for worldwide content, but my
20  main concern right now is in the United States because that's
21  where the majority of our subscribers are based.
22          THE COURT:  The people who are downloading the
23  copyrighted works, are they getting them from subscribers?
24          MS. KENNEDY:  That's a good question.  And most
25  likely, yes, because, you know, the way our company works, it
```

1    operates like a Netflix, you know, where you can sign up for a

2    subscription, it's behind the pay wall.  You pay 29.99 a month

3    and you get unlimited access to our catalog.

4          The -- you know, if the files are winding up on

5    BitTorrent, we know that it's probably coming from someone on

6    our website.  We have a very, very sophisticated IT team that

7    runs our website.  You know, we've got 20 million visitors a

8    day in some cases, and we've looked at, okay, can we isolate

9    who these people are that are putting the movies on BitTorrent

10   and kick them off our website and bring a lawsuit against

11   them.

12         We've run a few different tests.  The best one is,

13   you know, it usually takes about, say, five minutes from when

14   we put a new movie on our website for it to wind up on

15   BitTorrent.  So we've got an isolated universe of IP addresses

16   that logged into our website and downloaded that content at

17   that time.

18         The problem is, so IPP isn't able to record the first

19   IP address to see the work, because in order for them to

20   actually capture the infringement, it has to be out there

21   already and it's just very, very -- it's next to impossible to

22   get that first IP address.  When we're looking at our world of

23   people who had access to it, we see a lot of the times IP

24   addresses that trace to China, Russia, Eastern Europe, Africa,

25   in some cases, Middle East, and we believe that, you know,

1   these pirate websites, like The Pirate Bay that people go on

2   to get the BitTorrent files, they run on advertising and they

3   make their money and they're almost in every case located

4   offshore in Russia or Eastern Europe, or somewhere, China, et

5   cetera.  And what they do is they create these logins to our

6   websites, they get a throwaway Visa, Mastercard to sign up for

7   a subscription.  They sign up to their website, get as many

8   files as they can.  We isolate it, we try to kick them off as

9   soon as possible, but they've got like a whole team of people

10  doing this because they're making billions of dollars off of

11  this and it's just constantly going back and back.

12          And, you know, we can't just block off an entire half

13  continent of people to access our website because we think the

14  piracy is coming from there, and we also know they'll find

15  another way.

16          But that's, you know, that's basically the problem we

17  have.

18          MR. BANDLOW:  It's Whack-a-Mole.

19          THE COURT:  Is there anything unique about New Jersey

20  and downloading in the cases that you don't see in other

21  states?

22          MS. KENNEDY:  Well, two things I'll say.  One, I

23  really like my New Jersey counsel, so I like working with him,

24  but New Jersey does have a higher volume than most states.  I

25  put it in the top four or five, and I think it's just based on

```
 1    population.  It's based on having people with a number of
 2    degrees that are sophisticated and, you know, they're either
 3    drawn to Philadelphia or New York City or Princeton --
 4            MR. BANDLOW:  San Francisco.
 5            MS. KENNEDY:  -- in some cases, but we do have more
 6    infringement in New Jersey than we do, say, in Minnesota.
 7            MR. BANDLOW:  States with people with lots of tech
 8    background.
 9            THE COURT:  Aside from the volume, in terms of, I
10    don't know, how it's downloaded or things you've learned
11    through your different investigations, is there anything
12    unique to New Jersey that you don't see other places?
13            MS. KENNEDY:  No, not necessarily other than the
14    volume, I'd say.
15            THE COURT:  And in terms of how you -- not you,
16    Strike 3 investigates and decides to file these cases and
17    motions, is it pretty much consistent with what you do around
18    the country?
19            MS. KENNEDY:  Absolutely.
20            THE COURT:  Okay.
21            MS. KENNEDY:  And just to add, going back to the
22    Cobbler case when that came out, you know, that's obviously
23    9th Circuit precedent, we're located in Studio City,
24    California and we saw -- first of all, we already were -- we
25    already did have in place the investigation and the high
```

1    standard of when we amend the Complaint, but when the *Cobbler*

2    case came down, it's like, okay, you know, we know we're on

3    the right track and we're doing the right thing, but now we're

4    going to get even more serious, and under no circumstances

5    would we amend the Complaint and move forward unless we have

6    really compelling evidence.  And even though *Cobbler* only

7    applies to the Ninth Circuit, we're going to apply this to the

8    rest of the country because we think this is a very serious

9    decision that we're going to listen to.

10          Going go back to, respectfully, Judge Orenstein's

11   opinion where he says, you know, in these 50 cases you decided

12   not to proceed, I'll also add, we have in a lot of our cases

13   the same opposing counsel over and over again.  They know our

14   investigative process and they know kind of the things that we

15   look for and a lot of times, you know, when they get a new

16   client comes in, the client says to them, I just got this

17   subpoena from Strike 3, I think I might be in trouble.  They

18   say, okay, make your Facebook private, delete your Twitter,

19   close down your LinkedIn, remove all of your information.

20          THE COURT:  That would be spoliation, right?

21          MS. KENNEDY:  Well, true, but again, it's not -- you

22   know, it makes our lives a little bit more difficult and,

23   again, we've got to get past that Rule 11 good faith reason to

24   amend, and if we don't have anything, but you can tell that

25   everything is private and they've been really careful, can we

```
 1   say spoliation?  I don't know.  That's sometimes a case --

 2            THE COURT:  If it's deleted, not if they --

 3            MS. KENNEDY:  Right.

 4            MR. BANDLOW:  Make it more private so we can't get to

 5   it.

 6            MS. KENNEDY:  Right.

 7            THE COURT:  I'm not sure that's spoliation.

 8            MS. KENNEDY:  But it makes it difficult.  That's, you

 9   know, again a reality that we deal with.  Do I think that's a

10   reason for us not to be able to file other lawsuits and

11   protect our copyrights?  No.  But it is a reason that we don't

12   proceed against every case.

13            THE COURT:  Let me just see if I can sort of

14   summarize, wrap up, maybe we will take a short break.

15            MS. KENNEDY:  Sure.

16            THE COURT:  Before Strike 3 files it's John Doe

17   Complaint, it has information as to Strike 3's downloads from

18   IPP and it also has sort of a history of what else that was

19   downloaded to that IP address.

20            MS. KENNEDY:  Correct.

21            THE COURT:  Anything else?

22            MS. KENNEDY:  Again, it has, has the BitTorrent

23   program.

24            MR. BANDLOW:  We know where it is because we can

25   Maxmind it.
```

1          MS. KENNEDY:  Right, we know the location because of

2     Maxmind.  We have an analysis of the entry and exit points for

3     the downloads and the distribution.  So we have, like, a rough

4     timeframe of when that person is actually at their computer

5     committing the infringement.  I think that's --

6          MR. ATKIN:  And I just want to close the door, again,

7     going back to Your Honor's point about plausibility and

8     probability and preponderance.  We know for a fact that there

9     is a subscriber and we know that they have a computer.  We

10    don't know if there's a wife and child, we don't know if

11    they're in a suburb or city necessarily.  We have a general

12    approximate location from geolocation techniques.  So we have

13    that information as well.  We know for a fact there's one

14    computer.  We know for a fact there is one subscriber.

15         THE COURT:  At least one computer.

16         MR. ATKIN:  Well, again, we -- you know, you can have

17    a thousand computers in your home, but as the attorney sitting

18    looking at the Complaint, I know for a fact, rock hard

19    evidence there's one computer.

20         THE COURT:  You know there's at least one computer.

21         MR. ATKIN:  I know there's at least one computer, but

22    if you ask me are there two, I would throw my hands up and I

23    would say, I wish I knew.

24         THE COURT:  Will there come a day, do you think, when

25    Maxmind or a company like that will be able to zero in closer

1    as to where the subscriber is located?

2         MS. KENNEDY:  That's a good question.  I hope so, but

3    I'm not overwhelmingly confident, because again, I believe the

4    people that create these file sharing programs are often one

5    step ahead of us and I think they're going to actively work to

6    make it as difficult as possible.

7         MR. ATKIN:  I'd like to address one other thing with

8    that.  I don't know that it's necessarily -- I don't want to

9    disagree with my client.  I know in the briefing here one of

10   the arguments is brought up that Maxmind itself acknowledges

11   that you can't find an exact city and state address and they

12   say a line in there about, there's a, you know, we want to

13   avoid any potential misuse and we discussed what that could

14   possibly mean from Maxmind, and one of things that I think

15   could be a concern from a company like Maxmind is, you know,

16   if you have something that's not exactly precise but you're

17   given a latitude and a longitude, I know there are things in

18   the media of things called swatting, where you could call

19   someone -- a police department to someone's house because

20   you've decided they've yelled at you in a video game, you've

21   entered their IP address in.  You decide, oh, well, Maxmind

22   showed me that exact location.  So it's almost not a good idea

23   to have a database publicly available.  I almost prefer the

24   system of having a court have the protected information of the

25   subscriber and say, you've got to satisfy the Court that

1    you've got the right person and you're doing it for a

2    appropriate purpose before I let you get a subpoena to find

3    out their name and address.

4         I don't actually want to live in a world where I can

5    just type in my IP address and it comes up publicly available

6    like my phone book and says, John Atkin lives here, and if you

7    want to go talk to John Atkin or do something to John Atkin,

8    you can absolutely find it right away.  So while I don't know

9    where the state of the technology is, I think no one would

10   disagree with the concept that we have to come here, we have

11   to ask for a subpoena, because we are seeking information that

12   is protected and should be protected and should have some kind

13   of showing, which we're hoping that we've met.

14        MR. BANDLOW:  And as a lifetime First Amendment

15   lawyer as well, there is some value to anonymity.  And to be

16   able to pinpoint an internet speaker directly to their house

17   may raise some issues with that as well.  So maybe that may be

18   the concern.

19        THE COURT:  The subpoena's issued, Strike 3 gets the

20   name of the subscriber.  Before it moves to amend the

21   Complaint, it does this social media investigation and reaches

22   a conclusion whether or not it's satisfied that the subscriber

23   is the person who downloaded, right?

24        MS. KENNEDY:  Yes.  And it does a little bit more

25   than just the social media investigation.

1          THE COURT:  What is it?

2          MS. KENNEDY:  We also look at the location of the

3    address so we can see whether or not it's, you know, a

4    residential home, whether it's a one-bedroom apartment,

5    whether it's a four-bedroom apartment, that sort of thing.

6    And we get a list of the people who reside there.  And so we

7    can say, you know, there's only one person in this house, or

8    there's, you know, there's a family with a 19-year-old son,

9    27-year-old son.  We're not sure if the 27-year-old son lives

10   at home or not.  We've got matches that actually, you know,

11   match to one person in the house, but it could also possibly

12   be this person as well.  Maybe they're both on BitTorrent but

13   only one person likes our content.

14          If we get to that situation, you know -- again, it's

15   a judgment call.  We've got enough probably for a good

16   faith-base belief to proceed, if we've got matches and got

17   someone in the house.  But if we're being super cautious, we

18   might say, you know, because it might possibly be someone

19   else, we're not going to proceed in this case.

20          MR. BANDLOW:  And also, Your Honor, I would say that

21   oftentimes prior to amending we've been dealing with opposing

22   counsel that's been providing us with information as well,

23   too.  So we have that as well.  We get some sort of early

24   discovery from an opposing counsel and they'll say, hey,

25   here's a receipt, shows I was out of town, or things like

```
 1    that.  So we put that into the mix, too.

 2           THE COURT:  Okay.  That clock is a little fast.  It's

 3    12:06.  We've been going at this awhile.  I would suggest,

 4    let's take a 15-minute break, come back, and then we could

 5    discuss how we're going to proceed for the rest of this

 6    hearing.  I don't think we're going to finish before lunch, so

 7    maybe we could talk about an appropriate time to take a lunch

 8    break.  So we can stretch our legs for 15 minutes and for that

 9    time we'll adjourn.  Thank you.

10           RESPONSE:  Thank you, Your Honor.

11           THE DEPUTY CLERK:  All rise.

12           (RECESS TAKEN; 12:06 p.m.)

13           THE DEPUTY CLERK:  All rise.

14           (OPEN COURT; 12:37 p.m.)

15           THE COURT:  Please be seated.  In discussing this and

16    thinking about it, I wonder if the best thing to do is to take

17    a break for lunch, come back at 1:45 and then we'll pick up.

18    I would anticipate we will hear from Mr. Bunting and Mr.

19    Pasquale.  Ms. Kennedy, we will give you a break.

20           MS. KENNEDY:  Thank you, Your Honor.

21           THE COURT:  Because we really didn't get into the

22    technical issues yet, and I definitely want to have time for

23    counsel to do whatever questioning you want.  It seems like

24    you have more technical questions than -- I was sort of

25    questioning on a different area.
```

1          MR. SCULL:  Your Honor, I can't imagine I'm going to

2     have more than 10 or 15 minutes with either one of these two

3     witnesses, to be honest.  I think Your Honor covered most of

4     what I was going to ask.

5          THE COURT:  Okay, good.  There's not a whole lot of

6     places to eat in Camden, but I know the cafeteria at Rutgers

7     across the street is fine.  There's a great beer garden up the

8     street whose service is really slow, so you've got to be

9     really careful.  They're really slow.  But it's great food, if

10    you have time.

11         So why don't we take a break and we'll reconvene at

12    1:45, okay?  Thank you very much.

13         RESPONSE:  Thank you very much.

14         THE DEPUTY CLERK:  All rise.

15         (RECESS TAKEN; 12:39 p.m.)

16         THE DEPUTY CLERK:  All rise.

17         (OPEN COURT; 1:53 p.m.)

18         THE COURT:  Good afternoon, please be seated.  As bad

19    as I sounded this morning, I sound worse now.

20         (Telephone rings.)

21         MR. SCULL:  Sorry about that Judge.  I apologize,

22    Your Honor.

23         THE COURT:  One of the questions this morning I don't

24    think I was clear on is whether Strike 3 had information

25    available to it that would enable it to identify how many

1  devices were associated with the IP address, with the port

2  number assist in that regard.  This might be an answer for Mr.

3  Bunting.

4         MR. BUNTING:  You can have a couple of devices

5  apparently show up, but that isn't to say one device doesn't

6  have more than one BitTorrent client running and they would

7  have different port numbers.

8         So even though you could have two different port

9  numbers and it would look like two different devices, it could

10  in reality be one laptop.  I've had one person one time

11  actually have three running when I came in.

12         THE COURT:  What's a port?

13         MR. BUNTING:  A port -- what happens is you have the

14  IP address, it's like the address of your house, if you want

15  to look at it that way.  And for each service that you have

16  running, it might be like your browser, where you're browsing

17  the internet you have a BitTorrent client running, e-mail,

18  they're assigned different ports, and so it's a way of

19  breaking up the internet traffic through these ports.

20         So a port is a number and it's assigned, let's say --

21  let's say BitTorrent has port number of 2207.  So if you had

22  -- so that would tell you that BitTorrent was configured on

23  this machine, let's say, at 2207.  This could tie it to this

24  machine, but another machine may have uTorrent running over

25  here on this one and it could have another, maybe 5405.  That

         1   could look like two devices, but in reality, it could be
         2   running on one computer.  So you can't be certain just by port
         3   numbers how many devices are there either.
         4          THE COURT:  Is that something that Strike 3 looks at?
         5   Maybe Mr. Pasquale should answer that.
         6          MR. PASQUALE:  As far as ports, not for this
         7   particular litigation, no.
         8          THE COURT:  Not for this specific case we're dealing
         9   with, right?
        10          MR. PASQUALE:  Correct.
        11          THE COURT:  Do you know if there was more than one
        12   port for this case?
        13          MR. PASQUALE:  I do not.
        14          THE COURT:  Is that something you looked at?
        15          MR. PASQUALE:  No.
        16          THE COURT:  Why not?
        17          MR. PASQUALE:  I strictly look at IP address,
        18   destination and source IP.
        19          THE COURT:  Do you work, Mr. Pasquale, on every
        20   Complaint that Strike 3 files?
        21          MR. PASQUALE:  No, sir -- no, Judge.
        22          THE COURT:  So which complaints do you work on?
        23          MR. PASQUALE:  The ones that are assigned to me.
        24   Mostly -- well, mostly for the Northeast.
        25          THE COURT:  It's done geographically?

1          MR. PASQUALE:  Not necessarily.  Cases are assigned.

2          THE COURT:  How about New Jersey?  Are you the only

3     person who handles New Jersey cases?

4          MR. PASQUALE:  I believe so.

5          THE COURT:  What do you do, Mr. Pasquale?

6          MR. PASQUALE:  I have 30 years in the industry.  I

7     primarily work with financial firms.

8          THE COURT:  I'm sorry, I wasn't clear.

9          MR. PASQUALE:  In this particular litigation?

10         THE COURT:  My fault.  This case.

11         MR. PASQUALE:  So for this particular litigation,

12    what I do is, I investigate the PCAPs that are sent to me and

13    then I adhere my signature to the declaration to ensure that

14    the information on the PCAP is correct.

15         THE COURT:  Explain for the record what a PCAP is.

16         MR. PASQUALE:  So a PCAP is a packet capture file

17    that shows -- has a timestamp.  It also has a source IP

18    address, a destination IP address, along with the protocol

19    that's being used and the action that's actually happening.

20         So a description on what's happening with that

21    particular packet.

22         THE COURT:  It's alleged there were 31 downloaded

23    works in this case.  Is there a PCAP for each of those works?

24         MR. PASQUALE:  For each case, yes.

25         THE COURT:  No, no, no.  For each of the 31.

1          MR. PASQUALE:  I'm not sure I understand the

2  question.

3          THE COURT:  Does each work have a separate PCAP?

4          MR. PASQUALE:  Yes.

5          THE COURT:  So are there 31 PCAPs in this case?

6          MR. PASQUALE:  For this particular case, I believe

7  there's four.

8          THE COURT:  I'm not understanding it.

9          MR. PASQUALE:  Okay.  So what I'm calling a PCAP is

10  an actual file that has a bunch of transmissions on it.  So

11  maybe you're referring to the transmissions, how many

12  transmissions there are within a PCAP.

13          THE COURT:  Attached to the Complaint there's a list

14  of the 31 downloaded files, correct?

15          MR. PASQUALE:  I don't have that documentation in

16  front of me.

17          THE COURT:  Counsel has it.

18          MR. SCULL:  I have it, if he would like to see it,

19  Judge.

20          THE COURT:  Yes.

21          MR. SCULL:  Are you talking about his declaration

22  that was filed with the Complaint?

23          THE COURT:  The exhibit to the Complaint.

24          MR. SCULL:  I have that as well.  I can give them my

25  Complaint if they need it again.

```
 1          MR. BANDLOW:  And Ms. Kennedy may be able to expand

 2  on this a little bit, too, since she's involved in gathering

 3  that data.

 4          THE COURT:  Those are the 31 works alleged at issue

 5  in this case, right?  Look at Exhibit A.

 6          MR. PASQUALE:  Okay, yes.

 7          THE COURT:  Have you seen that chart before?

 8          MR. PASQUALE:  It is attached to the documentation

 9  that's sent to me, but I primarily don't look at this.  What I

10  look at is the actual PCAP where the data is being

11  transmitted.

12          THE COURT:  Did you work on each of these 31 files?

13          MR. PASQUALE:  I'd have to take a look at the

14  declarations, but if I signed them, yes.

15          THE COURT:  What did you do?

16          MR. PASQUALE:  What did I do against the PCAPs?

17          THE COURT:  For example, let me pick out a number.

18  No. 5.  Okay?  What did you do with regard to work No. 5?

19          MR. PASQUALE:  Someone needs to help me out.

20          MR. BANDLOW:  He's talking about one of the works

21  alleged in the Complaint.  I think his belief of the expanse

22  of what you did is different than what he did.

23          MS. KENNEDY:  Your Honor, just to clarify, 7 Rivers,

24  which is the company that Mr. Pasquale works for, he only

25  exams the PCAP for the first line in each Complaint.
```

1          THE COURT:  Well, that's what I'm trying to get at.

2    I don't know why Mr. Pasquale doesn't understand my questions.

3    They may not be as literate as he would like, but I want to

4    make sure he's not avoiding answering my questions.

5          MR. PASQUALE:  I'm not avoiding any answers.

6          MS. KENNEDY:  And just to explain the purpose of

7    that.  All we ask his company to do is open up the PCAP that

8    IPP gives us and confirm that the IP address is correct and

9    that the date and time is correct, because that PCAP and that

10   piece of information on that line is the most important,

11   because when we send the subpoena to the ISP, that's the

12   information that they use to look up the subscriber.  So we

13   want double verification that that information is 100 percent

14   correct so there's no errors going to the ISP.

15         We do have a PCAP for all of these.  In fact, I'd say

16   with 31 downloads, we probably have, like, two or three

17   hundred PCAPs because we collect more than just the one hit

18   per movie, and we certainly provide that during discovery, but

19   for purposes of serving the subpoena, the date and time on

20   that first line is most important for us, because that's

21   what's being utilized to look up the defendant.

22         THE COURT:  Which date and time?

23         MS. KENNEDY:  On Line 1.  Yes.

24         THE COURT:  Which date and time are you referring to?

25         MS. KENNEDY:  The UTC, date and time.

 1          THE COURT:  What does that stand for?

 2          MS. KENNEDY:  That stands for the date and time that

 3  the infringement occurred.

 4          MR. BANDLOW:  Universal Time Code, I think --

 5          MS. KENNEDY:  Right.  That's Greenwich Mean Time.  So

 6  we use UTC so that there's no error in translation when it

 7  comes to time zones.

 8          THE COURT:  Is that the time that IPP --

 9          MS. KENNEDY:  Correct.

10          THE COURT:  -- checks it?

11          MS. KENNEDY:  Yes.

12          THE COURT:  Mr. Pasquale, what do you do?

13          MR. PASQUALE:  What I do is I take a look at that

14  particular PCAP where that timestamp is and confirm that a

15  transmission occurred at that time between the source and

16  destination IP address.

17          THE COURT:  How do you do that?

18          MR. PASQUALE:  Through a program called Wire Shock.

19          THE COURT:  And what does that tell you?

20          MR. PASQUALE:  It tells me the source, destination,

21  IP address and that a file has been transferred.

22          THE COURT:  Why do you only do it for the one work?

23          MR. PASQUALE:  I'm trying to understand the term

24  "work."

25          THE COURT:  That's what it's called.  It's not my

1    chart, it's Strike 3's chart.  Work.

2            MR. PASQUALE:  Okay.  For each particular work,

3    there's one work to one declaration.

4            THE COURT:  Work No. 5 on the chart, do you see that?

5            MR. BANDLOW:  On Exhibit A.  He's talking about this

6    right here.  That one.

7            MR. PASQUALE:  Okay.

8            THE COURT:  Did you do anything with regard to Work

9    No. 5?

10           MR. PASQUALE:  Yes.

11           THE COURT:  What did you do?

12           MR. PASQUALE:  What I did was exactly what I

13   described before.  I took a look at the PCAP that was sent to

14   me, and compared it to the declaration, then adhered my

15   signature to it.

16           THE COURT:  Did you do that for each of the 31 works?

17           MR. PASQUALE:  Yes.

18           THE COURT:  Well, your general counsel or the general

19   counsel of Strike 3 --

20           MR. PASQUALE:  It is --

21           THE COURT:  Hold on, hold on.  I ask the questions.

22           -- might have a different understanding of what

23   happened.  Is that right, Ms. Kennedy?

24           MS. KENNEDY:  Yes.  And I think the confusion here is

25   he looks at the PCAPs that we give him and --

```
 1            THE COURT:  I want to know -- Mr. Pasquale submitted
 2  declarations with the Court, okay?  I want to hear what Mr.
 3  Pasquale has to say, not what you have to say, okay?
 4            Mr. Pasquale, you're not under oath.  I can put you
 5  under oath.  I'm assuming that's not necessary.
 6            You said you looked at all 31.  Ms. Kennedy says no.
 7  What's the story?
 8            MR. PASQUALE:  I'm under the assumption that these
 9  are all the PCAPs that I looked at.  So I may have overstated
10  my answer.
11            THE COURT:  Do you have any independent personal
12  recollection of working on this case?
13            MR. PASQUALE:  No.
14            THE COURT:  Did you do anything to prepare for this
15  hearing?
16            MR. PASQUALE:  I took a look at the declarations that
17  were sent to me.
18            THE COURT:  Did you read your declarations?
19            MR. PASQUALE:  Yes.  They're basically the same.
20            THE COURT:  And do your declarations say anything
21  about you doing work on all 31 works?
22            MR. PASQUALE:  No.
23            THE COURT:  Then why did you tell me you did work on
24  all 31?
25            MR. PASQUALE:  As I stated before, I was under the
```

1   assumption that these works were associated with my

2   declarations.  I do hundreds of declarations a month, so it's

3   very difficult for me to say, yeah, I remember that one, when

4   you just -- I look at a series of numbers.

5           THE COURT:  The information that you received, did

6   you receive it directly from IPP or from Strike 3?

7           MR. PASQUALE:  From Strike 3.

8           THE COURT:  Were you given any instructions when you

9   did your work?

10          MR. PASQUALE:  No.

11          THE COURT:  What did you understand your assignment

12  to be?

13          MR. PASQUALE:  My assignment is to confirm the

14  transmissions for particular IP addresses going back and

15  forth, and then adhering my signature to the declarations,

16  stating that that information is true.

17          THE COURT:  Do you personally sign the declarations?

18          MR. PASQUALE:  Yes, I do.

19          THE COURT:  You know a lot more about this than I do.

20  Did you receive and analyze the PCAP for any of the works

21  listed from 2 to 31, on Exhibit A?

22          MR. PASQUALE:  Without going through the

23  declarations, I really can't answer that question.

24          THE COURT:  Didn't you look at the declarations to

25  prepare for this hearing?

1          MR. PASQUALE:  There was four declarations that were

2     sent to me.

3          THE COURT:  Did you sign them all?

4          MR. PASQUALE:  I signed them, yes, except for one.

5          THE COURT:  So is it -- in your view, is it too

6     onerous to remember what you put under oath in four

7     declarations?

8          MR. PASQUALE:  It's very difficult --

9          THE COURT:  I don't mean to be snide, but I'm just

10    shocked that you're here today and you can't answer these

11    basic questions.

12         MR. PASQUALE:  You're asking me to look at a series

13    of numbers and references and compare it to a declaration that

14    I've done maybe nine, ten months ago.

15         THE COURT:  I'm asking you to be prepared in a

16    Federal Court hearing to determine what should be done in this

17    case, Mr. Pasquale.  That's what I'm doing, okay?  That's what

18    I'm doing.  I'm not here to trick anyone or play games.  I

19    want to know the facts.

20         Is there information that you were given regarding

21    Works 1 to 31 that is not included in Exhibit A?

22         MR. PASQUALE:  I don't know if I could answer this

23    question without looking at the documentation that I've

24    signed.  Just looking at a spreadsheet with numbers doesn't

25    help me much.

```
 1              THE COURT:  Does IPP's system identify the port used
 2   by the BitTorrent client?
 3              MR. PASQUALE:  Not that I know of.
 4              THE COURT:  What do you think about that, Mr.
 5   Bunting?
 6              MR. BUNTING:  It does.
 7              THE COURT:  So you disagree with Mr. Pasquale?
 8              MR. BUNTING:  I know it tracks the port number.
 9              THE COURT:  So in your view, Mr. Bunting, IPP
10   system will identify the port used by the BitTorrent client?
11              MR. BUNTING:  The port is listed in the PCAP.
12   There's two different layers.  There's the IP layer which
13   lists the IP address, and underneath that there's the
14   transport layer or TCP layer and that's where the port is
15   specified.  I think what happens in his case, he doesn't look
16   at the next layer down because he doesn't need to, that's not
17   part of what he's doing.
18              MR. PASQUALE:  That's correct.
19              THE COURT:  Do you get the name of the -- do you get,
20   Mr. Pasquale, do you get the name of the actual BitTorrent
21   that was used?
22              MR. PASQUALE:  No.
23              THE COURT:  Is that available?
24              MR. PASQUALE:  Not that I know of.
25              THE COURT:  Mr. Bunting, you agree with that?
```

```
 1            MR. BUNTING:  The name of the torrent file itself?

 2            THE COURT:  Right.

 3            MR. BUNTING:  Is in the report, yes.

 4            THE COURT:  So that is available.

 5            MR. BUNTING:  Yes.

 6            THE COURT:  Mr. Pasquale, do you get the version

 7  number of the BitTorrent software?

 8            MR. PASQUALE:  I may, but I don't focus on it.  I

 9  don't look for that.

10            THE COURT:  Is that available?

11            MR. PASQUALE:  I'm not sure.

12            THE COURT:  Mr. Bunting?

13            MR. BUNTING:  Yes.

14            THE COURT:  Is any of that information helpful to

15  identify who's downloading the work?

16            MR. PASQUALE:  Is that a question for me?

17            THE COURT:  Well, let me ask Mr. Pasquale.

18            (Laughter.)

19            THE COURT:  I'll start with you.

20            MR. PASQUALE:  The way you would be able to identify

21  it is by ISP only.

22            THE COURT:  So you think it's irrelevant to

23  identifying the actual person who downloaded, to know the port

24  used by the BitTorrent client, the actual name of the

25  BitTorrent and the version number of the BitTorrent?
```

```
 1          MR. PASQUALE:  It's irrelevant to me, yes.

 2          THE COURT:  Mr. Bunting, is that information helpful

 3   to identifying who downloads the work?

 4          MR. BUNTING:  Eventually, it would be.

 5          THE COURT:  Is that information looked at, Ms.

 6   Kennedy?

 7          MS. KENNEDY:  Yes.

 8          THE COURT:  Before the Complaint is filed?

 9          MS. KENNEDY:  Yes.

10          THE COURT:  Before the John Doe Complaint?

11          MS. KENNEDY:  Yes.

12          THE COURT:  Who looks at that?

13          MS. KENNEDY:  Either I do or someone in my in-house

14   team.

15          Just to clarify, Mr. Pasquale, all we ask him to do

16   is confirm the date, time, and IP address to make sure that

17   the ISP is doing the correct lookup.  In terms of looking at

18   the actual data that comes from IPP, I do that with my team.

19   We don't ask him to do that.  You know, his role is simple.

20   We want to make sure the lookup is being done correctly.

21          In terms of putting together all the information to

22   identify the infringer, yes, we do that in-house, but that's

23   not something that, for us, at the beginning stages of the

24   Complaint we thought was necessary to go into a declaration,

25   or have an outside expert confirm exists.  It's something that
```

```
 1   we certainly consider and look at.

 2          But again, we just wanted 7 Rivers to make sure that

 3   the lookup is being done correctly so there are no errors

 4   there.

 5          MR. BANDLOW:  Mr. Pasquale comes in at the stage

 6   where we're asking for the subpoena of the ISP to make sure

 7   that we are asking for the correct time, date, and relevant

 8   information, so that when the ISP looks up who was the

 9   subscriber at that's moment, we know we're asking for the

10   right moment, that we've been careful to check that we're

11   asking the ISP to check that moment who was the subscriber.

12          THE COURT:  But you're only asking Mr. Pasquale to

13   look at one of 31 works?

14          MR. BANDLOW:  Yes.  So that, so that we -- well, or

15   it may be a few more, but we want to pinpoint a moment when

16   that address was downloading something, because IP addresses

17   are dynamic sometimes, they could change.  But we know at that

18   moment, that address was downloading something.  We want to

19   know who the subscriber was at this moment.

20          THE COURT:  Why doesn't Mr. Pasquale do the same

21   investigation for Works 2 to 31?

22          MR. BANDLOW:  I think you should answer that better,

23   yeah.

24          MS. KENNEDY:  Because the ISP only wants one date and

25   time to do the lookup.  They don't go through and say, okay,
```

 1  there's, you know, 31 works or 50 works, we're going to look

 2  up every single hit date.  They want one that's recent in

 3  their data retention and that's what goes on the subpoena.

 4          MR. ATKIN:  Your Honor, if I could -- I'm sorry.

 5          THE COURT:  Are you, then, on the subpoena asking --

 6  I keep on using Comcast -- to identify the subscriber on

 7  July 27, 2018, at UTC 75726?

 8          MS. KENNEDY:  Correct.

 9          MR. BANDLOW:  Exactly.

10          THE COURT:  And that's the information you get back,

11  right?

12          MS. KENNEDY:  Correct.

13          MR. ATKIN:  Your Honor, if I could just add one thing

14  to this.  This is a little bit litigation strategy.  I

15  actually ask in the beginning why we didn't subpoena the name

16  for all 31 cited in this case, in this case that I asked

17  about.  And I actually, when I contacted with Verizon about

18  this, they said, we can do that, but it's going to cost a lot

19  more money for you.  They charge us sometimes a fee to hold

20  the information or to respond to the subpoena.

21          So if we have a hundred works, I don't know if it's

22  exactly $35 off the top of my head, but they could say, you

23  could ask for the most recent, get the one that you have, and

24  then go through discovery to find out if the other ones are

25  supported, or you can spend $3500 and get every single one and

1    go through discovery and see if you've got it there.

2           So we could subpoena all of that, but we, when Your

3    Honor -- I don't know if you have a copy of the subpoena in

4    front of you, we want to know that one date in time so that

5    Verizon isn't going through every single record.

6           THE COURT:  But this is -- just so I'm career, this

7    is the date and time that IPP is on BitTorrent, right?

8           MS. KENNEDY:  Yes.  Every single one of those

9    infringement dates listed on that Exhibit A is when IPP

10   reported the defendant infringing, and we have even more.  You

11   know, we just list on the Complaint only one instance per

12   work, but sometimes there's 50 or a hundred instances per

13   work.  They report a lot of data.  But again, you know, not

14   only is it an issue of the ISP charging us every time, but it

15   would take them forever -- you know, if we asked them for

16   every single infringement on the Complaint to look it up, some

17   of our -- you know, this case only has 31.  I believe another

18   case before us has 89.  We've had cases that go up to two or

19   300.  The ISPs would simply, they would take months, if not,

20   you know, like six months or so to even get the information

21   back to us and it would delay the case forever.  You just

22   simply -- it's just not practical.

23          THE COURT:  Is it correct that IP addresses sometimes

24   change?

25          MS. KENNEDY:  Yes.

```
 1          But we also do look at evidence to the best that we
 2   can try to make sure that that's not happening in our cases,
 3   when we file Complaints.
 4          So -- and that goes back to, for example, the
 5   BitTorrent program.  If you see it's the same BitTorrent
 6   program from, you know, June 1st all the way to the following
 7   August, you know, a year and two months later, you've got a
 8   pretty good indication that it's not switching IP addresses.
 9   You can also look at the additional evidence.  If you see that
10   they're downloading "Family Guy," you know, Episode 1, 3 -- or
11   2, 3, 4, 5, 6, you know, over the course of several months,
12   you get the idea it's not dynamic.  So we actually do screen
13   for that.
14          On occasion, we have had a few instances where the IP
15   addresses have come back dynamic and it's not so much that the
16   infringer has switched midway and it's a different person, but
17   it's actually that, you know, they're infringing on two
18   different IPs, so we sue the same person twice.  And in that
19   case, you know, obviously, we will dismiss one of the suits
20   and that's sometimes why we dismiss.  It's pretty rare, but
21   then again, we screen for this stuff.
22          THE COURT:  So Work No. 1, July 27, 2018, there's
23   work No. 28 is December 3rd, 2017.  Approximately eight months
24   previous.  Is it assumed that it's the same subscriber for
25   those eight months?
```

```
 1          MS. KENNEDY:  Yes, because again --

 2          MR. BANDLOW:  Not just assumed, backed up by some

 3     evidence.

 4          MS. KENNEDY:  Right.  Because the odds that two

 5     different people using the same IP address, trace it to the

 6     same area, downloading our movies at the -- with the same

 7     BitTorrent client, and also, you know, consistently

 8     downloading the other movies on the additional evidence.

 9          (Interruption.)

10          (Off the record.)

11          MR. BANDLOW:  Your Honor, if I could, just one thing,

12     just because we want to make sure that whatever -- that this

13     is very clear what everybody does in this case.

14          So IPP does its investigation and think of it this

15     way, when an infringement is happening, they take a snapshot

16     of it and that snapshot says this work was transmitted on this

17     date and at this time, here's my snapshot.  He looks at that

18     snapshot to make sure it says that time, that date, that work,

19     to confirm that that information is accurate before we use it

20     as a basis to get a subpoena.  So it's a very limited role.

21     He's not looking at every single PCAP we have, just those to

22     make sure that we can trust what IPP in Germany is telling us

23     that they've taken that snapshot and it contains that

24     information.

25          THE COURT:  Ms. Kennedy, are you familiar with the
```

1    term "bit field value"?

2              MS. KENNEDY:  Yes.

3              THE COURT:  Is that information Strike 3 has?

4              MS. KENNEDY:  Yes.

5              THE COURT:  Does it get it from IPP?

6              MS. KENNEDY:  Yes.

7              THE COURT:  Is that examined?

8              MS. KENNEDY:  Yes.

9              THE COURT:  Before the John Doe Complaint is filed?

10             MS. KENNEDY:  Yes.

11             THE COURT:  What is the significance of that?

12             MS. KENNEDY:  The bit field value reflects the

13   percentage of the movie that has been downloaded, and it does

14   it through --

15             THE COURT:  Downloaded by the subscriber?

16             MS. KENNEDY:  Downloaded by the infringer.

17             THE COURT:  Okay.  I'm sorry.

18             MR. ATKIN:  Learned that one.

19             (Laughter.)

20             MS. KENNEDY:  And so it reflects the percentage by

21   examining -- so just to take a step back, the way BitTorrent

22   works is it breaks a movie file up into, you know, a hundred

23   or a thousand pieces and each piece has its own unique hash

24   value to it and they all, you know, have a certain order as to

25   where they go in the movie and once you download all of the

1   pieces, BitTorrent, re, you know, re-puts them back together

2   like a puzzle and the movie works.

3            So the bit field value tells you which number is

4   connected to the pieces.  So if you've got a hundred pieces in

5   the case and you've got a bit field value that goes -- that

6   says, you know, 99 or a hundred, you know that they've got a

7   full copy of the movie.

8            MR. BANDLOW:  They very likely downloaded all of it.

9            THE COURT:  What were the bit field values of the 31

10  works?

11           MS. KENNEDY:  Again, I don't have that data in front

12  of me so I can't say for sure for every single work, but I do

13  know that as a general filter, we make sure that there's a bit

14  field value that has at least I want to say between 50 and 70

15  percent, so that we know that there is a substantial portion

16  of the movie there.  And just because a bit field value, you

17  know, say for one work has 73 percent, it doesn't mean that

18  they didn't get the whole movie, it just means that IPP wasn't

19  able to get that piece from them showing that they had the

20  higher bit field value.

21           But we do examine the bit field values to make sure

22  that in every work downloaded, there is a substantial

23  percentage of it, so they can't come back and say, oh, it was

24  just the de minimus value and, you know, I downloaded it for

25  two seconds just to get a couple of pieces but I had no

1    intention of watching the movie, so then I got rid of it.

2         So we do consider that information.

3         THE COURT:  If the bit value is less than a hundred,

4    is it playable?

5         MS. KENNEDY:  Yes.  From my understanding, it is.

6         THE COURT:  In every case?

7         MS. KENNEDY:  I can't say for sure in every case.

8         THE COURT:  Mr. Bunting, what do you say?  You're the

9    expert.

10        MR. BUNTING:  Depends on the tool you're using.  Some

11   -- some viewers require a full file or some of them will play

12   partials.

13        THE COURT:  When IPP downloads -- well, goes on

14   BitTorrent, is it downloading directly from the IP subscriber?

15        MS. KENNEDY:  Yes.

16        THE COURT:  But it's not downloading if there's a

17   movie, as I understand it, it's not downloading a hundred

18   percent of the movie from the subscriber.

19        MS. KENNEDY:  That's correct, and this is something

20   that I've worked with -- for IPP for many months trying to

21   figure out if there's a way to get that full copy of the movie

22   from the subscriber.

23        Again, it's something that's theoretically possible.

24   I think, you know, they maybe did like a hundred different

25   trials and I think they succeeded once, but it's very, very,

1    very difficult because again, just the way BitTorrent works,

2    it's meant to be efficient.  So you're meant to not get the

3    whole file from one person, you're meant to get it from as

4    many people as humanly possible to increase the speed so you

5    can get it as fast as possible.  And just with the technology

6    that exists today, in some very rare cases, they can do it,

7    but it's -- it's just not something they can do on a regular

8    basis or across the board.

9            THE COURT:  So let's take Work No. 5 as an example.

10   IPP goes on BitTorrent, and this particular IP subscriber has

11   downloaded that movie.  Some of that downloaded movie is going

12   to go to IPP, right?

13           MS. KENNEDY:  Correct.

14           THE COURT:  And some of it is going to come from

15   other people who downloaded the movie, right?

16           MS. KENNEDY:  That's correct, and we can't record

17   that.

18           THE COURT:  And does the BitTorrent -- when IPP

19   eventually downloads, say, a complete copy of Work No. 5, does

20   it know how much of that download came from the particular IP

21   subscriber that we're concerned about?

22           MS. KENNEDY:  I'm not -- I'm not sure if I completely

23   understand your question.

24           THE COURT:  Okay.  Maybe -- I'll ask it this way.

25   Suppose a movie is an hour.

```
 1          MS. KENNEDY:  Okay.

 2          THE COURT:  IPP downloads the entire movie.

 3   Different portions of that movie came from different people.

 4          MS. KENNEDY:  Right.

 5          THE COURT:  Some of it came from this particular IP

 6   subscriber.  Is IPP able to tell how much of the movie came

 7   from this particular subscriber?

 8          MS. KENNEDY:  Yes.  Yes.  So they certainly, when

 9   they're tracking this infringement, they download -- they

10   download the movie once for the purposes of having that

11   controlled copy, but when, you know, they certainly get it

12   over and over and over again, because they're tracking as much

13   infringement out there as possible.  But with our data, we

14   have every single transaction where they connected with the

15   infringer labeled and what you can tell is the bit field

16   value.

17          So, you know, they're trying to connect with the

18   infringer as much as possible over and over and over again.

19   Again, because the infringer is connecting with other people,

20   they can't get them every time, but they -- you know,

21   oftentimes the data will be like, you know, you see the bit

22   field value and there will be like 5, 17, 30, 75, 89, 99 and

23   that's, you know, five or six different times that they've

24   connected with the infringer and they've gotten those

25   five pieces, which might not be, you know, a huge portion of
```

1    the entire movie, but they can see that the infringer is

2    getting all of the pieces from everyone else.

3          THE COURT:  Does IPP or Strike 3 know whether the

4    subscriber has downloaded the complete copy of, say, Work No.

5    5?

6          MS. KENNEDY:  The best way we can tell is from the

7    bit field value until of course we get into discovery and look

8    at their hard drives.

9          THE COURT:  So the bit field -- does the bit field

10   value tell you how much of the movie the IP subscriber has

11   downloaded?

12         MS. KENNEDY:  Yes.  But again, just to qualify that,

13   if, you know, the last time IPP was able to connect with the

14   subscriber, it only has a bit field value of 45 or 77, it

15   doesn't mean that the subscriber only got to 77 percent, it

16   just means that IPP wasn't able to connect with it for those

17   remaining pieces.

18         THE COURT:  So Strike 3 doesn't know whether or not

19   before discovery, whether the subscriber downloaded the

20   complete work?

21         MS. KENNEDY:  We don't know for sure whether they

22   downloaded the complete work, but we have a good faith basis

23   for believing that they do, because we can see the progression

24   growing in the bit field value.  And again it, goes back to,

25   you know, taking a step back.  The purpose of using BitTorrent

1  is to get the complete work and if they're getting -- if

2  they're going on BitTorrent and getting it 31 times, there's a

3  pretty reasonable inference that it's working and they're

4  getting the movies.  If they're going back for more and more

5  and additional new releases, something is working because, you

6  know, there isn't really a whole lot of point for just getting

7  a bunch of random unplayable pieces on your computer.

8        THE COURT:  Under BitTorrent, is it broken up into

9  hashes or hash values?

10       MS. KENNEDY:  Yes.  So there's a hash value for each

11  piece and there's a hash value for the movie itself.

12       THE COURT:  Are you able to -- "you," Strike 3 or

13  IPP, or anybody, able to tell how many of those hashes or hash

14  values that IPP downloaded came from the subscriber?

15       MS. KENNEDY:  Sure.  Again, with our data, every

16  piece of evidence that we have has a hash with it, and they

17  all came from the subscriber, because that's the IP address

18  that was identified.

19       So yes, you know -- and again, like, for one work, we

20  could have 300 connections or we could have five connections,

21  but each connection has a hash value related to that

22  particular piece that we received and the bit field value.

23       THE COURT:  In the information that we have in front

24  of us that's in the record in this case, can we tell how many,

25  in terms of seconds or minutes of each work was downloaded

1    from the subscriber's IP address?

2         MS. KENNEDY:  Possibly, but again, just based on the

3    nature of the way BitTorrent works, you know, if they

4    connected, it would depend first of all how many pieces are

5    broken up into a file.  So, you know, if you have 10 pieces

6    out of a hundred, you know, and it's -- it's a 60-minute long

7    movie, you know that that's what -- not very good at math, but

8    I'd say that's about six minutes.

9         But at the end of the day it goes back to the bit

10   field value and, you know, the reasonable assumption that it's

11   not possible to get the full copy of the movie from the

12   subscriber.  It's not even really possible to get 50 percent

13   or 40 percent directly from the subscriber because BitTorrent

14   is designed to not do that.  It's --

15        MR. BANDLOW:  That would never happen.

16        MS. KENNEDY:  It just goes completely against its

17   function.

18        But you can tell the progression and you can see that

19   they are getting more and more of the -- more and more of the

20   movie as IPP's, you know, recording the infringement going on.

21   And, you know, it goes back to the reasonable assumption why

22   else would they be getting just pieces of a movie.  It doesn't

23   make sense.

24        THE COURT:  How many pieces are in a movie?

25        MS. KENNEDY:  It would depend on the movie how

 1    many --

 2            THE COURT:  Approximately.  What's an average?

 3            MS. KENNEDY:  That might be a better question for

 4    Steven.  I want to say it could be anywhere between like a

 5    hundred or a thousand or maybe 10,000.

 6            THE COURT:  Mr. Bunting, do you know?

 7            MR. BUNTING:  I'd have to do some math in my head

 8    here.  Let's see.

 9            THE COURT:  How about copyrighted Work No. 1.

10            MR. BANDLOW:  You have to know it's a 4K, it's a

11    high-quality movie, so that changes the pieces.

12            MR. BUNTING:  Let's say if it was four gigabytes or

13    say two and a half, let's just work in round numbers, and

14    there are 250 megabytes per piece, so what's that, 410?  Or

15    depending on how -- the torrent size will be broken down into

16    pieces, but according to the best way it can be transmitted.

17    So it's not always the same size pieces.  So it's really

18    difficult to give you an answer like that.

19            But say, 20, 30, 40, 50.  Just depends on the chunk

20    size they use.

21            THE COURT:  Mr. Tobias Fieser, if that's how you

22    pronounce it, of IPP, he gave a declaration that said that

23    defendant's IP address, quote, Was documented distributing to

24    IPP servers 216 pieces of Strike 3's copyrighted movies from

25    December 3, 2017, until September 6, 2018, okay?  That's what

1    he said.

2         216 out of how many?  Is that a lot?  Is that a

3    little?  Is that 30 seconds?  Is that 10 minutes?  Is that an

4    hour?  Do we know?

5         MR. BUNTING:  Again, I don't know.  You would have to

6    look at each movie as the number of pieces assigned that were

7    broken up and then when it was actually created into a

8    torrent, and that's going to vary on the size of the movie

9    somewhat with a BitTorrent client who's doing it.

10        THE COURT:  I'm trying to understand the significance

11   of 216 pieces.

12        MR. BUNTING:  Pieces.

13        THE COURT:  That's what he said.  I don't know if

14   that's a lot, if that's a little.

15        MR. BUNTING:  How many works does that represent?

16        MR. BANDLOW:  It's all 31 works.

17        THE COURT:  Do you know, Ms. Kennedy?

18        MS. KENNEDY:  Here's what I would say to that.  I've

19   got 216 pieces documented over six-month period regarding 31

20   works.  Again, with the way BitTorrent works, they're not

21   connecting to IPP for every single time that they go to get a

22   piece.  There could be -- there could be a thousand pieces

23   we're talking about, but what it's showing is that IPP's

24   connecting with them over and over and over again.  So think

25   about how many other people this particular infringer is

1   connecting with at the same time.

2        I think what it represents is that this infringer is

3   committing a lot of infringement.

4        IPP can't get every piece.  They can't get the full

5   copy from the infringer every single time.  But if they're

6   getting -- if they're connecting with them this many times, it

7   means the infringer is on a lot -- spending a lot of time on

8   BitTorrent stealing people's content.

9        THE COURT:  Let me turn to a different area, Ms.

10  Kennedy.

11       Does Strike 3 send out DMCA notices?

12       MS. KENNEDY:  Yes.  There's two types of DMCA

13  notices.  There's the DMCA notices that go to the torrent

14  websites, to Google, to the websites.  We work with a company

15  called X Takedowns and we've been doing it long before I

16  joined, I would say August 2015, and we've sent sometimes as

17  much as tens of thousands of DMCA notices per week.

18       We send -- I think, you know, there's a Google

19  transparency report you can go in, type in "Strike 3 Holdings"

20  and it will pop up, you know, a good portion that we've sent

21  to Google, and I think there's over a million.

22       THE COURT:  What category of people to do you send

23  the notices to?

24       MS. KENNEDY:  We're sending them to the infringing

25  websites like The Pirate Bay.  We're saying, hey, get our

1    content off there, you know, we don't want people accessing

2    this.  There's, you know -- yeah, there's probably like a

3    couple dozen torrent sites that we send to routinely.  We send

4    them to Google itself to delist them from the actual Google

5    search.  So if you type in Vixen torrent, you know, you'll see

6    the freshest ones because they're always up.  But if you go

7    down in the search engine, there should be:  These links have

8    been removed based on DMCA notices.  We also do it with tube

9    sites and file lockers and anything else that could possibly

10   be infringing -- or hosting our infringing content.

11         THE COURT:  What's the purpose of sending out the

12   notices?  Hopefully --

13         MS. KENNEDY:  It's -- I mean, we do it because --

14   because if we don't, we're giving up.  But it doesn't work.

15   And it's not just us.  Like the entire content industry will

16   say that the DMCA process is broken because, you know, a lot

17   of these torrent websites, again, they're outside U.S.

18   jurisdiction.  They don't care about the DMCA.  You know, go

19   ahead and sue me, I'm in Russia.  I'll pop up again in

20   somewhere else.  You know, as soon as you get Interpol

21   coordinated with the FBI and spend a year and a half, and, you

22   know, a million dollars to get me taken down, I'll pop up the

23   next day somewhere else.  They just don't care.

24         But you have to send DMCA notices, because if you

25   don't, you're giving up.

```
 1          THE COURT:  Does Strike 3 send DMCA notices to
 2   individual subscribers?
 3          MS. KENNEDY:  We have.  We did for a period when I
 4   first started.  We used a company called Rightscorp, which, to
 5   my knowledge is the only company that -- I know the Motion
 6   Picture Association and the RIAA have different companies that
 7   they work with, but Rightscorp was the only company I could
 8   find that would do this for us, considering that we were
 9   adult.
10          We worked with them for a couple of months.  It
11   didn't do anything, and here's -- well, two things.  One,
12   Rightscorp went out of business.  So, you know, we didn't
13   really -- it just wasn't really a viable option for us.
14          But two, it didn't seem to work and the reason is
15   because when you send a DMCA notice through an ISP utilizing
16   that sort of process, the ISP automates everything.  It's not
17   like a subpoena where they have a human go and plug in that
18   line, you know, that line 1, and look up the information and
19   then send, like, a certified letter to the defendant saying,
20   hey, you're involved in a lawsuit, you're in trouble, this is
21   serious.
22          Instead, what they do is, they just automatically
23   pass on the DMCA notice to whatever e-mail address they have
24   on the account, which nine out of ten times goes to the spam
25   inbox or it's just completely ignored because there's no
```

1    penalty.

2              MR. BANDLOW:  Or, Your Honor, in the BMG Cox

3    litigation that was recently happened, it was shown that Cox

4    just wasn't even sending them, that they were throwing them in

5    the trash.  They weren't even sending them to their

6    subscribers.  So, yeah, you have to rely on -- because again,

7    the DMCA notice doesn't technically go to the subscriber, it

8    goes to the service and it says to the service, you've got a

9    bad guy using your service, you better, A, tell them to stop,

10   and B, if you get a bunch of notices from us that you got a

11   bad guy, you got problems because you're not doing the things

12   you need to do under the DMCA to protect yourself.  So you

13   have to trust that they'll transmit this

14   tell-your-guy-to-stop-message and they often don't.

15             THE COURT:  Was notice sent out in connection with

16   the defendant in this case?

17             MS. KENNEDY:  No, because I believe we filed this

18   case in 2018 and it was after we stopped working with

19   Rightscorp.

20             THE COURT:  So is the company, does it continue --

21   excuse me, continue to send out DMCA notices?

22             MS. KENNEDY:  No, I think they've completely shut

23   their doors.

24             THE COURT:  No, Strike 3.

25             MS. KENNEDY:  Oh.  We don't have a mechanism to send

1   them out through the ISPs because we just don't have a company

2   that will do that for us.  But we do send them out to the

3   torrent sites themselves and on the webs, because we have a

4   company that does that.  And that's just a lot more common and

5   easier to do.

6          Again, you know, to go through these ISPs, you have

7   to have a connection with the ISPs, you have to -- it's just

8   -- for us, we just haven't found that option.

9          MR. BANDLOW:  And just to be clear, and I know you

10  didn't mean to be unclear about your question, but we can't

11  send a DMCA notice to a subscriber.  We can send it to the --

12  to Cox or Comcast because they know who that is and we hope

13  that they say something, but we could never send it to a

14  subscriber, we don't know who they are.

15         THE COURT:  So the question would be, wasn't notice

16  sent to whoever the --

17         MR. BANDLOW:  Comcast, Cox, et cetera.  The answer to

18  that is no, it was not.

19         MS. KENNEDY:  The other reason we kind of gave up on

20  this process is I followed very closely, for many years, the

21  efforts by the Motion Picture Association and the RIAA, and

22  they worked with all the main internet service providers to

23  create the system called Six Strikes.  And that's essentially

24  what it was, was, you know, you send the notice to Comcast and

25  Comcast has this six strikes system in place where they will

1   send an e-mail to the subscriber and after the second or

2   third, it gradually, you know, the warnings get more and more

3   intense or severe and I think after the sixth strike they'll

4   maybe slow down the internet for 10 minutes and, you know, a

5   red stop sign will flash.

6          They did this and they invested an enormous amount of

7   resources in it.  They did it for four or five years and they

8   waved their white flag and said, this is a colossal failure,

9   it's not stopping infringement.  If anything, infringement's

10  gotten worse because we're limited in our resources here and

11  the subscribers are, like, oh, nothing's going to happen, so

12  you know what, now I'm definitely going to infringe because

13  there's just no penalties.

14         THE COURT:  Does Strike 3 take any other action aside

15  from filing these copyright suits to prevent or deter

16  downloading of its copyrighted works?

17         MS. KENNEDY:  We've looked into a number of different

18  solutions.  You know, we've taken a bit of a different path

19  with tube sites, for example.  There's a lot of tube sites out

20  there that were pirating our content and we were able to have

21  some pretty heavy negotiation was them, you know, in

22  settlement discussions, where it's like, if you don't cut it

23  out and filter out this infringing content and start paying us

24  some royalty, we're going to sue you type discussions, and

25  we've come to voluntary agreements with various tube sites

1    where they'll pay us a royalty, they'll only have full copies

2    of our movie behind pay walls, they'll get rid of all the

3    infringing content.  Voluntary agreements like that.

4            As for BitTorrent, we send the DMCA notices to the

5    BitTorrent sites.  To the extent that works, you know, I don't

6    know.

7            But we've talked about -- you know, I was --

8    candidly, off the -- well, but, you know, two weeks ago, I was

9    speaking with the head of antipiracy for Universal Music Group

10   and we're talking about collaborative efforts that we could

11   look at together, you know, against some of the bigger

12   players.  But when it comes to doing major, major lawsuits

13   like, you know, the record industry or the motion picture

14   industry, we don't have those resources.  Unfortunately, our

15   industry doesn't have those resources.  So we're doing

16   everything that we can.

17           Going back to what I said earlier, this is the only

18   way that I've experienced that actually makes the infringement

19   stop.

20           THE COURT:  Does Strike 3 have available to it any

21   avenues in state court to deter or prevent the downloading

22   that it could use against someone like the defendant in this

23   case --

24           (Interruption.)

25           MS. KENNEDY:  To answer your question, regarding

1    state court, I would have to say maybe.  It's something that I

2    actually do have my legal team researching, but I don't --

3    Strike 3 hasn't -- I don't know for sure.

4            MR. BANDLOW:  It's still a litigation remedy.  It's

5    just a way of getting to some information a little quicker and

6    easier, but it would ultimately be so that you can bring a

7    litigation from it.

8            MS. KENNEDY:  We're exploring as many different

9    outlets and laws out there that, you know, we can utilize to

10   try to do this.

11           THE COURT:  Well, the reason I ask that is because

12   part of Strike 3's argument, why it needs the discovery in

13   this case is there's no other way to get it.

14           MS. KENNEDY:  Right.

15           Traditionally, you know, we -- traditionally, we look

16   at it as copyrights, you know, it's a federal question, it's a

17   federal right.  You know, the Cable Communications Privacy Act

18   says that in order to get the name and address, name of the

19   infringer, you need a court order, because copyright is a

20   federal issue, we should file in federal court.  To the extent

21   that some state courts may have various different discovery

22   type complaints available, I don't know if -- I don't know if

23   it would work -- I don't know if it would be proper or not.

24           It's certainly something we're looking into it, but

25   as of right now, all I know is that the Federal Court is the

```
 1   only way for sure.

 2          MR. ATKIN:  Your Honor, and also, I don't mean to

 3   actually help out the other side too much, but it allows for a

 4   bit of a uniformity, too, in the procedure, not that these

 5   other cases, you know, we were discussing control us

 6   necessarily, but it would be more of an issue if we had, well,

 7   New Jersey allows you to do X and Pennsylvania allows you to

 8   do Y.  It makes it a much more -- bigger procedural hurdle for

 9   even defendants to figure out where they're at, whereas if

10   we're operating under the same Federal Rules maybe with local

11   rules it allows a little bit more of uniformity to know what

12   we're expecting.

13          THE COURT:  Well, I think I have talked enough so far

14   today, and if there's no objection, I was going to turn the

15   floor over to defense counsel.

16          MR. SCULL:  Your Honor's covered just about

17   everything I would have asked in my questioning of Mr.

18   Pasquale and Mr. Bunting.

19          The only thing, I do want to make a couple of

20   arguments that -- and that's this:  I've heard a lot of --

21   I've heard a lot of, well, you know, we just suppose that it's

22   somebody at that address, we suppose.  And in the beginning of

23   this, of this hearing, Your Honor hit on a lot of key points

24   and that is, all you have is one snapshot in time.  You don't

25   know how many people are on that IP address.  There's
```

 1    absolutely no way of telling who was there, when they were

 2    there, what they were doing when they were there, what torrent

 3    program or which individual using the torrent program

 4    downloaded any of this content.

 5              THE COURT:  Is that a trial issue, though?

 6              MR. SCULL:  Is it a trial issue?  I don't know that

 7    it is.

 8              THE COURT:  Look at the procedural context that we're

 9    in now.  We're not here to decide the merits of the case.

10              MR. SCULL:  Correct, correct.

11              THE COURT:  We all know that, we all agree on that,

12    okay?

13              Are your arguments directed more to the merits of the

14    underlying case?

15              MR. SCULL:  Well, that argument is, Judge, I guess

16    you could look at it that way.  And Your Honor asked questions

17    about the packets and the moments in time.  You know, IP

18    addresses change all time.  They admit it as much in their

19    testimony.  IP addresses change, subscribers change.  This IP

20    address that we're looking at here could have gone through

21    four or five different subscribers, but they only looked at

22    one packet of information.

23              In all of these files that they alleged were

24    downloaded by this IP address, they looked at one packet of

25    information, one snap, one moment in time.

1          This could have been more than one moment in time.

2    It was obviously more than one moment in time and there could

3    have been a different subscriber at packets No. 2 through 31.

4    It doesn't necessarily mean it's the same subscriber.

5          So -- or the same subscriber had that IP address in

6    all of those snapshots.

7          With respect to the DMCA notices, Mr. Bandlow said,

8    well, you know, we don't send to 17 individual subscribers, we

9    would send them to the ISPs.  But they didn't send any to the

10   ISPs in any of these case.  They didn't send them to the ISPs.

11         THE COURT:  Is that true?

12         MR. SCULL:  They didn't send them to Comcast.

13         MS. KENNEDY:  For the DMCA notices, again, it goes

14   back to we tried to do it with Rightscorp, they went out of

15   business.

16         THE COURT:  So there's no DMCA notice send to Comcast

17   advising Comcast, stop subscriber 76.116.361.90 from

18   downloading?

19         MR. SCULL:  Or, and I quote, we will have a bigger

20   problem with you.  That's exactly what Mr. Bandlow said.  They

21   could have sent these DMCA notices to Verizon, to Comcast,

22   whoever these ISPs were, but they didn't do it.

23         And, you know, the other thing is, they could have

24   stopped the downloading of the content right at the beginning

25   had they sent the DMCA notices.  No, instead, they let IPP

1    go for a period of six months knowing that at some point in

2    time, there was content and allow more content allegedly to be

3    downloaded, when they could have in the beginning of this sent

4    the DMCA notice to Comcast saying, your subscriber at this IP

5    address is downloading this information and we want it

6    stopped.

7           THE COURT:  So let's take whatever you said as true,

8    accept it at face value.  How does that impact the Court's

9    decision whether they should get the discovery they request?

10          MR. SCULL:  Part of their argument is that they

11   cannot stop the theft of their content without actually filing

12   suits to do so.  That's the crux -- that's the crux of their

13   argument.  We have to file suit to stop all of these

14   infringements when, in the beginning of this, they could have

15   sent the DMCA notices, notified -- and according to --

16   according to Ms. Kennedy, you know, it's effective if you put

17   somebody on notice, they see that the content infringement

18   stops.  They could have stopped that content infringement in

19   the beginning, had they put them on notice.  That's my point.

20          THE COURT:  Do they -- you would understand the

21   statute DMCA better than me at this point.

22          Suppose they ask Comcast to send these notices and

23   Comcast ignored them.  Does Strike 3 have any relief against

24   Comcast?

25          MR. SCULL:  If Comcast -- I think they would if

1    Comcast allowed the conduct to continue.  Honestly, Your

2    Honor, I don't know, but I don't know why they wouldn't have

3    relief.  If Comcast knew that this was occurring and had

4    notice that this was occurring and allowed it to continue to

5    occur, why wouldn't they have a right against Comcast?

6            THE COURT:  Can I just stop you there.  I'd like to

7    hear Ms. Kennedy's or counsel's answer to this question.

8            MR. BANDLOW:  Yeah.

9            THE COURT:  Suppose the notice is sent to Comcast,

10   DMCA notice, stop subscriber, et cetera, et cetera, from

11   downloading our copyrighted works.  Comcast takes the letter,

12   puts it in the drawer and does nothing.  Does Strike 3 have

13   any relief?

14           MR. BANDLOW:  We had relief before that.  So, let me

15   back up, because I'm a little bit of a DMCA expert, so I want

16   to give you a bigger picture.

17           The DMCA in these cases is a gigantic red herring,

18   total red herring.

19           THE COURT:  The defendant doesn't think so.

20           MR. BANDLOW:  Everybody brings it up, it's a complete

21   red herring.  The DMCA was enacted to deal with

22   intermediaries, solely.  The DMCA was enacted to, quote

23   unquote, save the internet because what was happening was

24   people like YouTube were allowing user-generated content to be

25   posted to their sites so that people could exchange

1   information.  But, of course, what do people start immediately

2   doing with YouTube?  Loading up other people's copyrighted

3   works.  And that -- if a regular YouTube site showing a video

4   is a copyright infringement, so the content provider -- the

5   YouTubes of the world went to Congress and said, look, if

6   we're going to get sued every time a user uploads content,

7   it's going to kill the internet.  And Congress said, you're

8   right.  So what we're going to do, we're going to give you,

9   intermediary, a safe harbor.  The DMCA gives you a safe harbor

10  and it says, look, you won't get sued for copyright

11  infringement as long as you have the notice in takedown

12  provision.  As long as you allow people to say, hey, that's my

13  content somebody ripped off and put up on your system, please

14  take it down, and you follow that.

15        If you have that process in place and you follow it,

16  you get some immunity from copyright infringement liability.

17  It has zero to do with that ultimate uploader and downloader.

18  They're the direct infringers, they have liability no matter

19  what.  So we're not required to do DMCA notices so that we can

20  go sue BitTorrent infringers.  The legislative history makes

21  it a hundred percent clear that you don't have to do DMCA

22  notices to preserve your right to go sue the ultimate

23  downloaders and distributors.  All DMCA does is say to

24  Comcast, we're not going to kill you if some other people --

25  like using the phone, it's like if I defame somebody over the

1    phone, you don't get to sue AT&T; they were the conduit.  Same

2    thing here, Comcast gets to say, I'm just a conduit and as

3    long as I'm willing to take your notices and take stuff down,

4    I should get some immunity.

5         So the fact that a DMCA notice was or was not sent

6    here really is entirely irrelevant.  It doesn't stop us from

7    suing his client or anybody else that's distributing and

8    downloading our works.

9         That being said, the answer to your question is, if

10   we keep sending notices to Comcast and develop evidence that

11   they're taking them and chucking them in the trash or doing

12   like Cox was -- in the BMG case, Cox was doing this, all

13   right, we've got ten notices on this guy, your service is cut

14   off.  Five minutes later, it's back up.  That's what they were

15   doing.  They said, we've cut you off, okay, five minutes

16   later, back on.

17        Because the cable companies don't want to sort of get

18   rid of their subscribers, that's where their money comes from.

19   So there is an issue there.  The point is, yes, if Comcast

20   kept getting and ignoring them, then they've blown their safe

21   harbor and we could, theoretically, go sue them, but it would

22   have nothing to do with whether we can go get the ultimate

23   downloaders that Comcast is servicing whatsoever.

24        So DMCA notice is really a red herring.  It doesn't

25   prevent us from going after anybody we want to go after who's

```
 1   sitting in the basement downloading all our works and
 2   distributing them to the world.
 3           THE COURT:  Suppose Comcast -- let's take the exact
 4   opposite situation.  Comcast gets the notice from Strike 3 and
 5   says, I want to stop this.  I don't want one of my subscribers
 6   downloading copyrighted works from Strike 3.  What can it do?
 7           MR. BANDLOW:  They can shut them off.  Say, you no
 8   longer can use our service.  They could send warnings, that
 9   would help, but of course those get ignored.
10           We have a case right now that we're litigating where
11   the defendant got DMCA notices to their internet service
12   provider and ignored them.  They ignore them.  But, yes, if
13   Comcast, Comcast could shut them off, they would go get
14   another subscription service somewhere else.  But, yes, they
15   could cut them off.  And empirically, as I said, through
16   litigation it's been found, they're not.
17           THE COURT:  And under the statute, they would get
18   immunity from that.
19           MR. BANDLOW:  They're motivated to -- and, in fact --
20   look, a lot of the Comcasts of the world -- it's funny, we
21   keep using Comcast.  Comcast is great in terms of getting us
22   subpoena responses and stuff because they know, they want to
23   give us information and not blow their DMCA immunity.
24           THE COURT:  I want to just say for the record, you're
25   the first person I ever heard say --
```

```
 1          MR. BANDLOW:  Comcast is great?  Well, it's not my
 2   subscriber, so I don't know how awful it is.
 3          THE COURT:  Spoken from someone who had a Comcast
 4   issue yesterday.
 5          MR. BANDLOW:  The point is, is that they get that --
 6   if there's an appearance to people like us that, eh, we're not
 7   taking your infringement stuff seriously, they risk blowing
 8   their immunity.  So there may be some motivation to look like
 9   they're taking it seriously, but there's the other motivation
10   of, to really truly take it seriously, we're going to have to
11   ding a lot of our customers and we're not so sure we want to
12   do that.  So it's not really effective.
13          THE COURT:  So is Strike 3's beef with whoever their
14   provider -- ISP is, people like Comcast, and not this
15   unidentified subscriber?
16          MR. BANDLOW:  No.  Our beef is with the three to
17   400,000 different people a month that are downloading and
18   distributing our content.  That's our beef, because the
19   Comcasts of the world aren't going to stop it.  What we have
20   found is, the way to stop it is to send the message that, if
21   you download and distribute our content, it's going to put you
22   in court.
23          MR. ATKIN:  Your Honor, if I could add something to
24   this.  I just noticed an interesting intersection between this
25   morning, what we were talking about, subscribers versus
```

1    infringers.  What we're hypothetically talking about is

2    wouldn't it be wonderful if we had a tool, we could write to

3    Comcast -- I don't know if you're a Comcast case, but we could

4    say, you know, this subscriber has an IP address, we think

5    there's an infringer there, shut the internet down in their

6    house, and Comcast would run out and say, heavens no, shut it

7    down.

8            In your hypothetical case, Judge, where there is a

9    father and a mother and three kids and one of those is a

10   college-aged son who's doing the downloading, we've just

11   unilaterally come out and shut down the internet for an entire

12   family, where under our version, if we did DMCA notices, yes,

13   they would start to hear about it and maybe if men were

14   angels, they would say oh, I've gotten a DMCA notice, I need

15   to get my own house in order, I need to find out who is doing

16   it, I'm not going to just throw it up in the garbage.

17           But our version of it and the real world version we

18   have is, we know a subscriber exists, we know a house exists,

19   we know a computer exists, and we'd like to get some more

20   information to find out if it is the son.  We just don't want

21   to shut the internet off.  We don't want to just say, hey, we

22   know that it's happening out of this IP address, turn that

23   thing down.  Because there's hypotheticals out there where it

24   could not be that exact situation, and I think that's -- I

25   just wanted to raise that as an interesting parallel.

1      THE COURT:  Is there something short of discontinuing

2  service that Comcast could do?

3      MR. ATKIN:  Well, I think Mr. Bandlow talked about

4  that you could send notices, which sounds to me would be short

5  of just shutting down the lights.

6      MR. BANDLOW:  And the other thing to keep in mind, if

7  you're saying, well, you know, if Comcast could do X and

8  Comcast could do Y, and that should solve the problem, you're

9  basically saying, so the infringer gets a free pass.  The

10  infringer gets a pass.  Because we know the infringer did

11  something bad, that's why Comcast is saying cut it out.

12      You're basically saying all these people get to

13  infringe and we have no remedy against them, and the Congress

14  specifically said the opposite.  You still have that remedy

15  against those individual infringers, regardless of DMCA.

16  You're not -- DMCA isn't a free pass to the infringers, it's a

17  free pass to the conduit and that's all.

18      MR. ATKIN:  It would also be interesting to add, this

19  is not so much to brown nose the Court, but such a series of

20  events would remove the Court's oversight.  It would be

21  private company Strike 3 calls up private company Comcast and

22  says, we're threatening you, take down this internet, send out

23  threatening notices, no judicial oversight whatsoever.

24      The fact that we're having this hearing today shows

25  that the due process rights are there, that we have to go

1     through this.  You know, I hate to sound like the founding

2     fathers are so great, but this inefficient system, we have to

3     show up, we have to file a Complaint, we have to show good

4     cause, we have to convince the Court that good cause is there.

5     I think there's a value to that.

6           THE COURT:  We're going to turn the floor back.

7           MR. SCULL:  Remember what they argued in the

8     beginning?  They're only interested in the most egregious

9     people that do hundreds, hundreds of downloads in a month.

10    That's what they told you, that's what they said.  But the

11    bottom line here is, Judge, you stop that right away if the

12    you send something to the ISP.  If you send something to the

13    ISP, you can stop that -- you can stop it in its tracks.  So

14    those arguments really ring pretty deaf.

15          And then you have your remedy with the Court which is

16    one or two downloads.  I mean, really, that's what -- that's

17    on -- those two arguments, I'm sorry, but they just don't fit.

18          THE COURT:  Can the ISP remove from a subscriber's

19    computer downloaded copyrighted work?

20          MS. KENNEDY:  No.

21          THE COURT:  Ms. Kennedy, you're shaking your head.

22          MS. KENNEDY:  No, Your Honor, I don't believe they

23    can because the ISP doesn't have access to an individual's

24    computer, it just has access to their internet.

25          THE COURT:  When you settle your -- when Strike 3

1    settles its cases, what does it do about the works that have

2    already been downloaded?

3         MS. KENNEDY:  It depends.  I mean, in most cases --

4    in a lot of cases they've already deleted them by the time it

5    gets to settling.  But generally, of course, you know, we do

6    ask that they remove it.  But at the end of the day, if

7    they're settling and they promise to never do it again, and

8    are aware of the consequences and they're settling, you know,

9    we're not going to go on to their computer and say, get rid of

10   all the movies you have, because that's just --

11        MR. BANDLOW:  I've done most of the settlements, so I

12   can add to that.  I think the vast majority of our settlements

13   at least the default terminology is, you are to destroy and

14   get rid of any content.  I've had occasional opposing counsel

15   that have said, you know, my guy's paying you some money, can

16   we keep this stuff?  And we said, okay, it makes some sense to

17   that, if he's paying a significant chunk of change and he

18   wants to keep it, I guess he can.  But usually, they agree to

19   an order that they have to destroy it.

20        THE COURT:  Does Strike 3 verify that it's been

21   destroyed?

22        MR. BANDLOW:  I don't know that we've been aggressive

23   about sort of verifications.  Our key -- look, our primary

24   objective is to make sure they don't do it again.

25        THE COURT:  On Strike 3's websites, does it give

1    notice of its copyright claim?

2            MS. KENNEDY:  Yes, there should be under the terms

3    and conditions, this content is copyrighted.

4            There should be a page on the website that lists this

5    information and states that it's copyrighted.

6            THE COURT:  How many different websites does Strike 3

7    have that works are downloaded from?

8            MS. KENNEDY:  We currently have five websites.  In

9    this -- in this case, in this Complaint at the time it was

10   filed, we only had three or four -- actually, sorry, we

11   currently have six websites.  I believe there's only three or

12   four at the time this Complaint was filed.

13           THE COURT:  Is Strike 3 able to tell from which

14   website the download came from?

15           MS. KENNEDY:  Yes, because each website has specific

16   types of movies and you can tell based on the movie which

17   website it came from.

18           THE COURT:  Does Strike 3 use the same copyright

19   notice on each website?

20           MS. KENNEDY:  Yes.

21           THE COURT:  Tell me, is it on the bottom of the page,

22   the home page, or every page?

23           MS. KENNEDY:  I believe it's on our terms and

24   conditions.  It should be on the bottom of the page.  I know

25   -- I've certainly asked them to put it on the bottom of the

1    page, but I can't say off the top of my head right now whether

2    it's on the bottom of the page.

3           MR. BANDLOW:  It's in the terms of use when you sign

4    up for an account.

5           MS. KENNEDY:  And like whenever we sell a DVD,

6    because we're also the No. 1 seller of adult DVDs.  At the end

7    of the thing it says, Circle C Copyright, 2019, Strike 3

8    Holdings, LLC.

9           THE COURT:  I had a question for you, counsel.  As I

10   read your papers, I thought you were making two general

11   arguments.  Maxmind is not accurate, the reliability of the

12   data plaintiff relies on, quote, is called into question,

13   close quote.

14          Are those the arguments you're making in support of

15   your motion?

16          MR. SCULL:  Correct, Your Honor.

17          THE COURT:  All right.  What data are you alleging is

18   not reliable?

19          MR. SCULL:  The underlying data from IPP,

20   Your Honor.  The certification of the reliability of the data

21   from IPP came from Mr. Bunting.  Mr. Bunting, is not a

22   software engineer, Mr. Bunting's credentials don't make him a

23   software engineer.  I don't know that he's ever examined the

24   source code or verified the source code of that -- of the IPP

25   software, and in reviewing the Seattle, Washington case and

1    the expert reports in the Seattle, Washington case it calls

2    into the accuracy of the IPP software.  Those were based on my

3    arguments.

4          THE COURT:  And what is it about Maxmind that you

5    have difficulty with?

6          MR. SCULL:  According to the Maxmind website, the

7    website itself says, don't rely on this geolocation

8    technology, okay?  The website itself calls into question

9    reliance on its own technology.  Call it a disclaimer, call it

10   what you want, but when you look at that, Judge, you've gotta

11   wonder why they're telling you -- I mean, they're telling you

12   right on the website, don't rely on this because it's not

13   reliable.

14         THE COURT:  The argument they make is that in this

15   case it was accurate, right?  Is that what you said?

16         MR. ATKIN:  Your Honor, if I can add one thing, too.

17   The part that counsel is referring to on the website that

18   says, don't rely on it, it was a disclaimer to, as we

19   discussed before, don't try to find a street address with

20   this, we have to go get a subpoena.

21         But also, it talked about taking down two databases,

22   which I have notes here, GeoIP, and GeoIP2 Lite, which are not

23   the databases that Strike 3 uses.  Strike 3 uses geolocation

24   precision services, too, I believe.  I may be misstating it.

25         MS. KENNEDY:  We use the one with the highest

1   accuracy.

2         MR. ATKIN:  What Mr. Bunting hasn't been able to

3   testify to yet is that it's the same technology that law

4   enforcement uses as part of the Wyoming Toolkit to prosecute

5   internet crimes.

6         So the idea that Maxmind is not reliable is, yes,

7   boots on the ground, we've always found it to be reliable.  We

8   have no evidence whatsoever that it wasn't, and I want to

9   tread very carefully here because I know we've talked to the

10  court about how this client's name has been revealed in the

11  public record and found exact town -- and an interesting fact

12  here is sometimes we'll get arguments in these cases there are

13  accuracy tolerances 20 miles, 50 miles, I don't remember what

14  the exact is.  If you're on the Delaware River, it's very

15  possible you're showing up in Pennsylvania, you're not in

16  Pennsylvania, you're in Pennsville.

17        We always invite opposing counsel, if you can tell us

18  that, just show us the law in city and state, we will

19  dismiss -- we will rebring it maybe in the right spot if we

20  can.  They never do, despite NJRPC 3.3A5, a duty of candor to

21  the tribunal to bring a negative fact.  I'll have opposing

22  counsel stonewall me and say, I'm going to argue without any

23  kind of factual support that my client is not proven to be in

24  New Jersey and I'll say, okay, but does he live in New Jersey

25  and New York and he'll say, I'm not going to tell you.

1          And I've a case that's now been briefed before Judge

2    Bongiovanni where opposing counsel accidently filed a part of

3    the retainer agreement, showed the exact city and state, and

4    now we're arguing clawback there and it's -- one of the

5    arguments is you have a duty if you know that they've been

6    found, to at least tell the Court so they're not misled into

7    believing it's not accurate.

8          So the fact that law enforcement uses this, the fact

9    that it's proven accurate, the fact that Mr. Bunting

10   will testify, you know, if he's able to, about the accuracy

11   that he's seen, and just in this case, that we've been able to

12   track it there, I think that just puts it to rest.

13         MR. BANDLOW:  And Your Honor asked about how many

14   cases, and it's 3,000.  The number of times we've found

15   Maxmind to be wrong is zero.

16         THE COURT:  Do you want to, "you" being Strike 3,

17   want to present any evidence or testimony?  I've just been

18   asking questions during this hearing so far.

19         MR. BANDLOW:  I mean, I think we would -- I would

20   like, and we can do it -- I appreciate the sort of informal

21   style we've been doing it.  I'd like to just have Mr. Bunting

22   just tell you briefly about two things, his experience with

23   basically doing what we've been talking about all day, but

24   doing it for purposes of law enforcement, and his testing of

25   the IPP technology that was used in this case.

 1          So can you tell the Court --

 2          THE COURT:  Maybe now is a good time -- it's 3:15.

 3     Let's take a break for 15 minutes, and we'll come back at 3:30

 4     and start this.

 5          MR. BANDLOW:  That would be great, Your Honor.

 6          MR. ATKIN:  Thank you, Your Honor.

 7          (RECESS TAKEN; 3:15 p.m.)

 8          THE DEPUTY CLERK:  All rise.

 9          (OPEN COURT; 3:41 p.m.)

10          THE COURT:  Good afternoon.  Please be seated.  I

11     just have a few more questions and then I'll turn it over to

12     you, okay?

13          Ms. Kennedy, who is 7 Rivers?

14          MS. KENNEDY:  7 Rivers is the company that we use to

15     again confirm the line to double verify the information that's

16     sent to the ISP, and John Pasquale works for 7 Rivers.

17          THE COURT:  How long have you used 7 Rivers?

18          MS. KENNEDY:  I'm want to say about two years.

19          THE COURT:  Has it been since Strike 3 started filing

20     these cases?

21          MS. KENNEDY:  I believe so, approximately around the

22     time when we first started filing these cases.

23          THE COURT:  Is Mr. Pasquale a principal in 7 Rivers?

24          MS. KENNEDY:  No, I believe it's owned by his son

25     Paul Pasquale.

```
 1              THE COURT:  Okay.  And what is it, is it a big

 2    company, small company, two-man operation?

 3              MS. KENNEDY:  From my understanding, it's a small

 4    company, and they do a number of different types of forensic

 5    computer work.

 6              THE COURT:  Does 7 River do business with any

 7    company, other than Strike 3?

 8              MS. KENNEDY:  I believe they do.

 9              THE COURT:  Do you know what percentage of business

10    Strike 3 is of 7 River?

11              MS. KENNEDY:  I don't.

12              THE COURT:  Do you know, Mr. Pasquale?

13              MR. PASQUALE:  No, I do not.

14              THE COURT:  You do not?

15              MR. PASQUALE:  Nope.

16              THE COURT:  How long have you been working for the

17    company?

18              MR. PASQUALE:  For about a year and a half.

19              THE COURT:  And your son owns the company?

20              MR. PASQUALE:  Yes, he does.

21              THE COURT:  How many employees in the company?

22              MR. PASQUALE:  He is the only employee.  The rest are

23    consultants.

24              THE COURT:  How many -- are you considered a

25    consultant?
```

```
 1              MR. PASQUALE:  Yes.

 2              THE COURT:  How many consultants are there?

 3              MR. PASQUALE:  I believe he has about five working

 4    for him.

 5              THE COURT:  How many consultants work for Strike 3?

 6              MR. PASQUALE:  There are three.

 7              THE COURT:  What percentage of your work is done for

 8    Strike 3?

 9              MR. PASQUALE:  When it comes to 7 Rivers, one hundred

10    percent.

11              THE COURT:  Do you work for somebody else?

12              MR. PASQUALE:  Yes.

13              THE COURT:  What percentage of your total work is 7

14    Rivers?

15              MR. PASQUALE:  I would say about ten percent.

16              THE COURT:  Do you bill Strike 3, what, per hour, per

17    job, per declaration?  How do you bill them?

18              MR. PASQUALE:  I'm really not sure what the agreement

19    is between 7 Rivers and Strike 3.  I don't do the billing for

20    the firm.

21              THE COURT:  You've been working there a year and a

22    half and you don't know how 7 River bills Strike 3?

23              MR. PASQUALE:  No.

24              THE COURT:  Do you know, Ms. Kennedy?

25              MS. KENNEDY:  Yes.  It's per case.
```

```
 1          THE COURT:  Per case.  Flat fee?

 2          MS. KENNEDY:  Yes.

 3          THE COURT:  Mr. Pasquale, are you the only person who

 4  handles New Jersey cases?

 5          MR. PASQUALE:  I'm not exactly sure.

 6          THE COURT:  Do you work at home or you work in an

 7  office, Mr. Pasquale?

 8          MR. PASQUALE:  When it comes to 7 Rivers, I work from

 9  home.

10          THE COURT:  Now, we've been provided a declaration

11  from you in this case.  Who prepared this declaration?

12          MR. PASQUALE:  That was done by Strike 3, I believe.

13          THE COURT:  And is it the same form affidavit --

14  excuse me -- declaration used in each case?

15          MR. PASQUALE:  Yes, it is.

16          THE COURT:  You sign the affidavits?  I'm sorry,

17  declarations.

18          MR. PASQUALE:  Yes.

19          THE COURT:  Handwritten?

20          MR. PASQUALE:  Electronically.

21          THE COURT:  So the signature on these declarations,

22  that's an electronic signature?

23          MR. PASQUALE:  That's correct.

24          THE COURT:  And then, what, you e-mail it to Strike

25  3?
```

```
 1          MR. PASQUALE:  I put it on a Jira software
 2   application where they are then collected and then I believe
 3   Strike 3 gathers them.
 4          THE COURT:  For the record, I'm referring to
 5   plaintiff's Notice of Motion For Leave to Serve a Third Party
 6   Subpoena, Document 4.
 7          Your declaration, Mr. Pasquale, is Docket 4-4.  Are
 8   you saying that this declaration is prepared by Strike 3 and
 9   sent to you?
10          MR. PASQUALE:  That's correct.
11          THE COURT:  Who at Strike 3 prepared this
12   declaration?
13          MR. PASQUALE:  I don't know who prepared it from
14   Strike 3.
15          THE COURT:  Do you have records of who prepared it?
16   Who sent you the e-mail?
17          MR. PASQUALE:  It is -- those are stored along with
18   the PCAPs on a program called Jira, where I had then pulled
19   those cases, meaning the PCAPs and the declarations.
20          THE COURT:  How does whoever prepares the declaration
21   know what to put in the declaration?
22          MR. PASQUALE:  I can't answer that, because I don't
23   know who prepares the declaration, but I'm assuming that
24   they're looking at the PCAP and also the declaration.
25          THE COURT:  Okay.  All right.  Let's get this
```

```
 1   straight.  Do you do any work on a particular case before the
 2   John Doe Complaint is filed?
 3              MR. PASQUALE:  No.
 4              THE COURT:  You come in in connection with the motion
 5   for expedited discovery, right?
 6              MR. PASQUALE:  Correct.
 7              THE COURT:  When and how do you get the background
 8   information that you refer to in the declaration?
 9              MR. PASQUALE:  When and how?
10              THE COURT:  Mm-hmm.
11              MR. PASQUALE:  I get it from a program that's called
12   Jira, where all the cases are placed, and then I review them
13   one case at a time.
14              THE COURT:  So anything that's in Jira, you look at?
15              MR. PASQUALE:  Correct.  That's assigned to me.
16              THE COURT:  That's a great question.
17              Who puts that information into Jira and assigns that
18   to you?
19              MR. PASQUALE:  That would be Paul, my son, the owner
20   of 7 River Systems.
21              THE COURT:  And who does he get it from?
22              MR. PASQUALE:  From Strike 3.
23              THE COURT:  Do you know who at Strike 3?
24              MR. PASQUALE:  No.
25              THE COURT:  So it goes from Strike 3, to Paul, to
```

1    you.

2            MR. PASQUALE:  Correct.

3            THE COURT:  I'm sorry if I asked you this.  Are you

4    the only person who does Strike 3 declarations?

5            MR. PASQUALE:  No.

6            THE COURT:  How does Paul decide who to assign a

7    particular case to?

8            MR. PASQUALE:  I'm not sure exactly how he assigns

9    it, but I have to believe it's by region.  So for the

10   northeast, I would probably be assigned the stuff in the

11   northeast, along with stuff, I believe, in the northwest.

12           THE COURT:  So you go on to Jira and you see that

13   they've asked you to do certain work with regard to this IP

14   address, right?

15           MR. PASQUALE:  Yes.

16           THE COURT:  And is it the same work with regard to

17   each address?

18           MR. PASQUALE:  I'm sorry, say that again.

19           THE COURT:  I mean, I don't know, do they send you --

20   does Paul assign you 10 or 20 or a hundred IP addresses at one

21   time?

22           MR. PASQUALE:  Yes.

23           THE COURT:  And let's say it's 20, do you do the same

24   work on all 20?

25           MR. PASQUALE:  I do the same type of investigation,

1    yes.

2         THE COURT:  And how much time do you spend on each IP

3    address?

4         MR. PASQUALE:  It all depends.  It could be up to 10

5    minutes.

6         THE COURT:  And it could be as short as what?

7         MR. PASQUALE:  A minute.

8         THE COURT:  And once you do your verification, what

9    then do you do?

10         MR. PASQUALE:  I then put my signature to the

11   declaration and save it back into Jira.

12         THE COURT:  Is the declaration in the Jira program,

13   when you receive the background source information?

14         MR. PASQUALE:  Yes, it is.

15         THE COURT:  So someone at Strike 3 says, we want Mr.

16   -- we want the company --

17         MR. PASQUALE:  7 Rivers.

18         THE COURT:  -- not you, right, not you individually,

19   to sign this declaration.  They send it to Paul with the

20   background source information.  He assigns it to you and you

21   spend one to ten minutes verifying the information.

22         MR. PASQUALE:  Correct.

23         THE COURT:  And then you electronically sign the

24   declaration.  Do you send it back to Paul or do you send it

25   directly to Strike 3?

1          MR. PASQUALE:  I don't send it to either, I add it on

2     to the Jira program.

3          THE COURT:  Okay.  What do you do to confirm that IPP

4     recorded the transaction with this particular IP address at

5     the noted UTC time?  What do you physically do?

6          MR. PASQUALE:  So I take a look at the protocol which

7     is Bit Turn, and from there I notice the timestamp along with

8     the source and destination IP address, and within the PCAP

9     there's a description piece.  I look for an item that's called

10    piece begin.  So that means that the transmission is actually

11    happening.  So at that particular time, with that timestamp,

12    that's when the download or the data transmission is happening

13    and that's what I confirm.

14         THE COURT:  Does that require technical expertise, or

15    is it just a matter of checking that all the I's are dotted

16    and T's are crossed?

17         MR. PASQUALE:  Well, it needs technical expertise,

18    and, yes, it's a matter of ensuring that the I's are dotted

19    and T's are crossed, if you're a technical person.

20         THE COURT:  If you showed me what to look for and I

21    spent a day looking over your shoulder, would I be able to do

22    what you do?  Not me -- okay, let's take an ordinary

23    reasonable person, not me.

24         MR. PASQUALE:  Yes.  The answer is yes, no matter who

25    it is.

1          THE COURT:  So you're not really doing

2     roll-up-your-sleeves technical analysis, you're checking the

3     paperwork.

4          MR. PASQUALE:  I'm doing a verification.

5          THE COURT:  Why do you need to do that?  Why do we

6     need a separate company to do that?

7          MS. KENNEDY:  My rationale to have 7 Rivers do it is,

8     one -- and IPP is in Germany, unfortunately.  We wish they

9     were in our backyard and we could run over to their office.

10    But I just want a second pair of human eyes that's not someone

11    in my company to say, you know, this IP address, this hit date

12    and time, which is going to be used by Comcast to locate the

13    infringer, which in my view, doing this litigation is one of

14    the riskiest areas.  You know, if there's a number wrong on

15    the IP address, or if it's, you know, even 30 seconds or a

16    minute or five minutes or ten minutes off, it could create a

17    hypothetical risk of misidentification.

18         So for me, I just want one other set of eyes to look

19    at that information and say, yes, when you send that subpoena

20    to Comcast, I double checked, there is an actual PCAP that has

21    recorded the infringement taking place.

22         THE COURT:  So what 7 Rivers does is just check the

23    paperwork.

24         MS. KENNEDY:  Correct.

25         THE COURT:  But does anybody roll up their sleeves to

```
 1   check that what IPP is doing is accurate and correct?

 2            MS. KENNEDY:  Yes, that's what Mr. Bunting has done.

 3            THE COURT:  Did he do that in this case?

 4            MS. KENNEDY:  What -- well, I can only testify what

 5   he did was he tested their overall system and monitoring

 6   system to make sure that it works as it says they do and that

 7   it --

 8            THE COURT:  So Mr. Bunting looked sort of on a macro

 9   level --

10            MS. KENNEDY:  Yes.

11            THE COURT:  -- what IPP does.

12            MS. KENNEDY:  Right.

13            THE COURT:  But he did no work -- make the record

14   clear, Mr. Bunting did no work on this particular case.

15            MS. KENNEDY:  No, not specifically on this particular

16   case, but -- no.

17            THE COURT:  When did Mr. Bunting -- excuse me, sir,

18   could you put that silver bottle away.  You can't drink soda

19   in a federal courtroom.

20            MR. PASQUALE:  I apologize.

21            THE COURT:  When did Mr. Bunting do his verification?

22            MS. KENNEDY:  I believe he did it about -- a year

23   ago?

24            MR. BUNTING:  January 23rd last year.

25            THE COURT:  I'm sorry, January 23rd?
```

```
 1          MR. BUNTING:  23rd of 2018.

 2          MS. KENNEDY:  And, Your Honor, just to add, I worked

 3  with IPP in the past and, you know, I've seen their system be

 4  tested through a trial procedure, you know, with, you know,

 5  going through the entire gauntlet of discovery.  I've seen

 6  them deposed.  Another expert that I've worked with has tested

 7  their system.  I've seen their system tested in, like, say

 8  half a dozen evidentiary hearings throughout the country.

 9          So I have a good faith reasonable belief that it

10  works, because it's never been proven to not work.

11          Mr. Bunting is the one who most recently has tested

12  it, but it's been tested time and time again, over and over

13  again.

14          MR. ATKIN:  Judge, if I could add just two different

15  things on actually two different points there.  The first, I

16  think your question, has someone gone to IPP in this case and

17  tested it.  If you'll read Mr. Bunting's report, and I think

18  he'll testify soon about how he set up the test, he needed to

19  have access to all the parts of the computer network in order

20  to see where the file went to.  Asking us if we've tested with

21  this Doe's computer is sort of half the question because we

22  can say, we're seeing it, but until we can go over to his

23  house, knock on his door and say, hey, do you actually have it

24  on your computer, we're not going to have that closed loop in

25  this specific case.
```

```
 1            And the other thing, Judge, not that I'm asking Mr.
 2   Pasquale to get sworn in right now, but you preempted one of
 3   my questions that he was my responsibility to do the direct
 4   for.  And just, Mr. Pasquale, in terms of these
 5   certifications -- first of all for the record, I believe the
 6   lowest docket number here --
 7            THE COURT:  Declarations.
 8            MR. ATKIN:  -- declarations.  I'm sorry, Judge.  The
 9   lowest docket number here was done by Phillip Pasquale who I
10   believe is your nephew.
11            MR. PASQUALE:  Nephew.
12            MR. ATKIN:  There is another Pasquale.  I've seen his
13   name --
14            THE COURT:  He worked for --
15            MR. ATKIN:  7 Rivers as well.  And I've actually -- I
16   know that I've accidently put the wrong cover page on things
17   at times.  I think that happened in this case.
18            But the second question that I think is important is,
19   Mr. Pasquale, have you ever rejected a certification that's
20   been handed to you by Strike 3 on Jira along with the PCAP?
21            MR. PASQUALE:  Yes, I have.
22            MR. ATKIN:  And could you tell the Court about why
23   you would do that and what has happened?
24            MR. PASQUALE:  I do it because, No. 1, it's my
25   reputation on the line that I'm confirming that the
```

 1    information on the declaration is correct.

 2           The other thing is, I'm also putting 7 River

 3    Systems's reputation on the line.  Not only that, this is a

 4    federal -- I don't know, it's a court matter, and obviously

 5    the information -- the information needs to be correct, so

 6    that's why we confirm it.

 7           MR. ATKIN:  That's all I have, Your Honor.

 8           THE COURT:  Thank you.  I want to turn the floor over

 9    to Strike 3.

10           MR. BANDLOW:  Thank you, Your Honor.  We just wanted

11    to spend a little bit of time, and you've done an excellent

12    time of really canvassing most of the important issues, but I

13    think there's some additional input we can have from Mr.

14    Bunting.  Is it okay if we keep this informal -- okay.  I

15    appreciate that, Your Honor.

16           What I'd like to ask Mr. Bunting to do, and I don't

17    think I need to go over his qualifications, he submitted a --

18           THE COURT:  You don't need to.

19           MR. BANDLOW:  -- a pretty detailed CV on this issue.

20           THE COURT:  Let's get to the crux.

21           MR. BANDLOW:  Let's get to the heart of it, I agree.

22           And Mr. Bunting was a police officer for 35 years and

23    spent the last --

24           THE COURT:  I've read it.  Let's just get to the

25    crux.

```
 1            MR. BANDLOW:  Okay.  So, tell the Court just in

 2    general about how -- you've heard about this use of this

 3    technology to find people who are doing things on the

 4    internet.  You essentially did that in a slightly different

 5    context, for over a decade.  So give the Court a little sense

 6    of how you used some of the same technology and did sort of

 7    some of the same things.

 8            MR. BUNTING:  In the spring of 2018 as a member of

 9    the Delaware ICAC, which is Internet Crimes Against Children

10    Task Force, a group of us attended training from Flint Waters.

11    He is the head of the Wyoming ICAC, and he uses software that

12    he actually developed and wrote himself, it's called the

13    Wyoming Toolkit.  And basically, it runs on top of

14    peer-to-peer network.  At the time it was running on top of a

15    Gnutella network, which is slightly different from BitTorrent,

16    but they're really somewhat the same in that both require

17    direct connection to the computers or between the computers

18    they're sharing the files.

19            So we had basically used a client, was called PHEX,

20    P-H-E-X, it was a Gnutella client that had been modified to

21    work with the Toolkit and we were then able to go on the

22    internet and search for basically child pornography and those

23    who were hosting it.

24            THE COURT:  I don't mean to cut you off, Mr. Bunting.

25    I read all this --
```

```
 1            MR. BUNTING:  Okay.

 2            THE COURT:  -- I understand it.  Let's just get to

 3   this case, counsel.

 4            MR. BANDLOW:  Okay.  That's fine.

 5            THE COURT:  I understand -- I read all this, I

 6   understand it.

 7            MR. BANDLOW:  Got it.

 8            THE COURT:  Let's get to the crux.

 9            MR. BANDLOW:  We have heard some mention of Maxmind.

10   Is that something that you used in connection with that and

11   found it to --

12            MR. BUNTING:  Actually, Maxmind was built into the

13   program.  Wyoming Toolkit contracted with Maxmind and

14   basically they used it as part of what we call the geofencing

15   so we could then determine which police jurisdiction to assign

16   to a specific IP address based on it's location.

17            MR. BANDLOW:  And you never found it to be inaccurate

18   and said at least identifying a certain radius for where you

19   needed to be.

20            MR. BUNTING:  A general region, yes.

21            MR. BANDLOW:  Okay.  And then importantly for this

22   case, if you can, just for the Court, explain the general

23   process you undertook to test the IPP

24   software.

25            MR. BUNTING:  Basically, I took four files that I
```

1  created myself, movies, in my own backyard.  I hashed them

2  both with an MD5 and a SHA hash that I could -- basically an

3  electronic fingerprint so that I could identify them later.  I

4  embedded some metadata inside of them so that I again could

5  look inside the files and again identify them in addition to

6  the pictures themselves, of course, but data that I had placed

7  inside the metadata fields.

8       I then created torrent files from them, I sent those

9  four torrent files to Ben Perino at IPP.  The following day,

10 then, I had four machines configured, four laptops.  One was

11 configured with Windows 10, another was configured with a Mac

12 operating system, another was configured with a Windows 7 and

13 another was configured with Linux.  And I used different

14 BitTorrent clients on each one, so again I had a diverse

15 hardware platform, a diverse operating system platform and a

16 diverse set of BitTorrent clients.

17      So I had four movies.  I put -- used the one host

18 that I used to create them all, the torrents, I tested that

19 they were able to download the movies from my source where I

20 created it, got all four clients, were able to then download

21 it.  I then turned off that host so that now it only existed

22 on four laptops, a movie, different one on each one.

23      I took two of them, the Linux one and the Windows 7,

24 and connected them to my network and informed Mr. Perino that

25 they were active and to seek to try to find them.

1        It took me awhile, a third laptop, and took it to

2   University Library and at that location, I had a direct -- the

3   IP address assigned there is dynamic but it is an internet

4   routable IP address assigned directly to the machine.  So

5   basically, I had a direct IP address and not one that was

6   tucked behind a router that is what we call a private network

7   like at home, but rather a public one.

8        Within about a half hour of that connection, he then,

9   Perino, informed me he had already downloaded all three.  So

10  then I went back home and attached the fourth one to the

11  internet, which was a Mac, and he was able to quickly identify

12  that one.  He sent me a report and when I did this on each

13  machine, I had installed Wire Shark, which basically is an

14  open source tool used by the industry to capture network

15  packets.  And data travels on the network in what we call

16  packets, and these packets have very similar to a piece of

17  mail you would send, they have address on them, and that

18  address very much like in the mail, where the recipient, we

19  call that the destination address and that's the IP address,

20  and where it's going and there's a return address and we call

21  that the destination.

22       So each packet is so labeled and goes through the

23  network and PCAP is a collection of these packets and so Wire

24  Shark captures this data.

25       So I was then able to compare the data that was

1    captured on my machine to that which was eventually sent to me

2    from Ben Perino.  Everything matched up, the times were all

3    synchronized beforehand, so my times matched his times,

4    reports matched, the IP addresses matched, he was able to

5    downloaded all four files.  Sent me those files and I rehashed

6    them.  All the original hashes matched the hashes on the ones

7    that he collected, the metadata were all there, they were

8    identical in all regards.  He was able to successfully capture

9    my IP addresses, the one at the University library and the one

10   at home.  I knew what they were beforehand.  They were

11   accurately captured, so any subpoena that would have been

12   issued based upon that information would have accurately

13   identified me as a subscriber, just a simple basic test to see

14   if it worked.

15          MR. BANDLOW:  And just one follow up on something

16   earlier.  So when you were doing child pornography

17   investigations and you would find an IP address that appeared

18   to be transacting in that material, you would use that

19   information to give to a district attorney, or what have you,

20   to obtain a search warrant?

21          MR. BUNTING:  No.  We give it to the prosecutor or

22   district attorney who would then get a subpoena, issue a

23   subpoena to the ISP --

24          MR. BANDLOW:  Okay.

25          MR. BUNTING:  -- which would then reveal the

1   subscriber and then we would further investigate, run a DMV

2   check to see what cars were at that residence, what persons

3   were there, tax records, whatever we could find.  We would go

4   sit out and watch the address for a day or two, see who was

5   there, who was coming and going, and then eventually we would

6   execute a search warrant.

7            MR. BANDLOW:  And the search warrant would be based

8   on the belief that someone in that household is transacting in

9   child pornography.

10           MR. BUNTING:  Yes.

11           MR. BANDLOW:  And no one ever challenged any of those

12  search warrants and said, all you had was an IP address and

13  went in?

14           MR. BUNTING:  No.  They challenged the search

15  warrants, but never on that.

16           MR. BANDLOW:  All right.  That's all I have, Your

17  Honor.

18           THE COURT:  I have a few questions.  What is a

19  MaverickEye, an MEU?

20           MR. BUNTING:  That was in my report.  That was one of

21  the names that was given to that system that they had there --

22           MR. BANDLOW:  The IPP.

23           MR. BUNTING:  GuardaLey.

24           THE COURT:  IPP system.

25           MR. BUNTING:  IPP system, yes.

1          THE COURT:  Does that system capture the exact name

2     of the BitTorrent client and version numbers that were in use

3     by each test computer?

4          MR. BUNTING:  Yes.

5          THE COURT:  Does that system capture the source port

6     number in addition to the source IP address?

7          MR. BUNTING:  It does.

8          THE COURT:  What is the significance of the port

9     number?

10          MR. BUNTING:  Port number -- easiest way to kind of

11     visualize this.  Let's say you're looking at your house and

12     the IP address would identify your house and you have a lot of

13     different services on your computer that use the internet and

14     so there has to be a way of segregating, track it for each of

15     those applications, so it just doesn't all come into a jumble.

16     So it's done by isolating it through ports which are virtual

17     constructs, if you will, within what we call the network

18     system.

19          So, for instance, a browser would use port 80, or

20     your e-mail might -- or your FTP, which is a file transfer

21     protocol, would use port 21, but many of your torrent clients

22     use a variety of different ports, and so whatever port is

23     assigned or configured for that client is the port, which it

24     will use to transact its network business under that IP

25     address.  It allows you, if you will, to multiplex, if you

 1   will, have one IP address that's serving many different

 2   services on your computer, and each one of those are bound to

 3   a port.

 4          THE COURT:  If we take a situation where multiple

 5   works were downloaded from the same IP address --

 6          MR. BUNTING:  Yes.

 7          THE COURT:  -- but there's different ports associated

 8   with that IP address, what does that tell you?

 9          MR. BUNTING:  Well, it can mean a couple of things.

10   One, that you have a couple of different computers or devices,

11   because they can't use the same port at the same time.  So if

12   they're both on there at the same time, you had two computers,

13   one would have to have a different port.

14          Also, if you had one device that had two different

15   BitTorrent clients running.  And I've seen this, where one

16   fellow actually had three.  So they again couldn't all use the

17   same one.  So again, different clients would use different

18   ports.  So there's a couple of different interpretations you

19   could have on there.

20          THE COURT:  But might it be an indication that

21   multiple devices were used to download the 31 different works?

22          MR. BUNTING:  If you had different ports, it could

23   mean that or it could mean, again, one device, different

24   clients.

25          THE COURT:  Is it correct that IPP

1   system, it identifies the port used by the BitTorrent client

2   on the internet-facing device, if not the computer itself; is

3   that correct?

4           MR. BUNTING:  That's correct, yes.

5           THE COURT:  That's a correct statement.

6           And the IPP system also identifies the actual name of

7   the BitTorrent?

8           MR. BUNTING:  BitTorrent client, yes.

9           THE COURT:  And does the IPP

10  system also identify the version number of the BitTorrent

11  software?

12          MR. BUNTING:  It does.

13          THE COURT:  So suppose at the same IP address, the

14  IPP data reveals that the downloads were done by different

15  versions of BitTorrent software, would that be an indication

16  that different devices were used?

17          MR. BUNTING:  Different devices, or it could also be

18  that they updated their version of the client over the course

19  of time.

20          THE COURT:  Counsel, I don't have any other

21  questions, do you?

22          MR. SCULL:  I do, Your Honor.

23          Mr. Bunting, are you -- how many computer degrees in

24  computer science do you have?  Do you have a degree in

25  computer science?

1          MR. BUNTING:  None.  Computer science, no.

2          MR. SCULL:  Are you a software engineer?

3          MR. BUNTING:  I am not.

4          MR. SCULL:  Have you ever written any code?

5          MR. BUNTING:  Small scripts.

6          MR. SCULL:  Have you ever inspected any code?

7          MR. BUNTING:  Again, small scripts.

8          MR. SCULL:  You -- did you at any point in time

9  examine or refer or review the technical manual for IPP?

10          MR. BUNTING:  I did not.

11          MR. SCULL:  The -- so are you qualified to validate

12  source code?

13          MR. BUNTING:  No.

14          MR. SCULL:  Now, the system that you tested was a

15  four-computer system, isn't that correct?

16          MR. BUNTING:  A what?  Sorry.

17          MR. SCULL:  A four-computer system.

18          MR. BUNTING:  I configured four separate computers,

19  yes.

20          MR. SCULL:  Have you ever tested anything larger than

21  that?

22          MR. BUNTING:  On the IPP system?  No.

23          MR. SCULL:  Do you know -- what's the difference

24  between a false positive and a false negative?

25          MR. BUNTING:  Well, false positive, you're getting a

1    reading that's some kind of information -- again, it's my

2    definition.

3           MR. SCULL:  What's the mean time of failure for the

4    IPP software; do you know that?

5           MR. BUNTING:  Mean time of failure?

6           MR. SCULL:  Yes.

7           MR. BUNTING:  I don't know.

8           MR. SCULL:  I have nothing further, Your Honor.

9           THE COURT:  I don't have any questions.  Any

10   follow-up?

11          MR. BANDLOW:  No, Your Honor.  Oh, actually you have

12   something.

13          MS. KENNEDY:  I just want to ask, was it necessary to

14   examine IPP's software to determine -- or source code to

15   determine whether or not the system works?

16          MR. BUNTING:  No, I simply devised a simple test to

17   see if it could identify me and do so accurately.

18          MR. SCULL:  I'm sorry, I do have one more question,

19   Your Honor.

20          You didn't evaluate IPP's software or performance in

21   this case, did you?

22          MR. BUNTING:  For performance?

23          MR. SCULL:  In this case, correct.

24          MR. BUNTING:  In this particular case here, no.

25          MR. SCULL:  And you didn't review any of the packets

```
 1    that were downloaded?

 2           MR. BUNTING:  No.

 3           MR. SCULL:  And you didn't review any documentation

 4    from IPP whatsoever, is that correct?

 5           MR. BUNTING:  For?

 6           MR. SCULL:  For this case.

 7           MR. BUNTING:  No.

 8           MR. SCULL:  Nothing further, Judge.

 9           THE COURT:  Okay.  Just give me a moment.

10           As far as this Court is concerned, I have no further

11    questions or issues to address with counsel.  Counsel,

12    anything else you want to address?

13           MR. SCULL:  No, Your Honor.  No, I really don't.

14           THE COURT:  Strike 3, anything else?

15           MS. KENNEDY:  No, Your Honor.

16           MR. ATKIN:  No, Your Honor.

17           THE COURT:  The Court reserves decision on the motion

18    to quash, and the order to show cause.  We will get a copy of

19    the transcript, you'll get the Court's decision promptly and I

20    appreciate the courtesy and professionalism of Strike 3 and

21    defense counsel.  This was a very helpful and informative

22    hearings, and I appreciate all the time and effort you put

23    into it.

24           MR. BANDLOW:  Thank you, Your Honor.  There were

25    moments, Your Honor, there may have been additional
```

```
 1   information you wanted.  If you find you do, please let us

 2   know.

 3           THE COURT:  Okay.  Oh, good question.  I am going to

 4   ask you if you could provide from New Jersey similar

 5   information that you provided to Judge Orenstein, is it, in

 6   Brooklyn, and then there was one other thing early this

 7   afternoon -- this morning -- it seems like a week ago, but it

 8   was this morning.  You said there was a spreadsheet of

 9   information regarding defendant.

10           MR. BANDLOW:  The additional information spreadsheet

11   of other things downloaded, we can easily provide that.

12           THE COURT:  Yes.

13           MS. KENNEDY:  Your Honor, may I just add, when

14   providing that spreadsheet, there's a lot of information that

15   could identify the defendant.  There's also a lot of adult

16   content of it and courts in the past have asked us not to put

17   it on the public record.

18           THE COURT:  Oh, hundred percent.  Oh, you're

19   absolutely right.  Do you -- is it appropriate to send a copy

20   to defendant?

21           MS. KENNEDY:  Yes, absolutely.

22           THE COURT:  Oh, absolutely don't put it on Pacer,

23   just mail it to the Court.  Absolutely.

24           MR. SCULL:  I'm sorry, what's the spreadsheet you're

25   going to provide?
```

```
 1          MS. KENNEDY:  It's basically all of the additional
 2   information that IPP's recorded.
 3          MR. BANDLOW:  That IP address, what it downloaded.
 4          MR. SCULL:  Time, date?
 5          MR. BANDLOW:  Yeah, but more than just Strike 3
 6   content; mainstream, books, music, et cetera.
 7          THE COURT:  Absolutely, that's confidential material,
 8   shouldn't go on.
 9          MS. KENNEDY:  Thank you, Your Honor.
10          THE COURT:  If I do refer to it, I guess I'll have to
11   put it under seal with an order, but we'll cross that bridge
12   when we get to it.  Thank you for bringing that to my
13   attention, Ms. Kennedy.
14          Hopefully, you have a flight -- I should have asked
15   you what time your flight was.
16          MR. BANDLOW:  I changed it from 5:20.  I got lucky to
17   do that.  I'm out of here at 8:45, so I think I'll make it.
18          THE COURT:  Well, you can enjoy happy hour with our
19   new --
20          MR. BANDLOW:  I've gotten several recommendations,
21   Your Honor, from the locals.
22          THE COURT:  -- our new beer garden up the street.
23          MR. BANDLOW:  They should give you a cut, Your
24   Honor --
25          THE COURT:  It's better than saying we have a Subway
```

1  and a 7-Eleven, which was all we had to say for years, right?

2  And Guido's Pizza.  Thank you very much.

3          RESPONSE:  Thank you, Judge.

4          THE DEPUTY CLERK:  All rise.

5          (4:19 p.m.)

6          - - - - - - - - - - - - - - - -

7

8          I certify that the foregoing is a correct transcript

9  from the record of proceedings in the above-entitled matter.

10

11  */S/ Karen Friedlander, CRR, RMR*
    *Court Reporter/Transcriber_____*

12

13  *6-7-19*
    *Date*

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$35** [1] - 96:22
**$3500** [1] - 96:25

## /

**/S** [1] - 164:11

## 0

**07960** [1] - 1:17
**08070** [1] - 2:3
**08101** [1] - 1:11

## 1

**1** [10] - 1:7, 66:4, 86:23, 91:21, 98:10, 98:22, 108:9, 112:18, 132:6, 148:24
**10** [8] - 38:18, 80:2, 107:5, 109:3, 115:4, 142:20, 143:4, 152:11
**10,000** [1] - 108:5
**100** [2] - 12:13, 86:13
**10:15** [2] - 1:12, 3:2
**11** [9] - 14:6, 24:22, 32:12, 58:6, 58:14, 66:24, 67:4, 67:19, 73:23
**12** [9] - 9:15, 30:9, 30:12, 30:15, 30:20, 31:24, 32:1, 32:3, 35:9
**12:06** [2] - 79:3, 79:12
**12:37** [1] - 79:14
**12:39** [1] - 80:15
**143** [1] - 61:9
**15** [3] - 79:8, 80:2, 136:3
**15-minute** [1] - 79:4
**151** [1] - 2:2
**164** [1] - 1:7
**17** [2] - 104:22, 120:8
**18-14114** [3] - 1:5, 3:5, 4:17
**1888** [1] - 1:19
**19-year-old** [1] - 78:8
**1:45** [2] - 79:17, 80:12
**1:53** [1] - 80:17
**1st** [1] - 98:6

## 2

**2** [4] - 90:21, 95:21, 98:11, 120:3
**20** [8] - 17:24, 28:7, 70:7, 108:19,
134:13, 142:20, 142:23, 142:24
**200** [3] - 11:21, 12:10, 12:13
**2014** [1] - 11:1
**2015** [2] - 10:23, 110:16
**2017** [7] - 11:5, 11:9, 11:13, 56:7, 63:12, 98:23, 108:25
**2018** [7] - 17:24, 96:7, 98:22, 108:25, 113:18, 147:1, 150:8
**2019** [4] - 1:11, 3:2, 63:12, 132:7
**21** [1] - 156:21
**216** [4] - 108:24, 109:2, 109:11, 109:19
**2207** [2] - 81:21, 81:23
**23rd** [3] - 146:24, 146:25, 147:1
**25** [1] - 19:14
**25-year-old** [1] - 21:16
**250** [1] - 108:14
**27** [7] - 26:25, 29:14, 37:20, 38:25, 96:7, 98:22
**27-year-old** [2] - 78:9
**28** [1] - 98:23
**29.99** [1] - 70:2

## 3

**3** [112] - 1:4, 2:6, 3:4, 3:18, 3:21, 3:24, 5:8, 5:19, 6:2, 6:7, 8:5, 8:13, 8:18, 9:6, 9:12, 10:7, 10:22, 10:24, 18:2, 22:8, 22:14, 22:21, 23:19, 27:8, 28:13, 29:12, 35:14, 37:20, 38:4, 41:17, 41:19, 42:13, 46:16, 47:15, 49:2, 54:20, 55:7, 56:18, 57:20, 57:25, 58:2, 61:8, 62:24, 64:8, 67:21, 67:24, 68:3, 72:16, 73:17, 74:16, 77:19, 80:24, 82:4, 82:20, 88:19, 90:6, 90:7, 98:10, 98:11, 100:3, 105:3, 105:18, 106:12, 108:25, 110:11, 110:19, 112:1, 113:24, 115:14, 116:20, 117:3, 121:23, 122:12, 125:4,
125:6, 128:21, 129:25, 130:20, 131:6, 131:13, 131:18, 132:7, 133:23, 135:16, 136:19, 137:7, 137:10, 138:5, 138:8, 138:16, 138:19, 138:22, 139:12, 139:25, 140:3, 140:8, 140:11, 140:14, 141:22, 141:23, 141:25, 142:4, 143:15, 143:25, 148:20, 149:9, 161:14, 161:20, 163:5
**3's** [17] - 6:16, 10:12, 15:4, 43:23, 44:15, 46:23, 46:25, 48:18, 49:15, 50:23, 61:11, 74:17, 88:1, 108:24, 117:12, 126:13, 130:25
**3,000** [3] - 11:22, 12:10, 135:14
**3.3A5** [1] - 134:20
**30** [5] - 83:6, 104:22, 108:19, 109:3, 145:15
**300** [2] - 97:19, 106:20
**31** [35] - 1:11, 3:2, 21:5, 21:25, 28:13, 29:24, 43:21, 45:7, 46:13, 46:17, 49:5, 83:22, 83:25, 84:5, 84:14, 85:4, 85:12, 86:16, 88:16, 89:6, 89:21, 89:24, 90:21, 91:21, 95:13, 95:21, 96:1, 96:16, 97:17, 101:9, 106:2, 109:16, 109:19, 120:3, 157:21
**35** [2] - 59:5, 149:22
**3:00** [2] - 27:25, 28:5
**3:15** [2] - 136:2, 136:7
**3:30** [1] - 136:3
**3:41** [1] - 136:9
**3rd** [1] - 98:23

## 4

**4** [2] - 98:11, 140:6
**4-4** [1] - 140:7
**40** [4] - 58:10, 59:5, 107:13, 108:19
**400** [1] - 1:16
**400,000** [1] - 126:17
**410** [1] - 108:14
**45** [1] - 105:14
**49** [1] - 61:9
**4:19** [1] - 164:5
**4K** [2] - 43:3, 108:10
**4th** [1] - 1:10

## 5

**5** [10] - 66:4, 85:18, 88:4, 88:9, 98:11, 103:9, 103:19, 104:22, 105:5
**50** [17] - 6:7, 11:16, 57:20, 60:14, 60:21, 61:10, 62:6, 62:7, 62:12, 63:21, 73:11, 96:1, 97:12, 101:14, 107:12, 108:19, 134:13
**5405** [1] - 81:25
**55** [1] - 1:16
**5:20** [1] - 163:16

## 6

**6** [2] - 98:11, 108:25
**6-7-19** [1] - 164:13
**60** [1] - 57:14
**60-minute** [1] - 107:6

## 7

**7** [23] - 16:16, 85:23, 95:2, 136:13, 136:14, 136:16, 136:17, 136:23, 137:6, 137:10, 138:9, 138:13, 138:19, 138:22, 139:8, 141:20, 143:17, 145:7, 145:22, 148:15, 149:2, 152:12, 152:23
**7-Eleven** [1] - 164:1
**70** [3] - 46:10, 57:14, 101:14
**73** [1] - 101:17
**73.160.162.60** [2] - 1:8, 26:17
**73.160.60** [1] - 5:5
**75** [2] - 57:20, 104:22
**756-0160** [1] - 1:23
**75726** [1] - 96:7
**76.116.361.90** [1] - 120:17
**77** [2] - 105:14, 105:15

## 8

**8** [2] - 35:22, 38:2
**80** [2] - 46:10, 156:19
**856** [1] - 1:23
**89** [2] - 97:18, 104:22
**8:45** [1] - 163:17

## 9

**90067** [1] - 1:19
**94** [1] - 61:10
**99** [2] - 101:6, 104:22
**99.9** [1] - 18:18
**9th** [1] - 72:23

## A

**a.m** [4] - 1:12, 3:2, 27:25, 28:5
**abilities** [1] - 61:25
**ability** [3] - 4:21, 25:7, 27:13
**able** [32] - 6:17, 19:5, 50:7, 50:18, 51:3, 52:4, 68:8, 70:18, 74:10, 75:25, 77:16, 85:1, 93:20, 101:19, 104:6, 105:13, 105:16, 106:12, 106:13, 115:20, 131:13, 134:2, 135:10, 135:11, 144:21, 150:21, 152:19, 152:20, 153:11, 153:25, 154:4, 154:8
**above-entitled** [1] - 164:9
**absolute** [2] - 61:19, 62:17
**absolutely** [14] - 14:14, 47:3, 47:18, 51:18, 51:20, 57:4, 72:19, 77:8, 119:1, 162:19, 162:21, 162:22, 162:23, 163:7
**accept** [1] - 121:8
**accepts** [1] - 66:17
**access** [7] - 67:15, 70:3, 70:23, 71:13, 129:23, 129:24, 147:19
**accessing** [1] - 111:1
**accidently** [2] - 135:2, 148:16
**Accord** [1] - 56:7
**according** [4] - 108:16, 121:15,

121:16, 133:6
**account** [9] - 29:19,
31:19, 37:7, 37:8,
37:13, 40:20, 40:21,
112:24, 132:4
**accounts** [1] - 29:20
**accuracy** [6] - 4:10,
4:21, 133:2, 134:1,
134:13, 135:10
**accurate** [8] - 54:2,
99:19, 132:11,
133:15, 135:7,
135:9, 146:1
**accurately** [3] -
154:11, 154:12,
160:17
**Accurint** [1] - 64:15
**accusation** [1] - 67:11
**acknowledges** [1] -
76:10
**Act** [1] - 117:17
**acting** [1] - 38:23
**ACTION** [1] - 1:4
**action** [6] - 30:10,
30:13, 31:11, 33:14,
83:19, 115:14
**active** [2] - 59:22,
152:25
**actively** [1] - 76:5
**activity** [6] - 29:20,
29:23, 38:10, 38:11,
40:15, 55:19
**acts** [1] - 25:11
**actual** [13] - 25:3,
25:7, 37:16, 60:20,
84:10, 85:10, 92:20,
93:23, 93:24, 94:18,
111:4, 145:20, 158:6
**ADA** [4] - 52:16,
53:12, 54:3, 56:1
**adapted** [1] - 45:17
**adapting** [1] - 46:7
**add** [20] - 13:9, 16:3,
20:5, 25:12, 27:12,
45:11, 55:13, 61:14,
65:25, 72:21, 73:12,
96:13, 126:23,
128:18, 130:12,
133:16, 144:1,
147:2, 147:14,
162:13
**addition** [2] - 152:5,
156:6
**additional** [21] -
21:13, 35:3, 49:11,
53:6, 53:23, 54:9,
54:15, 55:22, 56:25,
58:3, 58:4, 58:21,
65:4, 98:9, 99:8,
106:5, 149:13,

161:25, 162:10,
163:1
**address** [128] - 12:3,
18:3, 18:4, 18:16,
18:23, 21:13, 22:11,
22:15, 22:25, 23:3,
23:7, 23:18, 23:20,
24:23, 26:19, 26:20,
27:21, 28:14, 28:18,
28:22, 28:24, 29:13,
29:15, 30:11, 31:10,
31:15, 32:7, 32:10,
32:22, 33:6, 33:7,
33:11, 33:14, 33:20,
34:20, 34:22, 35:1,
35:17, 36:1, 36:3,
36:7, 36:19, 37:21,
38:6, 40:10, 40:13,
40:19, 40:20, 41:2,
41:4, 43:21, 44:23,
49:7, 49:9, 50:2,
50:4, 50:6, 52:9,
53:7, 53:25, 54:18,
70:19, 70:22, 74:19,
76:7, 76:11, 76:21,
77:3, 77:5, 78:3,
81:1, 81:14, 82:17,
83:18, 86:8, 87:16,
87:21, 92:13, 94:16,
95:16, 95:18, 99:5,
106:17, 107:1,
108:23, 112:23,
117:18, 118:22,
118:25, 119:20,
119:24, 120:5,
121:5, 127:4,
127:22, 133:19,
142:14, 142:17,
143:3, 144:4, 144:8,
145:11, 145:15,
151:16, 153:3,
153:4, 153:5,
153:17, 153:18,
153:19, 153:20,
154:17, 155:4,
155:12, 156:6,
156:12, 156:25,
157:1, 157:5, 157:8,
158:13, 161:11,
161:12, 163:3
**Address** [2] - 5:5,
26:17
**ADDRESS** [1] - 1:8
**address's** [1] - 18:13
**addresses** [19] -
12:10, 15:12, 16:1,
16:23, 19:1, 33:17,
50:3, 70:15, 70:24,
90:14, 95:16, 97:23,
98:8, 98:15, 119:18,
119:19, 142:20,

154:4, 154:9
**adhere** [1] - 83:13
**adhered** [1] - 88:14
**adhering** [1] - 90:15
**adjourn** [1] - 79:9
**admit** [1] - 119:18
**adopted** [1] - 48:1
**adult** [7] - 20:25,
31:16, 53:20, 53:21,
112:9, 132:6, 162:15
**advertising** [1] - 71:2
**advising** [1] - 120:17
**affect** [1] - 19:23
**affidavit** [1] - 139:13
**affidavits** [1] - 139:16
**affirmed** [2] - 8:23,
8:24
**afford** [1] - 59:18
**Africa** [1] - 70:24
**afternoon** [3] - 80:18,
136:10, 162:7
**age** [1] - 52:12
**aged** [2] - 52:13,
127:10
**agent** [2] - 38:19,
38:20
**aggressive** [1] -
130:22
**ago** [6] - 9:14, 63:13,
91:14, 116:8,
146:23, 162:7
**agree** [10] - 24:18,
31:8, 32:8, 33:24,
39:1, 39:2, 92:25,
119:11, 130:18,
149:21
**agreement** [3] - 67:15,
135:3, 138:18
**agreements** [3] -
10:14, 115:25, 116:3
**agrees** [1] - 32:21
**ahead** [4] - 16:4, 76:5,
111:19
**aided** [1] - 1:25
**album** [1] - 54:16
**allegation** [4] - 26:11,
27:9, 29:16, 35:8
**allegations** [3] - 13:2,
14:6, 35:13
**allege** [3] - 22:24,
29:13, 44:6
**alleged** [10] - 15:20,
18:20, 20:21, 31:11,
35:23, 61:12, 83:22,
85:4, 85:21, 119:23
**allegedly** [1] - 121:2
**alleging** [2] - 22:25,
132:17
**allergies** [2] - 3:8,
5:18

**allow** [3] - 30:21,
121:2, 123:12
**allowed** [5] - 17:8,
32:24, 53:20, 122:1,
122:4
**allowing** [1] - 122:24
**allows** [6] - 52:19,
118:3, 118:7,
118:11, 156:25
**almost** [5] - 19:24,
69:4, 71:3, 76:22,
76:23
**alone** [1] - 22:17
**ALSO** [1] - 2:5
**amend** [16] - 23:14,
31:20, 33:8, 44:2,
53:17, 53:18, 58:12,
58:14, 64:1, 64:8,
66:5, 66:13, 73:1,
73:5, 73:24, 77:20
**amended** [3] - 44:2,
52:23, 62:15
**Amended** [7] - 13:14,
14:1, 32:12, 44:7,
52:23, 58:2, 64:4
**amending** [2] - 35:4,
78:21
**Amendment** [3] -
7:17, 62:1, 77:14
**amendment** [3] -
32:15, 63:24, 63:25
**American** [1] - 52:22
**amount** [16] - 18:10,
25:2, 27:10, 29:23,
30:2, 30:5, 36:22,
37:5, 37:11, 39:17,
39:24, 40:3, 40:15,
43:5, 43:13, 115:6
**amounts** [2] - 30:3,
39:20
**analysis** [2] - 75:2,
145:2
**analytic** [1] - 65:3
**analytics** [2] - 19:4,
57:17
**analyze** [2] - 49:3,
90:20
**Angeles** [1] - 1:19
**angels** [1] - 127:14
**anonymity** [1] - 77:15
**answer** [21] - 6:21,
21:23, 36:20, 41:12,
42:1, 44:19, 45:20,
81:2, 82:5, 89:10,
90:23, 91:10, 91:22,
95:22, 108:18,
114:17, 116:25,
122:7, 124:9,
140:22, 144:24
**answered** [1] - 62:16

**answering** [1] - 86:4
**answers** [1] - 86:5
**anticipate** [1] - 79:18
**antipiracy** [1] - 116:9
**apartment** [3] - 29:6,
78:4, 78:5
**API** [1] - 51:13
**apologize** [5] - 21:22,
48:9, 64:6, 80:21,
146:20
**appeal** [2] - 8:22, 9:24
**appealed** [3] - 8:5,
8:19, 9:21
**Appeals** [3] - 8:8,
8:12, 8:13
**appear** [2] - 19:2,
59:10
**appearance** [4] - 3:11,
3:16, 30:9, 126:6
**appeared** [1] - 154:17
**application** [2] -
12:23, 140:2
**applications** [1] -
156:15
**applies** [1] - 73:7
**apply** [1] - 73:7
**appreciate** [4] -
135:20, 149:15,
161:20, 161:22
**approach** [1] - 25:21
**appropriate** [5] - 6:21,
35:8, 77:2, 79:7,
162:19
**approve** [3] - 11:23,
13:18, 56:20
**approved** [2] - 13:20,
57:9
**approximate** [5] -
11:19, 12:4, 49:8,
54:1, 75:12
**architect** [1] - 64:24
**area** [4] - 21:2, 79:25,
99:6, 110:9
**areas** [1] - 145:14
**argue** [1] - 134:22
**argued** [1] - 129:7
**arguing** [1] - 135:4
**argument** [8] - 66:19,
67:7, 67:8, 117:12,
119:15, 121:10,
121:13, 133:14
**arguments** [11] -
66:17, 76:10,
118:20, 119:13,
129:14, 129:17,
132:11, 132:14,
133:3, 134:12, 135:5
**arise** [1] - 57:24
**arm** [2] - 33:13, 33:16
**art** [1] - 17:17

**Asian** [1] - 52:21
**aside** [5] - 8:5, 43:15, 50:23, 72:9, 115:14
**asleep** [1] - 28:5
**aspects** [1] - 5:22
**assign** [3] - 142:6, 142:20, 151:15
**assigned** [13] - 9:16, 9:20, 81:18, 81:20, 82:23, 83:1, 109:6, 141:15, 142:10, 153:3, 153:4, 156:23
**Assigned** [2] - 5:5, 26:17
**ASSIGNED** [1] - 1:7
**assigning** [1] - 52:25
**assignment** [2] - 90:11, 90:13
**assigns** [3] - 141:17, 142:8, 143:20
**assist** [2] - 6:5, 81:2
**assists** [2] - 10:16, 13:25
**associated** [5] - 23:1, 45:1, 81:1, 90:1, 157:7
**Association** [2] - 112:6, 114:21
**assume** [3] - 28:23, 62:6, 68:2
**assumed** [2] - 98:24, 99:2
**assumes** [1] - 38:4
**assuming** [3] - 38:3, 89:5, 140:23
**assumption** [6] - 20:13, 29:1, 89:8, 90:1, 107:10, 107:21
**AT&T** [1] - 124:1
**ATKIN** [37] - 1:15, 1:16, 3:20, 3:23, 6:1, 6:12, 6:14, 8:4, 22:12, 22:22, 25:17, 25:21, 51:23, 51:25, 52:7, 61:4, 75:6, 75:16, 75:21, 76:7, 96:4, 96:13, 100:18, 118:2, 126:23, 128:3, 128:18, 133:16, 134:2, 136:6, 147:14, 148:8, 148:12, 148:15, 148:22, 149:7, 161:16
**Atkin** [10] - 3:20, 5:18, 6:13, 14:10, 25:15, 25:20, 77:6, 77:7
**attached** [3] - 84:13, 85:8, 153:10
**attend** [1] - 17:13

**attended** [1] - 150:10
**attention** [6] - 15:4, 15:5, 19:12, 40:4, 40:16, 163:13
**attorney** [7] - 13:25, 31:1, 52:25, 66:5, 75:17, 154:19, 154:22
**attorneys** [1] - 14:15
**August** [2] - 98:7, 110:16
**authenticating** [1] - 4:14
**authorization** [1] - 27:5
**automates** [1] - 112:16
**automatic** [1] - 42:11
**automatically** [1] - 112:22
**available** [12] - 17:13, 51:17, 62:21, 64:18, 76:23, 77:5, 80:25, 92:23, 93:4, 93:10, 116:20, 117:22
**Avengers** [2] - 53:9, 53:11
**Avenue** [1] - 1:16
**avenues** [1] - 116:21
**average** [1] - 108:2
**avoid** [2] - 47:24, 76:13
**avoiding** [2] - 86:4, 86:5
**aware** [6] - 33:16, 34:11, 34:17, 37:9, 68:21, 130:8
**awful** [1] - 126:2
**awhile** [2] - 79:3, 153:1

**B**

**backed** [1] - 99:2
**background** [6] - 8:3, 14:5, 72:8, 141:7, 143:13, 143:20
**backyard** [2] - 145:9, 152:1
**bad** [4] - 80:18, 113:9, 113:11, 128:11
**Bandlow** [7] - 3:17, 3:18, 5:19, 6:4, 120:7, 120:20, 128:3
**BANDLOW** [161] - 1:18, 1:18, 3:17, 4:2, 4:7, 4:18, 4:24, 5:20, 6:9, 8:11, 11:6, 11:9, 12:20, 20:4, 20:14, 21:8, 21:21, 21:24,

22:3, 22:10, 22:25, 23:3, 23:6, 23:9, 23:12, 24:1, 24:4, 24:8, 24:13, 24:17, 24:25, 25:6, 25:14, 26:5, 26:8, 26:10, 26:13, 26:16, 26:20, 26:24, 27:1, 27:3, 27:7, 27:10, 27:22, 28:4, 28:8, 28:15, 28:18, 28:20, 28:23, 29:3, 29:9, 29:17, 30:14, 31:6, 31:12, 32:1, 32:5, 32:17, 32:19, 33:16, 34:11, 34:13, 35:12, 35:16, 36:2, 36:12, 36:17, 36:20, 37:3, 37:23, 38:6, 38:12, 38:17, 38:22, 39:1, 39:16, 40:12, 40:15, 40:20, 40:23, 41:3, 41:13, 41:21, 42:18, 44:19, 51:11, 56:12, 58:16, 60:15, 60:18, 61:6, 62:5, 64:3, 65:17, 66:22, 67:2, 71:18, 72:4, 72:7, 74:4, 74:24, 77:14, 78:20, 85:1, 85:20, 87:4, 88:5, 95:5, 95:14, 95:22, 96:9, 99:2, 99:11, 101:8, 107:15, 108:10, 109:16, 113:2, 114:9, 114:17, 117:4, 122:8, 122:14, 122:20, 125:7, 125:19, 126:1, 126:5, 126:16, 128:6, 130:11, 130:22, 132:3, 135:13, 135:19, 136:5, 149:10, 149:19, 149:21, 150:1, 151:4, 151:7, 151:9, 151:17, 151:21, 154:15, 154:24, 155:7, 155:11, 155:16, 155:22, 160:11, 161:24, 162:10, 163:3, 163:5, 163:16, 163:20, 163:23
**barely** [1] - 28:6
**base** [3] - 68:19, 68:20, 78:16
**based** [20] - 10:8, 10:9, 16:1, 27:25, 42:8, 48:20, 49:9,

55:11, 55:14, 65:11, 69:21, 71:25, 72:1, 107:2, 111:8, 131:16, 133:2, 151:16, 154:12, 155:7
**basement** [1] - 125:1
**basic** [4] - 35:8, 64:15, 91:11, 154:13
**basis** [20] - 23:18, 23:19, 24:21, 24:22, 25:10, 27:8, 27:13, 29:16, 32:16, 34:24, 35:25, 36:18, 38:10, 39:12, 52:22, 53:16, 99:20, 103:8, 105:22
**battle** [1] - 59:7
**Bay** [2] - 71:1, 110:25
**bear** [3] - 5:17, 24:7, 29:23
**become** [1] - 48:21
**becoming** [2] - 68:15, 68:21
**bedroom** [2] - 78:4, 78:5
**beef** [3] - 126:13, 126:16, 126:18
**beer** [2] - 80:7, 163:22
**beforehand** [2] - 154:3, 154:10
**begin** [1] - 144:10
**beginning** [10] - 12:3, 23:13, 94:23, 96:15, 118:22, 120:24, 121:3, 121:14, 121:19, 129:8
**behalf** [4] - 3:18, 3:20, 5:4, 38:23
**behind** [7] - 41:13, 44:17, 44:23, 46:9, 70:2, 116:2, 153:6
**belief** [11] - 38:1, 39:6, 42:9, 44:5, 58:14, 62:17, 67:19, 78:16, 85:21, 147:9, 155:8
**Ben** [2] - 152:9, 154:2
**best** [9] - 16:13, 17:17, 17:22, 69:12, 70:12, 79:16, 98:1, 105:6, 108:16
**better** [10] - 20:6, 20:10, 47:13, 51:19, 62:7, 95:22, 108:3, 113:9, 121:21, 163:25
**between** [9] - 22:4, 45:1, 87:15, 101:14, 108:4, 126:24, 138:19, 150:17, 159:24

**beyond** [2] - 30:4, 58:15
**big** [1] - 137:1
**bigger** [4] - 116:11, 118:8, 120:19, 122:16
**bill** [3] - 29:21, 138:16, 138:17
**billing** [1] - 138:19
**billions** [1] - 71:10
**bills** [1] - 138:22
**biomedical** [1] - 52:15
**Bit** [1] - 144:7
**bit** [30] - 20:11, 22:5, 73:22, 77:24, 85:2, 96:14, 100:1, 100:12, 101:3, 101:5, 101:9, 101:13, 101:16, 101:20, 101:21, 102:3, 104:15, 104:21, 105:7, 105:9, 105:14, 105:24, 106:22, 107:9, 115:18, 118:4, 118:11, 122:15, 149:11
**BitTorrent** [74] - 15:11, 16:20, 16:24, 18:10, 34:21, 40:7, 42:3, 42:6, 42:10, 42:17, 42:19, 42:24, 43:22, 44:9, 44:24, 45:13, 45:24, 46:1, 47:10, 47:22, 47:23, 48:23, 49:25, 57:2, 68:25, 69:10, 70:5, 70:9, 70:15, 71:2, 74:22, 78:12, 81:6, 81:17, 81:21, 81:22, 92:2, 92:10, 92:20, 93:7, 93:24, 93:25, 97:7, 98:5, 99:7, 100:21, 101:1, 102:14, 103:1, 103:10, 103:18, 105:25, 106:2, 106:8, 107:3, 107:13, 109:9, 109:20, 110:8, 116:4, 116:5, 123:20, 150:15, 152:14, 152:16, 156:2, 157:15, 158:1, 158:7, 158:8, 158:10, 158:15
**black** [2] - 24:22, 37:20
**blindly** [1] - 67:1
**block** [1] - 71:12

**blow** [1] - 125:23
**blowing** [1] - 126:7
**blown** [1] - 124:20
**BMG** [2] - 113:2, 124:12
**board** [2] - 11:11, 103:8
**boiler** [1] - 13:6
**Bongiovanni** [1] - 135:2
**book** [2] - 30:2, 77:6
**books** [1] - 51:8, 163:6
**boots** [1] - 134:7
**bore** [1] - 5:12
**bored** [1] - 7:7
**bottle** [1] - 146:18
**bottom** [8] - 7:2, 7:10, 64:16, 129:11, 131:21, 131:24, 131:25, 132:2
**bound** [1] - 157:2
**boy** [2] - 62:6, 62:12
**break** [7] - 74:14, 79:4, 79:8, 79:17, 79:19, 80:11, 136:3
**breaking** [1] - 81:19
**breaks** [1] - 100:22
**bridge** [1] - 163:11
**brief** [1] - 48:10
**briefed** [2] - 8:11, 135:1
**briefing** [1] - 76:9
**briefly** [1] - 135:22
**bring** [4] - 19:12, 70:10, 117:6, 134:21
**bringing** [1] - 163:12
**brings** [1] - 122:20
**broad** [1] - 47:2
**Broadway** [1] - 2:2
**broken** [5] - 106:8, 107:5, 108:15, 109:7, 111:16
**Brooklyn** [7] - 8:17, 9:10, 9:13, 9:17, 60:24, 63:22, 162:6
**brought** [3] - 16:16, 40:16, 76:10
**brown** [1] - 128:19
**browser** [2] - 81:16, 156:19
**browsing** [1] - 81:16
**buck** [2] - 13:16, 30:6
**build** [1] - 15:18
**Building** [1] - 11:10
**built** [1] - 151:12
**bunch** [3] - 84:10, 106:7, 113:10
**Bunting** [31] - 2:8, 4:3, 4:5, 4:7, 4:16, 44:19,

81:3, 92:5, 92:9, 92:25, 93:12, 94:2, 102:8, 108:6, 118:18, 132:21, 134:2, 135:9, 135:21, 146:2, 146:8, 146:14, 146:17, 146:21, 147:11, 149:14, 149:16, 149:22, 150:24, 158:23
**bunting** [2] - 44:21, 79:18
**BUNTING** [61] - 44:22, 45:9, 45:23, 81:4, 81:13, 92:6, 92:8, 92:11, 93:1, 93:3, 93:5, 93:13, 94:4, 102:10, 108:7, 108:12, 109:5, 109:12, 109:15, 146:24, 147:1, 150:8, 151:1, 151:12, 151:20, 151:25, 154:21, 154:25, 155:10, 155:14, 155:20, 155:23, 155:25, 156:4, 156:7, 156:10, 157:6, 157:9, 157:22, 158:4, 158:8, 158:12, 158:17, 159:1, 159:3, 159:5, 159:7, 159:10, 159:13, 159:16, 159:18, 159:22, 159:25, 160:5, 160:7, 160:16, 160:22, 160:24, 161:2, 161:5, 161:7
**Bunting's** [2] - 132:22, 147:17
**business** [11] - 7:15, 7:16, 38:9, 38:10, 38:16, 53:21, 112:12, 120:15, 137:6, 137:9, 156:24
**BY** [2] - 1:16, 1:18

---

**C**

**CA** [1] - 1:19
**Cable** [1] - 117:17
**cable** [4] - 29:11, 30:24, 40:1, 124:17
**cafeteria** [1] - 80:6
**California** [4] - 5:21, 10:9, 34:7, 72:24
**Camden** [2] - 1:11, 80:6

**candid** [1] - 62:3
**candidly** [1] - 116:8
**candor** [1] - 134:20
**cannot** [1] - 121:11
**canvassing** [1] - 149:12
**capture** [7] - 49:20, 70:20, 83:16, 153:14, 154:8, 156:1, 156:5
**captured** [4] - 4:13, 154:1, 154:11
**captures** [1] - 153:24
**capturing** [2] - 16:1, 17:12
**car** [1] - 56:6
**care** [3] - 31:16, 111:18, 111:23
**career** [1] - 97:6
**careful** [5] - 10:20, 67:16, 73:25, 80:9, 95:10
**carefully** [2] - 35:3, 134:9
**carriers** [1] - 38:13
**cars** [1] - 155:2
**case** [129] - 3:5, 3:14, 4:14, 4:17, 4:23, 8:24, 8:25, 13:11, 13:13, 13:15, 13:21, 14:2, 14:4, 15:19, 17:24, 18:21, 19:19, 23:16, 25:13, 26:15, 30:9, 31:8, 32:9, 33:1, 33:2, 34:6, 34:11, 34:14, 35:5, 35:6, 43:13, 45:7, 45:21, 46:13, 48:2, 48:7, 49:5, 50:22, 50:25, 51:15, 51:21, 51:23, 51:25, 52:8, 54:7, 56:8, 57:3, 57:4, 57:8, 59:5, 60:24, 61:3, 61:13, 61:21, 63:18, 64:10, 65:22, 66:9, 66:10, 66:15, 66:16, 67:3, 69:4, 71:3, 72:22, 73:2, 74:1, 74:12, 78:19, 82:8, 82:12, 83:10, 83:23, 83:24, 84:5, 84:6, 85:5, 89:12, 91:17, 92:15, 96:16, 97:17, 97:18, 97:21, 98:19, 99:3, 101:5, 102:6, 102:7, 106:24, 113:16, 113:18, 116:23, 117:13, 119:9, 119:14, 120:10,

124:12, 125:10, 127:3, 127:8, 131:9, 132:25, 133:1, 133:15, 135:1, 135:11, 135:25, 138:25, 139:1, 139:11, 139:14, 141:1, 141:13, 142:7, 146:3, 146:14, 146:16, 147:16, 147:25, 148:17, 151:3, 151:22, 160:21, 160:23, 160:24, 161:6
**cases** [62] - 4:19, 4:24, 6:4, 6:7, 7:2, 9:6, 9:12, 9:15, 10:10, 10:19, 11:15, 18:5, 33:12, 33:17, 33:19, 34:1, 34:4, 34:6, 35:15, 45:15, 45:22, 48:3, 55:5, 59:9, 59:25, 60:10, 61:1, 61:2, 61:9, 61:10, 61:17, 61:19, 62:24, 63:11, 63:12, 63:16, 63:21, 67:11, 70:8, 70:25, 71:20, 72:5, 72:16, 73:11, 73:12, 83:1, 83:3, 97:18, 98:2, 103:6, 118:5, 122:17, 130:1, 130:3, 130:4, 134:12, 135:14, 136:20, 136:22, 139:4, 140:19, 141:12
**casual** [1] - 20:19
**catalog** [1] - 70:3
**category** [3] - 59:12, 59:25, 110:22
**caution** [1] - 58:16
**cautious** [3] - 10:20, 62:4, 78:17
**Century** [1] - 1:19
**certain** [10] - 7:7, 12:18, 15:10, 17:7, 23:24, 24:4, 82:2, 100:24, 142:13, 151:18
**certainly** [10] - 17:6, 17:20, 22:6, 30:23, 86:18, 95:1, 104:8, 104:11, 117:24, 131:25
**certainty** [1] - 61:22
**certification** [2] - 132:20, 148:19
**certifications** [1] -

148:5
**certified** [1] - 112:19
**certify** [1] - 164:8
**cetera** [11] - 34:17, 37:10, 38:13, 40:2, 41:20, 64:21, 71:5, 114:17, 122:10, 163:6
**challenged** [2] - 155:11, 155:14
**change** [8] - 30:19, 35:17, 95:17, 97:24, 119:18, 119:19, 130:17
**changed** [2] - 68:7, 163:16
**changes** [1] - 108:11
**charge** [3] - 29:19, 29:20, 96:19
**charging** [1] - 97:14
**chart** [4] - 85:7, 88:1, 88:4
**charts** [1] - 49:9
**check** [6] - 56:19, 95:10, 95:11, 145:22, 146:1, 155:2
**check-off** [1] - 56:19
**checked** [1] - 145:20
**checking** [2] - 144:15, 145:2
**checks** [1] - 87:10
**child** [4] - 75:10, 150:22, 154:16, 155:9
**children** [12] - 21:5, 22:14, 22:16, 23:23, 24:1, 27:18, 27:20, 27:23, 27:25, 28:5, 39:12, 53:3
**Children** [1] - 150:9
**China** [2] - 70:24, 71:4
**chord** [1] - 54:4
**chose** [2] - 62:18, 64:1
**chucking** [1] - 124:11
**chunk** [2] - 108:19, 130:17
**Circle** [1] - 132:7
**Circuit** [4] - 31:21, 35:6, 72:23, 73:7
**circumstance** [2] - 31:23, 59:23
**circumstances** [4] - 20:24, 57:6, 58:5, 73:4
**cited** [3] - 34:1, 34:3, 96:16
**city** [4] - 75:11, 76:11, 134:18, 135:3
**City** [3] - 10:9, 72:3, 72:23

CIVIL [1] - 1:4
claim [3] - 26:14, 62:11, 131:1
claims [1] - 62:20
clarification [1] - 8:2
clarified [1] - 21:23
clarify [3] - 60:23, 85:23, 94:15
clawback [1] - 135:4
clear [6] - 80:24, 83:8, 99:13, 114:9, 123:21, 146:14
clearances [1] - 10:15
clearly [2] - 20:23, 34:5
CLERK [7] - 3:1, 79:11, 79:13, 80:14, 80:16, 136:8, 164:4
client [29] - 3:22, 3:23, 15:3, 44:25, 45:2, 45:9, 45:15, 46:11, 47:23, 66:11, 73:16, 76:9, 81:6, 81:17, 92:2, 92:10, 93:24, 99:7, 109:9, 124:7, 134:23, 150:19, 150:20, 156:2, 156:23, 158:1, 158:8, 158:18
client's [2] - 62:14, 134:10
clients [8] - 45:17, 152:14, 152:16, 152:20, 156:21, 157:15, 157:17, 157:24
clock [1] - 79:2
close [4] - 58:17, 73:19, 75:6, 132:13
closed [1] - 147:24
closely [2] - 6:3, 114:20
closer [2] - 39:2, 75:25
closest [1] - 63:2
Cobbler [22] - 31:13, 31:14, 31:24, 32:17, 32:19, 32:20, 32:21, 32:22, 32:25, 33:3, 33:6, 33:17, 34:3, 34:4, 35:1, 52:19, 72:22, 73:1, 73:6
Code [1] - 87:4
code [8] - 20:17, 25:18, 132:24, 159:4, 159:6, 159:12, 160:14
Cohen [1] - 1:10
collaborative [1] - 116:10

collect [1] - 86:17
collected [2] - 140:2, 154:7
collection [1] - 153:23
college [1] - 127:10
college-aged [1] - 127:10
Colorado [1] - 5:22
colossal [1] - 115:8
Columbia [1] - 8:9
Comcast [48] - 21:3, 26:21, 26:22, 29:6, 38:5, 60:7, 96:6, 114:12, 114:17, 114:24, 114:25, 120:12, 120:16, 120:17, 120:21, 121:4, 121:22, 121:23, 121:24, 121:25, 122:1, 122:3, 122:5, 122:9, 122:11, 123:24, 124:2, 124:10, 124:19, 124:23, 125:3, 125:4, 125:13, 125:21, 126:1, 126:3, 126:14, 127:3, 127:6, 128:2, 128:7, 128:8, 128:11, 128:21, 145:12, 145:20
comcast [1] - 125:21
Comcasts [2] - 125:20, 126:19
comfortable [1] - 35:20, 59:7
coming [7] - 6:25, 7:11, 41:10, 42:9, 70:5, 71:14, 155:5
comitted [2] - 35:23, 36:15
Commencing [1] - 1:12
commit [1] - 42:4
committing [2] - 75:5, 110:3
common [3] - 55:25, 59:9, 114:4
communication [2] - 14:19, 17:5
communications [1] - 60:20
Communications [1] - 117:17
companies [3] - 34:17, 112:6, 124:17
company [41] - 7:18, 10:13, 10:19, 10:25, 16:7, 16:8, 20:3,

30:24, 40:1, 52:22, 57:21, 61:21, 65:23, 68:22, 69:6, 69:25, 75:25, 76:15, 85:24, 86:7, 110:14, 112:4, 112:5, 112:7, 113:20, 114:1, 114:4, 128:21, 136:14, 137:2, 137:4, 137:7, 137:17, 137:19, 137:21, 143:16, 145:6, 145:11
company's [1] - 68:15
compare [3] - 50:18, 91:13, 153:25
compared [1] - 88:14
compelling [1] - 73:6
Complaint [90] - 11:24, 12:2, 12:15, 13:6, 13:14, 13:17, 13:20, 14:1, 14:10, 14:12, 16:17, 17:24, 22:8, 22:23, 23:16, 24:9, 24:14, 24:16, 24:22, 25:13, 25:16, 25:19, 25:22, 26:4, 26:6, 30:10, 30:11, 31:20, 32:4, 32:12, 32:15, 32:20, 33:4, 34:7, 34:10, 35:4, 35:10, 35:14, 35:24, 42:14, 44:2, 44:7, 48:17, 52:23, 53:1, 53:17, 53:18, 54:21, 55:11, 56:20, 57:10, 57:22, 57:25, 58:1, 58:3, 58:7, 58:19, 58:23, 62:16, 63:23, 64:1, 64:4, 66:5, 66:13, 66:24, 73:1, 73:5, 74:17, 75:18, 77:21, 82:20, 84:13, 84:22, 84:23, 84:25, 85:21, 85:25, 94:8, 94:10, 94:24, 97:11, 97:16, 100:9, 129:3, 131:9, 131:12, 141:2
complaint [3] - 22:24, 26:14, 35:14
Complaints [1] - 98:3
complaints [3] - 12:19, 82:22, 117:22
complete [9] - 27:4, 62:13, 64:16, 103:19, 105:4, 105:20, 105:22, 106:1, 122:20
completely [5] - 43:12, 103:22,

107:16, 112:25, 113:22
complex [1] - 12:1
Compliant [1] - 26:2
computer [39] - 1:25, 18:25, 19:3, 25:16, 40:9, 41:6, 41:10, 42:10, 42:19, 53:1, 53:5, 53:22, 75:4, 75:9, 75:14, 75:15, 75:19, 75:20, 75:21, 82:2, 106:7, 127:19, 129:19, 129:24, 130:9, 137:5, 147:19, 147:21, 147:24, 156:3, 156:13, 157:2, 158:2, 158:23, 158:24, 158:25, 159:1, 159:15, 159:17
computer-aided [1] - 1:25
computers [9] - 47:11, 53:19, 55:18, 75:17, 150:17, 157:10, 157:12, 159:18
concept [1] - 77:10
concern [4] - 7:15, 69:20, 76:15, 77:18
concerned [5] - 5:13, 103:21, 161:10
concerns [1] - 14:7
concert [1] - 54:14
conclude [1] - 20:12
conclusion [2] - 46:24, 77:22
conditions [2] - 131:3, 131:24
conduct [3] - 35:23, 36:15, 38:14, 39:17, 122:1
conduit [3] - 124:1, 124:2, 128:17
confer [1] - 44:17
confess [2] - 5:6, 7:3
confident [1] - 76:3
confidential [1] - 163:7
confidentiality [1] - 67:15
configured [8] - 81:22, 152:10, 152:11, 152:12, 152:13, 156:23, 159:18
confirm [16] - 4:21, 27:15, 37:14, 37:18, 44:18, 86:8, 87:14, 90:13, 94:16, 94:25,

99:19, 136:15, 144:3, 144:13, 149:6
confirmed [1] - 4:13
confirming [1] - 148:25
confusion [1] - 88:24
Congress [3] - 123:5, 123:7, 128:13
connect [4] - 53:7, 104:17, 105:13, 105:16
connected [6] - 41:3, 101:4, 104:14, 104:24, 107:4, 152:24
connecting [5] - 104:19, 109:21, 109:24, 110:1, 110:6
connection [8] - 49:21, 106:21, 113:15, 114:7, 141:4, 150:17, 151:10, 153:8
connections [2] - 106:20
consequences [1] - 130:8
consider [5] - 14:16, 39:5, 49:10, 95:1, 102:2
consideration [1] - 7:9
considered [1] - 137:24
considering [3] - 16:7, 63:13, 112:8
consistent [2] - 42:17, 72:17
consistently [1] - 99:7
constant [2] - 14:19, 17:5
constantly [6] - 17:16, 19:21, 24:1, 46:7, 47:24, 71:11
constructs [1] - 156:17
consultant [1] - 137:25
consultants [3] - 137:23, 138:2, 138:5
contact [2] - 64:18, 67:16
contacted [1] - 96:17
contain [1] - 69:13
containing [1] - 18:13
contains [1] - 99:23
content [36] - 12:6, 12:11, 16:23, 17:8, 20:1, 47:5, 47:9, 68:21, 69:9, 69:19,

70:16, 78:13, 110:8, 111:1, 111:10, 111:15, 115:20, 115:23, 116:3, 119:4, 120:24, 121:2, 121:11, 121:17, 121:18, 122:24, 123:4, 123:6, 123:13, 126:18, 126:21, 130:14, 131:3, 162:16, 163:6
**context** [8] - 31:24, 31:25, 34:13, 35:7, 51:2, 51:19, 119:8, 150:5
**continent** [1] - 71:13
**continue** [7] - 9:6, 9:12, 19:25, 113:20, 113:21, 122:1, 122:4
**CONTINUED** [1] - 2:1
**continues** [1] - 68:23
**continuing** [1] - 19:22
**contract** [1] - 17:6
**contracted** [1] - 151:13
**contractors** [1] - 19:8
**contrary** [1] - 31:9
**contribute** [1] - 17:9
**contributory** [2] - 25:8, 26:13
**control** [5] - 25:10, 37:12, 39:4, 39:18, 118:5
**controlled** [2] - 33:21, 104:11
**controlling** [1] - 25:4
**conversations** [1] - 45:16
**convince** [1] - 129:4
**Cooper** [1] - 1:10
**coordinate** [1] - 10:10
**coordinated** [1] - 111:21
**coordinating** [1] - 10:16
**copied** [1] - 27:3
**copies** [1] - 116:1
**copy** [12] - 26:2, 27:4, 97:3, 101:7, 102:21, 103:19, 104:11, 105:4, 107:11, 110:5, 161:18, 162:19
**copyright** [10] - 11:4, 23:1, 62:24, 115:15, 117:19, 123:4, 123:10, 123:16, 131:1, 131:18
**Copyright** [1] - 132:7

**copyrighted** [14] - 29:15, 42:15, 42:23, 43:23, 69:23, 108:9, 108:24, 115:16, 122:11, 123:2, 125:6, 129:19, 131:3, 131:5
**copyrights** [5] - 10:20, 62:1, 68:3, 74:11, 117:16
**corners** [1] - 32:4, 34:10
**corporate** [1] - 63:8
**correct** [58] - 8:19, 11:8, 18:24, 21:1, 22:22, 42:25, 44:21, 45:13, 45:23, 46:14, 46:15, 46:19, 46:22, 50:24, 54:19, 55:9, 61:12, 61:14, 64:11, 68:1, 74:20, 82:10, 83:14, 84:14, 86:8, 86:9, 86:14, 87:9, 92:18, 94:17, 95:7, 96:8, 96:12, 97:23, 102:19, 103:13, 103:16, 119:10, 132:16, 139:23, 140:10, 141:6, 141:15, 142:2, 143:22, 145:24, 146:1, 149:1, 149:5, 157:25, 158:3, 158:4, 158:5, 159:15, 160:23, 161:4, 164:8
**correctly** [2] - 94:20, 95:3
**cost** [1] - 96:18
**Counsel** [1] - 2:6
**counsel** [56] - 3:7, 3:23, 5:2, 5:6, 5:12, 5:14, 5:19, 6:1, 6:10, 9:23, 10:2, 10:4, 10:5, 10:12, 10:18, 11:11, 14:13, 14:16, 15:17, 22:20, 24:11, 26:3, 33:24, 36:9, 55:4, 55:6, 59:10, 60:16, 60:19, 61:3, 61:20, 65:20, 66:8, 66:9, 66:17, 71:23, 73:13, 78:22, 78:24, 79:23, 84:17, 88:18, 88:19, 118:15, 130:14, 132:9, 133:17, 134:17, 134:22, 135:2, 151:3, 158:20, 161:11, 161:21

**counsel's** [2] - 15:3, 122:7
**count** [1] - 26:6
**country** [13] - 6:17, 7:6, 10:11, 10:17, 12:14, 12:16, 13:1, 13:8, 14:15, 33:12, 72:18, 73:8, 147:8
**couple** [14] - 19:14, 27:17, 35:11, 52:8, 57:16, 67:24, 81:4, 101:25, 111:3, 112:10, 118:19, 157:9, 157:10, 157:18
**course** [13] - 8:4, 10:1, 14:20, 18:13, 42:5, 44:10, 98:11, 105:7, 123:1, 125:9, 130:5, 152:6, 158:18
**Court** [35] - 1:22, 3:14, 5:4, 5:12, 6:22, 6:25, 7:4, 7:8, 7:15, 8:8, 8:12, 8:13, 8:20, 8:22, 8:23, 32:3, 37:15, 51:22, 76:25, 89:2, 91:16, 117:25, 128:19, 129:4, 129:15, 135:6, 136:1, 148:22, 150:1, 150:5, 151:22, 161:10, 161:17, 162:23, 164:11
**court** [11] - 6:5, 19:18, 25:18, 76:24, 116:21, 117:1, 117:19, 117:20, 126:22, 134:10, 149:4
**COURT** [510] - 1:2, 3:2, 3:3, 3:22, 4:1, 4:4, 4:16, 4:22, 5:1, 5:6, 6:7, 6:13, 6:20, 6:24, 7:23, 8:2, 8:5, 8:8, 8:12, 8:16, 8:23, 9:4, 9:9, 9:12, 9:18, 9:21, 10:2, 10:4, 10:7, 10:10, 10:22, 11:3, 11:7, 11:10, 11:14, 11:19, 11:23, 12:15, 13:2, 13:5, 13:8, 13:16, 13:20, 13:23, 14:4, 14:9, 14:21, 14:24, 15:3, 15:7, 15:20, 15:23, 16:4, 16:18, 17:1, 17:23, 18:1, 18:20, 18:25, 19:7, 19:10, 19:15, 20:11, 21:2, 21:17, 21:23, 21:25,

22:7, 22:19, 22:23, 23:2, 23:5, 23:7, 23:10, 23:15, 24:3, 24:6, 24:11, 24:16, 24:21, 25:5, 25:13, 25:15, 25:20, 25:22, 26:3, 26:6, 26:9, 26:11, 26:15, 26:18, 26:21, 26:25, 27:2, 27:6, 27:8, 27:16, 28:2, 28:7, 28:12, 28:16, 28:19, 28:21, 29:1, 29:5, 29:12, 30:8, 31:4, 31:8, 31:24, 32:3, 32:14, 32:18, 33:12, 33:24, 34:1, 34:4, 34:12, 35:10, 35:13, 35:22, 36:9, 36:13, 36:18, 37:1, 37:19, 38:2, 38:9, 38:16, 38:18, 38:25, 39:9, 40:6, 40:14, 40:18, 40:22, 40:25, 41:11, 41:14, 41:25, 42:13, 42:21, 43:9, 43:15, 43:17, 43:20, 43:25, 44:11, 44:17, 44:21, 45:5, 45:24, 46:13, 46:16, 46:20, 46:23, 47:15, 47:19, 48:2, 48:5, 48:7, 48:11, 48:16, 49:1, 49:12, 49:14, 49:17, 50:2, 50:9, 50:12, 50:21, 50:25, 51:9, 51:15, 51:20, 52:6, 54:6, 54:17, 54:20, 55:2, 55:5, 55:10, 56:8, 56:15, 56:17, 56:22, 57:9, 57:19, 57:24, 58:8, 58:18, 58:25, 60:2, 60:4, 60:10, 60:17, 60:21, 60:23, 61:7, 62:21, 62:24, 63:21, 64:2, 64:5, 66:16, 66:21, 67:7, 67:21, 67:24, 68:2, 68:6, 69:15, 69:22, 71:19, 72:9, 72:15, 72:20, 73:20, 74:2, 74:7, 74:13, 74:16, 74:21, 75:15, 75:20, 75:24, 77:19, 78:1, 79:2, 79:14, 79:15, 79:21, 80:5, 80:17, 80:18, 80:23, 81:12, 82:4, 82:8, 82:11, 82:14, 82:16, 82:19, 82:22, 82:25, 83:2, 83:5, 83:8, 83:10, 83:15,

83:22, 83:25, 84:3, 84:5, 84:8, 84:13, 84:17, 84:20, 84:23, 85:4, 85:7, 85:12, 85:15, 85:17, 86:1, 86:22, 86:24, 87:1, 87:8, 87:10, 87:12, 87:17, 87:19, 87:22, 87:25, 88:4, 88:8, 88:11, 88:16, 88:18, 88:21, 89:1, 89:11, 89:14, 89:18, 89:20, 89:23, 90:5, 90:8, 90:11, 90:17, 90:19, 90:24, 91:3, 91:5, 91:9, 91:15, 92:1, 92:4, 92:7, 92:9, 92:19, 92:23, 92:25, 93:2, 93:4, 93:6, 93:10, 93:12, 93:14, 93:17, 93:19, 93:22, 94:2, 94:5, 94:8, 94:10, 94:12, 95:12, 95:20, 96:5, 96:10, 97:6, 97:23, 98:22, 99:25, 100:3, 100:5, 100:7, 100:9, 100:11, 100:15, 100:17, 101:9, 102:3, 102:6, 102:8, 102:13, 102:16, 103:9, 103:14, 103:18, 103:24, 104:2, 104:5, 105:3, 105:9, 105:18, 106:8, 106:12, 106:23, 107:24, 108:2, 108:6, 108:9, 108:21, 109:10, 109:13, 109:17, 110:9, 110:22, 111:11, 112:1, 113:15, 113:20, 113:24, 114:15, 115:14, 116:20, 117:11, 118:13, 119:5, 119:8, 119:11, 120:11, 120:16, 121:7, 121:20, 122:6, 122:9, 122:19, 125:3, 125:17, 125:24, 126:3, 126:13, 128:1, 129:6, 129:18, 129:21, 129:25, 130:20, 130:25, 131:6, 131:13, 131:18, 131:21, 132:9, 132:17, 133:4, 133:14,

135:16, 136:2, 136:9, 136:10, 136:17, 136:19, 136:23, 137:1, 137:6, 137:9, 137:12, 137:14, 137:16, 137:19, 137:21, 137:24, 138:2, 138:5, 138:7, 138:11, 138:13, 138:16, 138:21, 138:24, 139:1, 139:3, 139:6, 139:10, 139:13, 139:16, 139:19, 139:21, 139:24, 140:4, 140:11, 140:15, 140:20, 140:25, 141:4, 141:7, 141:10, 141:14, 141:16, 141:21, 141:23, 141:25, 142:3, 142:6, 142:12, 142:16, 142:19, 142:23, 143:2, 143:6, 143:8, 143:12, 143:15, 143:18, 143:23, 144:3, 144:14, 144:20, 145:1, 145:5, 145:22, 145:25, 146:3, 146:8, 146:11, 146:13, 146:17, 146:21, 146:25, 148:7, 148:14, 149:8, 149:18, 149:20, 149:24, 150:24, 151:2, 151:5, 151:8, 155:18, 155:24, 156:1, 156:5, 156:8, 157:4, 157:7, 157:20, 157:25, 158:5, 158:9, 158:13, 158:20, 160:9, 161:9, 161:14, 161:17, 162:3, 162:12, 162:18, 162:22, 163:7, 163:10, 163:18, 163:22, 163:25

**Court's** [6] - 3:6, 12:22, 61:8, 121:8, 128:20, 161:19
**courtesy** [1] - 161:20
**Courthouse** [1] - 1:10
**courtroom** [2] - 34:25, 146:19

**courts** [7] - 7:6, 7:24, 8:17, 11:16, 30:14, 117:21, 162:16
**cover** [1] - 148:16
**covered** [4] - 64:6, 64:7, 80:3, 118:16
**Cox** [6] - 113:2, 113:3, 114:12, 114:17, 124:12
**crawls** [1] - 16:20
**create** [5] - 71:5, 76:4, 114:23, 145:16, 152:18
**created** [4] - 109:7, 152:1, 152:8, 152:20
**creative** [1] - 7:18
**creators** [1] - 46:6
**credentials** [1] - 132:22
**credit** [1] - 29:5
**Crimes** [1] - 150:9
**crimes** [1] - 134:5
**cross** [4] - 5:8, 14:22, 50:6, 163:11
**cross-examination** [1] - 14:22
**cross-examine** [1] - 5:8
**cross-reference** [1] - 50:6
**crossed** [2] - 144:16, 144:19
**CRR** [1] - 164:11
**crux** [5] - 121:12, 149:20, 149:25, 151:8
**customer** [1] - 26:21
**customers** [1] - 126:11
**customize** [1] - 13:14
**cut** [7] - 115:22, 124:13, 124:15, 125:15, 128:11, 150:24, 163:23
**CV** [1] - 149:19

# D

**D.C** [1] - 63:2
**dad** [1] - 20:25
**daily** [1] - 15:23
**dare** [1] - 65:21
**data** [48] - 12:6, 12:12, 15:12, 15:13, 15:14, 15:25, 16:13, 16:25, 18:5, 18:12, 19:4, 19:5, 37:10, 40:2, 41:21, 43:6, 48:6, 48:8, 48:12, 49:3, 50:14, 55:14, 57:17,

67:14, 67:21, 67:22, 69:18, 85:3, 85:10, 94:18, 96:3, 97:13, 101:11, 104:13, 104:21, 106:15, 132:12, 132:17, 132:19, 132:20, 144:12, 152:6, 153:15, 153:24, 153:25, 158:14
**database** [5] - 50:1, 50:6, 51:12, 64:14, 76:23
**databases** [2] - 133:21, 133:23
**date** [18] - 16:25, 61:4, 86:9, 86:19, 86:22, 86:24, 86:25, 87:2, 94:16, 95:7, 95:24, 96:2, 97:4, 97:7, 99:17, 99:18, 145:11, 163:4
**Date** [1] - 164:13
**dates** [5] - 18:14, 18:20, 28:15, 28:16, 97:9
**days** [1] - 37:10
**de** [1] - 101:24
**deaf** [1] - 129:14
**deal** [3] - 7:19, 74:9, 122:21
**dealing** [4] - 3:13, 43:10, 78:21, 82:8
**decade** [1] - 150:5
**December** [2] - 98:23, 108:25
**decide** [9] - 13:11, 48:17, 54:4, 55:10, 61:19, 62:17, 76:21, 119:9, 142:6
**decided** [6] - 31:18, 34:6, 47:9, 59:4, 73:11, 76:20
**decides** [5] - 42:14, 57:21, 57:25, 64:8, 72:16
**decision** [10] - 8:13, 9:10, 9:21, 9:25, 12:22, 32:21, 73:9, 121:9, 161:17, 161:19
**decisions** [2] - 8:19, 9:5
**declaration** [24] - 83:13, 84:21, 88:3, 88:14, 91:13, 94:24, 108:22, 138:17, 139:10, 139:11, 139:14, 140:7, 140:8, 140:12,

140:20, 140:21, 140:23, 140:24, 141:8, 143:11, 143:12, 143:19, 143:24, 149:1
**declarations** [19] - 85:14, 89:2, 89:16, 89:18, 89:20, 90:2, 90:15, 90:17, 90:23, 90:24, 91:1, 91:7, 139:17, 139:21, 140:19, 142:4, 148:7, 148:8
**decreasing** [1] - 68:9
**defame** [1] - 123:25
**default** [1] - 130:13
**Defendant** [3] - 1:9, 2:3, 36:15
**defendant** [51] - 12:5, 14:2, 15:3, 23:2, 23:10, 23:11, 23:17, 24:23, 26:15, 26:16, 27:3, 27:6, 29:3, 29:4, 30:8, 30:13, 30:16, 35:23, 37:21, 38:2, 38:9, 38:19, 39:3, 39:18, 49:21, 50:21, 51:3, 51:16, 52:1, 52:7, 52:8, 52:10, 52:11, 52:14, 53:16, 54:25, 59:13, 63:7, 63:15, 67:16, 86:21, 97:10, 112:19, 113:16, 116:22, 122:19, 125:11, 162:9, 162:15, 162:20
**defendant's** [11] - 13:11, 18:3, 38:19, 38:20, 38:23, 39:4, 62:16, 63:7, 66:18, 108:23
**defendants** [3] - 16:22, 65:19, 118:9
**defense** [4] - 5:12, 5:14, 118:15, 161:21
**definitely** [3] - 48:15, 79:22, 115:12
**definition** [2] - 47:2, 160:2
**degree** [2] - 61:22, 158:24
**degrees** [2] - 72:2, 158:23
**Delaware** [2] - 134:14, 150:9
**delay** [1] - 97:21
**delete** [1] - 73:18
**deleted** [2] - 74:2, 130:4

**delist** [1] - 111:4
**Delvepoint** [1] - 64:14
**demand** [1] - 67:17
**demographics** [1] - 53:4
**denied** [1] - 8:21
**Dental** [1] - 56:2
**dental** [6] - 52:16, 52:17, 53:12, 53:13, 54:5, 56:3
**dentist** [2] - 52:21, 56:3
**deny** [2] - 7:13, 61:25
**denying** [1] - 8:18
**department** [2] - 10:13, 76:19
**deposed** [5] - 31:17, 63:7, 63:8, 63:9, 147:6
**deposition** [1] - 14:24
**depositions** [2] - 17:13, 63:5
**DEPUTY** [7] - 3:1, 79:11, 79:13, 80:14, 80:16, 136:8, 164:4
**described** [1] - 88:13
**description** [2] - 83:20, 144:9
**design** [1] - 7:18
**designed** [1] - 107:14
**desk** [1] - 13:17
**desktop** [6] - 40:25, 42:22, 43:7, 43:17, 46:1
**desktops** [1] - 43:10
**despite** [1] - 134:20
**destination** [7] - 82:18, 83:18, 87:16, 87:20, 144:8, 153:19, 153:21
**destroy** [3] - 65:22, 130:13, 130:19
**destroyed** [1] - 130:21
**detail** [3] - 5:24, 14:3, 24:7
**detailed** [1] - 149:19
**detect** [3] - 4:9, 4:21, 46:8
**detection** [1] - 47:24
**deter** [2] - 115:15, 116:21
**determine** [8] - 41:9, 45:18, 49:8, 55:21, 91:16, 151:15, 160:14, 160:15
**deterrence** [1] - 68:8
**deterrent** [1] - 68:24
**develop** [2] - 17:16, 124:10
**developed** [1] -

150:12
**device** [7] - 41:20, 81:5, 157:14, 157:23, 158:2
**devices** [24] - 41:24, 42:2, 42:14, 42:16, 42:25, 43:22, 44:8, 44:15, 44:22, 45:3, 45:7, 46:17, 46:25, 47:17, 48:18, 81:1, 81:4, 81:9, 82:1, 82:3, 157:10, 157:21, 158:16, 158:17
**devised** [1] - 160:16
**difference** [2] - 22:3, 159:23
**different** [86] - 7:5, 12:10, 12:12, 16:11, 18:22, 21:16, 31:3, 38:1, 41:5, 41:8, 41:22, 44:15, 45:1, 45:2, 45:3, 45:7, 45:9, 45:15, 45:18, 46:1, 46:12, 46:17, 46:25, 47:16, 48:18, 49:7, 49:9, 49:19, 51:13, 51:21, 52:5, 54:9, 57:12, 57:13, 64:12, 64:25, 70:12, 72:11, 79:25, 81:7, 81:8, 81:9, 81:18, 85:22, 88:22, 92:12, 98:16, 98:18, 99:5, 102:24, 104:3, 104:23, 110:9, 112:6, 115:17, 115:18, 117:8, 117:21, 119:21, 120:3, 126:17, 131:6, 137:4, 147:14, 147:15, 150:4, 150:15, 152:13, 152:22, 156:13, 156:22, 157:1, 157:7, 157:10, 157:13, 157:14, 157:17, 157:18, 157:21, 157:22, 157:23, 158:14, 158:16, 158:17
**difficult** [10] - 45:18, 46:8, 51:1, 73:22, 74:8, 76:6, 90:3, 91:8, 103:1, 108:18
**difficulty** [1] - 133:5
**ding** [1] - 126:11
**direct** [7] - 26:9, 49:20, 123:18, 148:3, 150:17,

153:2, 153:5
**directed** [1] - 119:13
**direction** [1] - 38:1
**directly** [7] - 22:6, 77:16, 90:6, 102:14, 107:13, 143:25, 153:4
**director** [1] - 65:24
**disabuses** [1] - 37:25
**disagree** [4] - 66:20, 76:9, 77:10, 92:7
**disclaimer** [2] - 133:9, 133:18
**discontinuing** [1] - 128:1
**discovery** [21] - 7:5, 44:7, 44:10, 51:15, 52:1, 53:18, 53:23, 60:6, 63:4, 63:6, 78:24, 86:18, 96:24, 97:1, 105:7, 105:19, 117:12, 117:21, 121:9, 141:5, 147:5
**discuss** [1] - 79:5
**discussed** [2] - 76:13, 133:19
**discussing** [2] - 79:15, 118:5
**discussions** [3] - 48:21, 115:22, 115:24
**dismiss** [5] - 58:23, 62:7, 98:19, 98:20, 134:19
**dismissals** [1] - 59:3
**dismissed** [2] - 61:9, 61:10
**dispositive** [1] - 47:13
**distinguish** [1] - 41:6
**distribute** [2] - 17:8, 126:21
**distributed** [1] - 27:4
**distributing** [10] - 16:23, 18:10, 55:16, 69:1, 69:3, 69:8, 108:23, 124:7, 125:2, 126:18
**distribution** [1] - 75:3
**distributors** [1] - 123:23
**District** [10] - 6:2, 6:3, 8:9, 8:20, 8:22, 8:23, 9:15, 51:21, 62:22, 63:2
**DISTRICT** [2] - 1:2, 1:2
**district** [5] - 6:18, 9:1, 9:7, 154:19, 154:22
**diverse** [3] - 152:14, 152:15, 152:16

**division** [2] - 9:16, 9:17
**DMCA** [41] - 110:11, 110:12, 110:13, 110:17, 111:8, 111:16, 111:18, 111:24, 112:1, 112:15, 112:23, 113:7, 113:12, 113:21, 114:11, 116:4, 120:7, 120:13, 120:16, 120:21, 120:25, 121:4, 121:15, 121:21, 122:10, 122:15, 122:17, 122:21, 122:22, 123:9, 123:19, 123:21, 123:23, 124:5, 124:24, 125:11, 125:23, 127:12, 127:14, 128:15, 128:16
**DMV** [1] - 155:1
**Docket** [3] - 3:5, 4:17, 140:7
**docket** [2] - 148:6, 148:9
**Document** [1] - 140:6
**documentation** [4] - 84:15, 85:8, 91:23, 161:3
**documented** [1] - 51:9, 108:23, 109:19
**documents** [2] - 25:24, 31:17
**Doe** [21] - 3:4, 5:4, 22:9, 26:16, 30:24, 52:5, 52:7, 52:10, 52:11, 52:14, 53:15, 54:21, 57:25, 58:19, 61:11, 63:23, 66:17, 74:16, 94:10, 100:9, 141:2
**DOE** [1] - 1:7
**Doe's** [1] - 147:21
**dollars** [2] - 71:10, 111:22
**done** [25] - 8:21, 30:5, 34:16, 41:19, 54:22, 58:17, 64:5, 64:8, 64:9, 67:12, 82:25, 91:14, 91:16, 94:20, 95:3, 130:11, 138:7, 139:12, 146:2, 148:9, 149:11, 156:16, 158:14
**door** [3] - 34:25, 75:6, 147:23
**doors** [1] - 113:23

**dotted** [2] - 144:15, 144:18
**double** [5] - 4:12, 16:16, 86:13, 136:15, 145:20
**doubt** [2] - 39:23, 58:15
**down** [24] - 5:12, 7:7, 12:9, 12:13, 16:6, 24:7, 55:15, 65:20, 73:2, 73:19, 92:16, 108:15, 111:7, 111:22, 115:4, 123:14, 124:3, 127:5, 127:7, 127:11, 127:23, 128:5, 128:22, 133:21
**download** [20] - 9:12, 27:19, 42:18, 42:24, 43:2, 45:24, 45:25, 48:18, 53:20, 57:20, 100:25, 103:20, 104:9, 104:10, 126:21, 131:14, 144:12, 152:19, 152:20, 157:21
**downloaded** [60] - 22:1, 22:2, 23:17, 23:20, 24:24, 27:3, 27:20, 27:24, 28:13, 42:15, 44:15, 45:7, 46:17, 46:24, 46:25, 47:17, 49:4, 49:25, 50:23, 53:12, 54:17, 55:7, 55:8, 55:16, 56:18, 67:22, 70:16, 72:10, 74:19, 77:23, 83:22, 84:14, 93:23, 100:13, 100:15, 100:16, 101:8, 101:22, 101:24, 103:11, 103:15, 105:4, 105:11, 105:19, 105:22, 106:14, 106:25, 119:4, 119:24, 121:3, 129:19, 130:2, 131:7, 153:9, 154:5, 157:5, 161:1, 162:11, 163:3
**downloader** [1] - 123:17
**downloaders** [2] - 123:23, 124:23
**downloading** [53] - 20:18, 21:6, 21:19, 27:12, 27:25, 34:14, 36:1, 36:19, 37:2, 37:22, 39:14, 40:7, 41:19, 42:23, 43:23,

47:8, 50:8, 50:17, 50:19, 52:10, 52:12, 52:15, 53:9, 53:10, 54:10, 54:16, 56:5, 65:5, 65:6, 68:25, 69:15, 69:22, 71:20, 93:15, 95:16, 95:18, 98:10, 99:6, 99:8, 102:14, 102:16, 102:17, 115:16, 116:21, 120:18, 120:24, 121:5, 122:11, 124:8, 125:1, 125:6, 126:17, 127:10
**downloads** [21] - 20:12, 21:6, 21:18, 21:25, 29:15, 41:18, 43:9, 43:21, 44:25, 46:14, 68:9, 74:17, 75:3, 86:16, 94:3, 102:13, 103:19, 104:2, 129:9, 129:16, 158:14
**dozen** [3] - 14:18, 111:3, 147:8
**dozens** [2] - 34:15, 43:5
**drawer** [1] - 122:12
**drawn** [1] - 72:3
**drink** [1] - 146:18
**drive** [1] - 63:7
**drives** [3] - 44:8, 53:19, 105:8
**driving** [1] - 56:6
**drop** [1] - 65:22
**due** [2] - 61:10, 128:25
**dunk** [3] - 37:16, 62:8, 62:9
**during** [5] - 17:13, 46:14, 65:13, 86:18, 135:18
**duties** [1] - 10:16
**duty** [3] - 59:22, 134:20, 135:5
**DVD** [1] - 132:5
**DVDs** [1] - 132:6
**dynamic** [4] - 95:17, 98:12, 98:15, 153:3

## E

**e-books** [1] - 51:8
**e-mail** [6] - 81:17, 112:23, 115:1, 139:24, 140:16, 156:20
**e-mails** [1] - 14:18
**early** [8] - 11:12, 21:12, 29:18, 33:1,

41:16, 63:16, 78:23, 162:6
**easier** [2] - 114:5, 117:6
**easiest** [1] - 156:10
**easily** [1] - 162:11
**East** [2] - 1:19, 70:25
**Eastern** [5] - 6:2, 6:3, 9:15, 70:24, 71:4
**eat** [1] - 80:6
**effect** [2] - 68:8, 68:24
**effective** [2] - 121:16, 126:12
**efficient** [1] - 103:2
**effort** [3] - 19:18, 57:18, 161:22
**efforts** [2] - 114:21, 116:10
**egregious** [1] - 129:8
**eight** [4] - 39:22, 42:12, 98:23, 98:25
**either** [10] - 20:21, 44:5, 59:10, 59:13, 60:17, 72:2, 80:2, 82:3, 94:13, 144:1
**elaborate** [3] - 25:1, 44:20, 62:5
**electronic** [2] - 139:22, 152:3
**electronically** [2] - 139:20, 143:23
**embedded** [1] - 152:4
**Emilie** [4] - 2:6, 3:24, 6:15, 22:5
**empathetic** [1] - 59:16
**empirical** [1] - 22:5
**empirically** [1] - 125:15
**employee** [1] - 137:22
**employees** [2] - 52:20, 137:21
**enable** [1] - 80:25
**enacted** [2] - 122:21, 122:22
**encourage** [1] - 19:25
**end** [6] - 14:25, 16:12, 38:18, 107:9, 130:6, 132:6
**End** [2] - 53:9, 53:11
**enforcement** [3] - 134:4, 135:8, 135:24
**enforces** [1] - 68:3
**engage** [1] - 37:8
**engaged** [1] - 38:9
**engaging** [1] - 38:14
**engine** [1] - 111:7
**engineer** [3] - 132:22, 132:23, 159:2
**enjoy** [1] - 163:18
**enormous** [1] - 115:6

**ensure** [1] - 83:13
**ensuring** [1] - 144:18
**entered** [2] - 7:4, 76:21
**enters** [1] - 30:8
**entire** [9] - 10:13, 20:2, 69:5, 71:12, 104:2, 105:1, 111:15, 127:11, 147:5
**entirely** [3] - 22:16, 35:8, 124:6
**entitled** [1] - 164:9
**entries** [2] - 3:11, 3:16
**entry** [3] - 57:1, 65:12, 75:2
**Episode** [1] - 98:10
**equal** [2] - 52:25
**equally** [3] - 21:25, 22:1, 22:19
**equation** [1] - 30:20
**err** [1] - 58:16
**error** [1] - 87:6
**errors** [2] - 86:14, 95:3
**especially** [4] - 7:6, 13:25, 51:2, 62:2
**ESQUIRE** [3] - 1:16, 1:18, 2:2
**Esquire** [1] - 2:6
**essentially** [3] - 13:13, 114:23, 150:4
**et** [11] - 34:17, 37:10, 38:13, 40:2, 41:20, 64:20, 71:4, 114:17, 122:10, 163:6
**ethically** [1] - 17:21
**Europe** [2] - 70:24, 71:4
**evaluate** [1] - 160:20
**events** [1] - 128:20
**eventually** [5] - 18:15, 94:4, 103:19, 154:1, 155:5
**evidence** [37] - 4:13, 4:15, 15:17, 17:12, 20:15, 31:2, 31:13, 44:3, 49:10, 49:11, 49:14, 49:22, 52:3, 53:7, 53:24, 54:9, 54:15, 55:22, 56:11, 57:1, 64:23, 65:4, 65:7, 65:15, 66:3, 66:4, 66:6, 73:6, 75:19, 98:1, 98:9, 99:3, 99:8, 106:16, 124:10, 134:8, 135:17
**evidentiary** [1] - 147:8
**ex** [1] - 7:4
**exact** [11] - 11:14,

22:15, 40:6, 76:11, 76:22, 125:3, 127:24, 134:11, 134:14, 135:3, 156:1
**exactly** [7] - 76:16, 88:12, 96:9, 96:22, 120:20, 139:5, 142:8
**examination** [1] - 14:22
**examine** [4] - 5:8, 101:21, 159:9, 160:14
**examined** [2] - 100:7, 132:23
**examining** [1] - 100:21
**example** [11] - 51:19, 52:3, 55:23, 56:2, 60:7, 63:20, 65:2, 85:17, 98:4, 103:9, 115:19
**examples** [1] - 56:5
**exams** [1] - 85:25
**excellent** [1] - 149:11
**except** [2] - 18:18, 91:4
**exception** [1] - 35:16
**exchange** [2] - 44:8, 122:25
**excuse** [4] - 3:7, 113:21, 139:14, 146:17
**execute** [1] - 155:6
**exhibit** [1] - 84:23
**Exhibit** [5] - 85:5, 88:5, 90:21, 91:21, 97:9
**existed** [1] - 152:21
**existence** [2] - 10:22, 10:23
**exists** [5] - 94:25, 103:6, 127:18, 127:19
**exit** [3] - 57:1, 65:12, 75:2
**expand** [2] - 39:3, 85:1
**expanse** [1] - 85:21
**expect** [2] - 17:21, 63:9
**expecting** [1] - 118:12
**expedited** [2] - 60:5, 141:5
**experience** [4] - 43:9, 47:4, 69:6, 135:22
**experienced** [1] - 116:18
**expert** [7] - 4:7, 63:5, 94:25, 102:9, 122:15, 133:1, 147:6

**expertise** [2] - 144:14, 144:17
**experts** [1] - 44:17
**explain** [4] - 4:4, 83:15, 86:6, 151:22
**explore** [2] - 14:6, 20:11
**exploring** [1] - 117:8
**extends** [1] - 18:21
**extent** [4] - 5:23, 44:20, 116:5, 117:20
**extra** [1] - 63:3
**extreme** [1] - 67:13
**eyes** [2] - 145:10, 145:18

---

**F**

---

**face** [1] - 121:8
**Facebook** [4] - 25:24, 64:20, 65:16, 73:18
**facility** [1] - 31:16
**facing** [1] - 158:2
**fact** [20] - 8:3, 20:7, 38:22, 53:4, 53:5, 61:12, 69:4, 75:8, 75:13, 75:14, 75:18, 86:15, 124:5, 125:19, 128:24, 134:11, 134:21, 135:8, 135:9
**factors** [1] - 55:23
**facts** [5] - 7:10, 30:19, 33:17, 44:12, 91:19
**factual** [1] - 134:23
**failure** [3] - 115:8, 160:3, 160:5
**fair** [5] - 46:16, 61:24, 62:2, 62:19, 68:2
**fairly** [4] - 21:10, 23:1, 24:4, 61:6
**faith** [10] - 25:10, 42:9, 44:5, 53:16, 58:14, 67:19, 73:23, 78:16, 105:22, 147:9
**faith-base** [1] - 78:16
**fall** [2] - 52:12, 63:10
**false** [3] - 159:24, 159:25
**familiar** [3] - 9:9, 45:12, 99:25
**family** [4] - 39:11, 53:2, 78:8, 127:12
**Family** [1] - 98:10
**fantastic** [1] - 26:3
**far** [4] - 82:6, 118:13, 135:18, 161:10
**fast** [3] - 49:12, 79:2, 103:5
**father** [1] - 127:9

**fathers** [1] - 129:2
**fault** [1] - 83:10
**FBI** [1] - 111:21
**Federal** [4] - 61:23, 91:16, 117:25, 118:10
**federal** [7] - 11:16, 117:16, 117:17, 117:20, 146:19, 149:4
**fee** [2] - 96:19, 139:1
**fellow** [1] - 157:16
**felt** [1] - 16:13
**female** [1] - 52:20
**few** [8] - 45:17, 49:9, 68:17, 70:12, 95:15, 98:14, 136:11, 155:18
**Fi** [3] - 20:16, 20:20, 25:18
**field** [18] - 100:1, 100:12, 101:3, 101:5, 101:9, 101:14, 101:16, 101:20, 101:21, 104:15, 104:22, 105:7, 105:9, 105:14, 105:24, 106:22, 107:10
**fields** [1] - 152:7
**Fieser** [1] - 108:21
**fighting** [2] - 3:8, 69:7
**figure** [4] - 29:16, 57:7, 102:21, 118:9
**file** [18] - 6:7, 9:6, 9:12, 16:17, 16:21, 18:5, 18:18, 18:19, 19:18, 21:3, 22:23, 32:11, 34:18, 42:14, 48:17, 54:21, 55:10, 55:11, 55:21, 56:22, 56:23, 57:21, 57:25, 58:2, 58:7, 62:2, 66:11, 72:16, 74:10, 76:4, 83:16, 84:10, 87:21, 93:1, 98:3, 100:22, 102:11, 103:3, 107:5, 111:9, 117:20, 121:13, 129:3, 147:20, 156:20
**filed** [20] - 3:13, 9:14, 11:5, 11:17, 11:21, 11:24, 13:17, 17:24, 58:19, 63:19, 63:23, 67:11, 84:22, 94:8, 100:9, 113:17, 131:10, 131:12, 135:2, 141:2
**files** [24] - 22:8, 30:9,

43:4, 43:5, 51:4, 51:6, 52:5, 54:10, 57:1, 70:4, 71:2, 71:8, 74:16, 82:20, 84:14, 85:12, 119:23, 150:18, 151:25, 152:5, 152:8, 152:9, 154:5
**filing** [9] - 12:23, 30:17, 57:10, 63:12, 68:6, 115:15, 121:11, 136:19, 136:22
**fill** [1] - 69:4
**filmed** [1] - 43:3
**films** [2] - 53:20, 53:21
**filter** [2] - 101:13, 115:23
**finally** [1] - 52:2
**financial** [1] - 83:7
**fine** [4] - 6:21, 45:18, 80:7, 151:4
**fingerprint** [1] - 152:3
**finish** [1] - 79:6
**FIRM** [1] - 1:15
**Firm** [1] - 3:20
**firm** [1] - 138:20
**firmly** [1] - 58:6
**firms** [2] - 16:11, 83:7
**First** [3] - 7:17, 62:1, 77:14
**first** [18] - 11:1, 15:5, 16:6, 38:19, 53:1, 55:15, 63:19, 70:18, 70:22, 72:24, 85:25, 86:20, 107:4, 112:4, 125:25, 136:22, 147:15, 148:5
**fit** [2] - 13:15, 129:17
**five** [15] - 14:17, 22:20, 55:15, 70:13, 71:25, 104:23, 104:25, 106:20, 115:7, 119:21, 124:14, 124:15, 131:8, 138:3, 145:16
**flag** [1] - 115:8
**flash** [1] - 115:5
**flat** [2] - 35:7, 139:1
**flight** [2] - 163:14, 163:15
**Flint** [1] - 150:10
**floor** [3] - 118:15, 129:6, 149:8
**flyer** [1] - 41:18
**focus** [2] - 48:7, 93:8
**focusing** [1] - 36:16
**follow** [5] - 52:18, 123:14, 123:15, 154:15, 160:10

**follow-up** [2] - 52:18, 160:10
**followed** [1] - 114:20
**following** [2] - 98:6, 152:9
**follows** [2] - 17:2
**food** [1] - 80:9
**FOR** [1] - 1:2
**Force** [1] - 150:10
**forcing** [1] - 67:1
**foregoing** [1] - 164:8
**forensic** [2] - 16:8, 137:4
**forensically** [3] - 17:12, 49:20, 49:21
**forensics** [1] - 4:7
**forever** [2] - 97:15, 97:21
**forget** [1] - 23:21
**form** [11] - 7:11, 12:15, 13:6, 17:9, 35:14, 35:16, 44:5, 56:19, 57:9, 57:11, 139:13
**formed** [1] - 11:1
**Fornite** [1] - 24:5
**forth** [1] - 90:15
**forward** [16] - 14:2, 30:21, 31:21, 57:8, 59:4, 59:12, 59:21, 61:19, 61:21, 62:20, 63:15, 66:23, 67:5, 67:6, 67:20, 73:5
**founding** [1] - 129:1
**four** [29] - 9:1, 14:17, 19:17, 23:24, 32:4, 34:10, 48:3, 64:12, 71:25, 78:5, 84:7, 91:1, 91:6, 108:12, 115:7, 119:21, 131:10, 131:12, 151:25, 152:9, 152:10, 152:17, 152:20, 152:22, 154:5, 159:15, 159:17, 159:18
**four-bedroom** [1] - 78:5
**four-computer** [2] - 159:15, 159:17
**fourth** [1] - 153:10
**Francisco** [1] - 72:4
**free** [3] - 128:9, 128:16, 128:17
**freeloader** [1] - 20:20
**frequent** [1] - 41:18
**frequently** [1] - 19:1
**freshest** [1] - 111:6
**Friday** [2] - 1:11, 65:14
**Friedlander** [1] - 1:22,

164:11
**friedlanderreporter @gmail.com** [1] - 1:23
**front** [8] - 24:17, 48:8, 51:22, 52:3, 84:16, 97:4, 101:11, 106:23
**FTP** [1] - 156:20
**full** [7] - 54:9, 101:7, 102:11, 102:21, 107:11, 110:4, 116:1
**fully** [1] - 8:11
**function** [2] - 6:10, 107:17
**funny** [1] - 125:20
**future** [2] - 9:25, 62:20

### G

**game** [2] - 30:2, 76:20
**Game** [5] - 53:9, 53:10, 53:11, 55:23
**games** [1] - 91:18
**garbage** [1] - 127:16
**garden** [2] - 80:7, 163:22
**gathering** [1] - 85:2
**gathers** [1] - 140:3
**gauntlet** [1] - 147:5
**general** [7] - 3:12, 3:23, 5:10, 5:11, 5:18, 10:4, 10:5, 10:12, 11:11, 17:19, 49:24, 75:11, 88:18, 101:13, 132:10, 150:2, 151:20, 151:22
**General** [2] - 2:6, 10:25
**generally** [10] - 5:25, 6:11, 6:16, 12:18, 13:5, 19:13, 43:1, 47:4, 67:21, 130:5
**generated** [1] - 122:24
**geofencing** [1] - 151:14
**geographically** [1] - 82:25
**GeoIP** [1] - 133:22
**GeoIP2** [1] - 133:22
**geolocation** [3] - 75:12, 133:7, 133:23
**Germany** [5] - 15:8, 16:6, 16:15, 99:22, 145:8
**gigabytes** [1] - 108:12
**gigantic** [1] - 122:17
**girls** [1] - 23:25
**given** [10] - 15:14, 19:10, 36:20, 43:3,

43:13, 59:17, 76:17, 90:8, 91:20, 155:21
**Glacier** [3] - 35:5, 35:6
**Gnutella** [2] - 150:15, 150:20
**goal** [2] - 44:11, 45:5
**Google** [5] - 110:14, 110:18, 110:21, 111:4
**gotta** [1] - 133:10
**gradually** [1] - 115:2
**grant** [3] - 7:13, 9:5, 60:5
**granted** [2] - 9:2, 63:3
**granting** [1] - 7:4
**granular** [1] - 5:24
**great** [12] - 7:18, 33:2, 55:23, 56:2, 61:1, 80:7, 80:9, 125:21, 126:1, 129:2, 136:5, 141:16
**Greenwich** [1] - 87:5
**Greg** [1] - 65:24
**ground** [1] - 134:7
**Group** [1] - 116:9
**group** [1] - 150:10
**grow** [1] - 68:23
**growing** [6] - 46:9, 46:10, 68:15, 68:20, 105:24
**grown** [1] - 21:4
**GuardaLey** [1] - 155:23
**guess** [8] - 8:9, 24:3, 39:12, 45:20, 53:3, 119:15, 130:18, 163:10
**guest** [1] - 20:20
**guests** [1] - 20:15
**Guide** [1] - 56:1
**Guido's** [1] - 164:2
**Guy** [1] - 98:10
**guy** [6] - 66:3, 66:25, 113:9, 113:11, 113:14, 124:13
**guys** [1] - 23:24

### H

**hac** [1] - 6:5
**half** [6] - 58:10, 71:12, 108:13, 111:21, 137:18, 138:22, 147:8, 147:21, 153:8
**handed** [1] - 148:20
**handing** [1] - 26:2
**handle** [1] - 5:21
**handles** [2] - 83:3, 139:4
**hands** [1] - 75:22

**handwritten** [1] - 139:19
**happy** [3] - 48:9, 56:11, 163:18
**harbor** [3] - 123:9, 124:21
**hard** [8] - 39:25, 40:3, 44:8, 53:19, 63:7, 67:1, 75:18, 105:8
**hardship** [1] - 59:12
**hardware** [1] - 152:15
**hash** [9] - 41:8, 100:23, 106:9, 106:10, 106:11, 106:13, 106:16, 106:21, 152:2
**hashed** [1] - 152:1
**hashes** [4] - 106:9, 106:13, 154:6
**hate** [1] - 129:1
**hay** [1] - 28:6
**HD** [1] - 43:4
**head** [16] - 17:18, 28:13, 31:16, 34:9, 51:1, 51:5, 56:10, 59:2, 60:13, 96:22, 108:7, 116:9, 129:21, 132:1, 150:11
**hear** [11] - 31:1, 32:25, 60:11, 60:13, 60:15, 60:19, 79:18, 89:2, 122:7, 127:13
**heard** [5] - 118:20, 118:21, 125:25, 150:2, 151:9
**hearing** [11] - 3:9, 6:25, 7:1, 7:12, 79:6, 89:15, 90:25, 91:16, 118:23, 128:24, 135:18
**hearings** [4] - 5:24, 17:14, 147:8, 161:22
**heart** [1] - 149:21
**heavens** [1] - 127:6
**heavy** [1] - 115:21
**held** [1] - 30:15
**help** [6] - 24:20, 67:6, 85:19, 91:25, 118:3, 125:9
**helpful** [3] - 93:14, 94:2, 161:21
**helping** [1] - 69:13
**herring** [4] - 122:17, 122:18, 122:21, 124:24
**hiding** [1] - 34:22
**high** [4] - 61:22, 65:2, 72:25, 108:11
**high-quality** [1] -

*108*:11
**high-tech** *[1] - 65*:2
**higher** *[3] - 61*:15,
71:24, 101:20
**highest** *[1] - 133*:25
**highly** *[1] - 43*:14
**himself** *[2] - 52*:22,
150:12
**hired** *[1] - 49*:19
**history** *[5] - 29*:5,
30:1, 32:6, 74:18,
123:20
**hit** *[8] - 18*:14, 20:8,
34:9, 54:4, 86:17,
96:2, 118:23, 145:11
**hits** *[1] - 19*:11
**hitting** *[1] - 28*:6
**hmm** *[1] - 141*:10
**hold** *[5] - 21*:18,
61:15, 88:21, 96:19
**holding** *[1] - 10*:25
**Holdings** *[10] - 2*:6,
3:4, 3:19, 3:21, 3:24,
5:19, 10:8, 47:15,
110:19, 132:8
**HOLDINGS** *[1] - 1*:4
**home** *[15] - 29*:11,
40:13, 44:23, 55:19,
55:20, 65:10, 75:17,
78:4, 78:10, 131:22,
139:6, 139:9, 153:7,
153:10, 154:10
**Honda** *[1] - 56*:7
**honest** *[2] - 62*:3, 80:3
**honestly** *[1] - 122*:1
**Honor** *[77] - 3*:25, 4:2,
5:3, 5:20, 6:1, 6:9,
8:1, 8:4, 8:7, 9:22,
12:20, 20:4, 21:22,
22:12, 24:2, 24:8,
24:18, 25:2, 25:14,
25:17, 25:21, 26:1,
26:5, 26:14, 27:1,
32:11, 33:25, 34:9,
39:1, 48:9, 54:8,
56:14, 61:5, 62:23,
67:10, 78:20, 79:10,
79:20, 80:1, 80:3,
80:22, 85:23, 96:4,
96:13, 97:3, 99:11,
113:2, 118:2,
118:23, 119:16,
122:2, 126:23,
129:22, 132:16,
132:20, 133:16,
135:13, 136:5,
136:6, 147:2, 149:7,
149:10, 149:15,
155:17, 158:22,
160:8, 160:11,

160:19, 161:13,
161:15, 161:16,
161:24, 161:25,
162:13, 163:9,
163:21, 163:24
**Honor's** *[2] - 75*:7,
118:16
**HONORABLE** *[1] -
1*:13
**hope** *[4] - 28*:4, 53:18,
76:2, 114:12
**hopefully** *[2] - 111*:12,
163:14
**hoping** *[1] - 77*:13
**host** *[2] - 152*:17,
152:21
**hosting** *[2] - 111*:10,
150:23
**hour** *[5] - 103*:25,
109:4, 138:16,
153:8, 163:18
**hours** *[1] - 58*:10
**house** *[47] - 13*:25,
19:7, 19:9, 20:8,
20:16, 20:22, 21:4,
21:9, 21:11, 21:16,
22:2, 22:6, 22:9,
22:17, 22:21, 23:21,
26:22, 27:17, 27:19,
37:2, 39:15, 39:22,
41:1, 41:6, 41:10,
42:22, 42:23, 43:17,
43:23, 47:7, 49:3,
76:19, 77:16, 78:7,
78:11, 78:17, 81:14,
94:13, 94:22, 127:6,
127:15, 127:18,
147:23, 156:11,
156:12
**household** *[6] - 21*:22,
36:25, 39:4, 39:8,
64:22, 155:8
**houses** *[1] - 23*:24
**huge** *[3] - 43*:5, 69:3,
104:25
**hum** *[1] - 36*:17
**human** *[2] - 112*:17,
145:10
**humanly** *[1] - 103*:4
**hundred** *[19] - 19*:24,
37:16, 51:6, 69:2,
86:17, 96:21, 97:12,
100:22, 101:4,
101:6, 102:3,
102:17, 102:24,
107:6, 108:5,
123:21, 138:9,
142:20, 162:18
**hundreds** *[3] - 90*:2,
129:9

**hurdle** *[1] - 118*:8
**hurt** *[1] - 20*:3
**husband** *[1] - 39*:11
**hygienists** *[1] - 52*:21
**hypothetical** *[6] -
22*:13, 27:16, 53:2,
53:3, 127:8, 145:17
**hypothetically** *[4] -
30*:8, 42:21, 57:19,
127:1
**hypotheticals** *[1] -
127*:23

---

## *I*

**I's** *[2] - 144*:15, 144:18
**ICAC** *[2] - 150*:9,
150:11
**ID** *[3] - 44*:25, 46:11,
47:23
**idea** *[8] - 20*:10, 28:16,
28:18, 28:19, 28:21,
76:22, 98:12, 134:6
**ideal** *[1] - 69*:11
**identical** *[1] - 154*:8
**identified** *[4] - 31*:15,
50:10, 106:18,
154:13
**identifier** *[1] - 47*:25
**identifiers** *[1] - 46*:2
**identifies** *[2] - 158*:1,
158:6
**identify** *[19] - 36*:7,
44:14, 45:6, 47:16,
47:22, 80:25, 92:1,
92:10, 93:15, 93:20,
94:22, 96:6, 152:3,
152:5, 153:11,
156:12, 158:10,
160:17, 162:15
**identifying** *[5] - 42*:20,
55:22, 93:23, 94:3,
151:18
**identity** *[3] - 58*:1,
58:20, 66:19
**IDs** *[4] - 45*:2, 45:9,
45:15, 45:18
**ignore** *[1] - 125*:12
**ignored** *[4] - 112*:25,
121:23, 125:9,
125:12
**ignoring** *[1] - 124*:20
**illegal** *[1] - 34*:13
**imagine** *[2] - 39*:25,
80:1
**immediately** *[3] -
30*:25, 54:12, 123:1
**immunity** *[5] - 123*:16,
124:4, 125:18,
125:23, 126:8

**impact** *[3] - 68*:12,
68:13, 121:8
**importance** *[1] - 52*:15
**important** *[6] - 41*:15,
50:13, 86:10, 86:20,
148:18, 149:12
**importantly** *[1] -
151*:21
**impossible** *[2] -
43*:12, 70:21
**improper** *[1] - 67*:12
**in-house** *[6] - 13*:25,
19:7, 19:9, 49:3,
94:13, 94:22
**inability** *[1] - 61*:11
**inaccurate** *[1] -
151*:17
**inadvertent** *[2] -
60*:25, 61:2
**inbox** *[1] - 112*:25
**inclined** *[1] - 65*:8
**included** *[1] - 91*:21
**inconvenience** *[2] -
16*:15, 62:10
**increase** *[1] - 103*:4
**increasing** *[1] - 68*:14
**increasingly** *[1] -
48*:22
**independent** *[2] -
19*:8, 89:11
**indication** *[2] - 98*:8,
157:20, 158:15
**individual** *[4] - 112*:2,
119:3, 120:8, 128:15
**individual's** *[1] -
129*:23
**individually** *[2] - 56*:1,
143:18
**industry** *[6] - 83*:6,
111:15, 116:13,
116:14, 116:15,
153:14
**inefficient** *[1] - 129*:2
**inference** *[7] - 20*:14,
21:19, 25:3, 29:18,
39:13, 40:8, 106:3
**inferences** *[4] - 27*:11,
27:24, 28:8, 29:22
**informal** *[2] - 135*:20,
149:14
**information** *[112] -
8*:3, 12:4, 12:8,
12:18, 18:2, 18:14,
21:13, 22:18, 23:13,
27:15, 28:4, 28:10,
30:3, 30:20, 30:22,
32:2, 33:3, 33:23,
35:3, 37:14, 37:18,
37:25, 39:18, 39:19,
41:17, 41:22, 41:23,

42:3, 42:8, 42:20,
44:4, 47:3, 47:12,
47:16, 48:16, 48:24,
49:2, 49:23, 54:6,
54:22, 54:24, 55:12,
55:14, 55:20, 57:21,
58:1, 58:11, 59:11,
59:17, 60:6, 64:13,
64:16, 64:18, 67:6,
67:12, 67:18, 73:19,
74:17, 75:13, 76:24,
77:11, 78:22, 80:24,
83:14, 86:10, 86:12,
86:13, 90:5, 90:16,
91:20, 93:14, 94:2,
94:5, 94:21, 95:8,
96:10, 96:20, 97:20,
99:19, 99:24, 100:3,
102:2, 106:23,
112:18, 117:5,
119:22, 119:25,
121:5, 123:1,
125:23, 127:20,
131:5, 136:15,
141:8, 141:17,
143:13, 143:20,
143:21, 145:19,
149:1, 149:5,
154:12, 154:19,
160:1, 162:1, 162:5,
162:9, 162:10,
162:14, 163:2
**informative** *[1] -
161*:21
**informed** *[3] - 40*:1,
152:24, 153:9
**infringe** *[2] - 115*:12,
128:13
**infringed** *[4] - 12*:5,
12:6, 20:5, 29:25
**infringement** *[63] -
15*:9, 15:11, 15:18,
17:10, 18:14, 18:19,
18:20, 23:1, 25:8,
25:11, 26:9, 27:11,
28:24, 30:3, 30:5,
31:19, 31:22, 33:9,
33:15, 33:20, 36:21,
36:22, 37:5, 37:9,
37:12, 38:24, 39:21,
39:25, 40:3, 41:7,
42:4, 42:5, 43:13,
49:18, 49:22, 50:19,
55:1, 59:20, 65:13,
68:14, 69:5, 69:7,
70:20, 72:6, 75:5,
87:3, 97:9, 97:16,
99:15, 104:9,
104:13, 107:20,
110:3, 115:9,
116:18, 121:17,

121:18, 123:4, 123:11, 123:16, 126:7, 145:21
**infringement's** [1] - 115:9
**infringements** [5] - 25:2, 29:24, 39:17, 56:24, 121:14
**infringer** [30] - 24:10, 25:7, 31:11, 44:6, 47:5, 47:14, 50:4, 50:15, 56:7, 57:7, 59:13, 61:12, 94:22, 98:16, 100:16, 104:15, 104:18, 104:19, 104:24, 105:1, 109:25, 110:2, 110:5, 110:7, 117:19, 127:5, 128:9, 128:10, 145:13
**infringers** [14] - 4:9, 4:21, 12:14, 15:15, 15:21, 16:22, 18:8, 46:8, 68:22, 123:18, 123:20, 127:1, 128:15, 128:16
**infringing** [16] - 12:7, 12:10, 16:21, 18:9, 19:17, 21:1, 29:23, 49:11, 49:14, 97:10, 98:17, 110:24, 111:10, 115:23, 116:3
**initial** [2] - 24:9, 33:22
**injustice** [1] - 67:4
**input** [1] - 149:13
**inside** [3] - 152:4, 152:5, 152:7
**inspected** [1] - 159:6
**installed** [1] - 153:13
**instance** [3] - 48:20, 97:11, 156:19
**instances** [2] - 97:12, 98:14
**instead** [2] - 112:22, 120:25
**instructions** [3] - 17:1, 19:10, 90:8
**intellectual** [1] - 10:24
**intense** [1] - 115:3
**intention** [1] - 102:1
**interacts** [1] - 36:5
**interest** [1] - 7:25
**interested** [3] - 7:17, 7:23, 129:8
**interesting** [4] - 126:24, 127:25, 128:18, 134:11
**interests** [1] - 67:4

**interject** [1] - 22:12
**intermediaries** [1] - 122:22
**intermediary** [1] - 123:9
**Internet** [1] - 150:9
**internet** [29] - 9:3, 12:7, 16:1, 20:2, 24:2, 25:24, 34:22, 38:14, 64:17, 77:16, 81:17, 81:19, 114:22, 115:4, 122:23, 123:7, 125:11, 127:5, 127:11, 127:21, 128:22, 129:24, 134:5, 150:4, 150:22, 153:3, 153:11, 156:13, 158:2
**internet-facing** [1] - 158:2
**Interpol** [1] - 111:20
**interpretations** [1] - 157:18
**interrupt** [1] - 36:9
**interruption** [2] - 99:9, 116:24
**intersection** [1] - 126:24
**intervention** [1] - 6:5
**introduce** [1] - 3:22
**introduced** [1] - 6:15
**introducing** [1] - 30:19
**invested** [1] - 115:6
**investigate** [2] - 83:12, 155:1
**investigates** [1] - 72:16
**investigating** [1] - 58:11
**investigation** [19] - 4:19, 4:20, 16:10, 21:14, 24:20, 36:2, 41:9, 52:19, 54:13, 58:5, 58:21, 59:11, 66:22, 72:25, 77:21, 77:25, 95:21, 99:14, 142:25
**investigations** [3] - 58:3, 72:11, 154:17
**investigative** [1] - 73:14
**investigator** [1] - 15:6
**invite** [1] - 134:17
**involved** [5] - 5:25, 8:13, 11:5, 85:2, 112:20
**IP** [121] - 1:8, 5:5, 12:3,

12:10, 15:12, 16:1, 16:23, 18:4, 18:13, 18:16, 22:10, 22:25, 23:3, 23:7, 23:18, 23:20, 24:23, 26:17, 26:19, 27:6, 27:21, 28:14, 28:21, 29:13, 29:14, 30:11, 31:9, 33:13, 33:20, 34:20, 35:17, 35:25, 36:3, 36:7, 36:19, 37:21, 38:6, 40:12, 40:20, 41:4, 43:21, 44:23, 46:24, 49:7, 49:8, 50:2, 50:3, 50:4, 50:6, 52:4, 52:9, 53:25, 54:7, 54:18, 69:6, 70:15, 70:19, 70:22, 70:23, 74:19, 76:21, 77:5, 81:1, 81:14, 82:17, 82:18, 83:17, 83:18, 86:8, 87:16, 87:21, 90:14, 92:12, 92:13, 94:16, 95:16, 97:23, 98:8, 98:14, 99:5, 102:14, 103:10, 103:20, 104:5, 105:10, 106:17, 107:1, 108:23, 118:25, 119:17, 119:19, 119:24, 120:5, 121:4, 127:4, 127:22, 142:13, 142:20, 143:2, 144:4, 144:8, 145:11, 145:15, 151:16, 153:3, 153:4, 153:5, 153:19, 154:4, 154:9, 154:17, 155:12, 156:6, 156:12, 156:24, 157:1, 157:5, 157:8, 158:13, 163:3
**iPad** [6] - 25:25, 41:1, 42:23, 43:2, 43:6, 43:12
**iPhone** [2] - 41:1, 43:6
**IPP** [79] - 15:6, 15:20, 16:5, 16:12, 16:18, 16:19, 17:1, 17:2, 18:2, 18:13, 41:16, 43:20, 44:14, 45:16, 47:15, 47:19, 48:11, 48:13, 48:14, 48:21, 49:2, 49:18, 50:22, 69:17, 70:18, 74:18, 86:8, 87:8, 90:6, 92:9, 94:18, 97:7, 97:9, 99:14, 99:22,

100:5, 101:18, 102:13, 102:20, 103:10, 103:12, 103:18, 104:2, 104:6, 105:3, 105:13, 105:16, 106:13, 106:14, 108:22, 108:24, 109:21, 110:4, 120:25, 132:19, 132:21, 132:24, 133:2, 135:25, 144:3, 145:8, 146:1, 146:11, 147:3, 147:16, 151:23, 152:9, 155:22, 155:24, 155:25, 157:25, 158:6, 158:9, 158:14, 159:9, 159:22, 160:4, 161:4
**IPP's** [7] - 53:23, 92:1, 107:20, 109:23, 160:14, 160:20, 163:2
**IPs** [1] - 98:18
**Iqbal** [1] - 31:7
**irrelevant** [4] - 7:19, 93:22, 94:1, 124:6
**Islip** [1] - 9:16
**isolate** [3] - 69:2, 70:8, 71:8
**isolated** [1] - 70:15
**isolating** [1] - 156:16
**ISP** [24] - 18:3, 18:22, 19:1, 40:10, 40:18, 49:4, 86:11, 86:14, 93:21, 94:17, 95:6, 95:8, 95:11, 95:24, 97:14, 112:15, 112:16, 126:14, 129:12, 129:13, 129:18, 129:23, 136:16, 154:23
**ISPs** [8] - 97:19, 114:1, 114:6, 114:7, 120:9, 120:10, 120:22
**issue** [18] - 4:14, 7:7, 8:17, 12:22, 33:18, 36:11, 53:23, 60:24, 85:4, 97:14, 117:20, 118:6, 119:5, 119:6, 124:19, 126:4, 149:19, 154:22
**issued** [4] - 3:15, 7:9, 77:19, 154:12
**issues** [11] - 3:12, 5:12, 7:7, 7:17, 7:19, 7:23, 14:9, 77:17,

79:22, 149:12, 161:11
**IT** [2] - 64:24, 70:6
**item** [1] - 144:9
**itself** [10] - 7:3, 31:10, 61:11, 76:10, 93:1, 106:11, 111:4, 133:7, 133:8, 158:2

---

**J**

**January** [2] - 146:24, 146:25
**JERSEY** [1] - 1:2
**Jersey** [19] - 1:11, 6:2, 51:22, 52:10, 60:2, 60:5, 62:22, 71:19, 71:23, 71:24, 72:6, 72:12, 83:2, 83:3, 118:7, 134:24, 139:4, 162:4
**Jira** [10] - 140:1, 140:18, 141:12, 141:14, 141:17, 142:12, 143:11, 143:12, 144:2, 148:20
**job** [6] - 15:6, 15:9, 57:13, 61:1, 65:11, 138:17
**JOEL** [1] - 1:13
**John** [21] - 2:7, 3:4, 3:20, 4:3, 5:4, 14:17, 16:16, 22:9, 26:16, 54:21, 57:25, 58:19, 66:17, 74:16, 77:6, 77:7, 94:10, 100:9, 136:16, 141:2
**JOHN** [2] - 1:7, 1:16
**joined** [1] - 110:16
**JR** [1] - 2:2
**judge** [2] - 61:7, 63:21
**Judge** [24] - 4:11, 8:5, 9:10, 9:18, 34:5, 51:22, 52:1, 61:25, 63:3, 73:10, 80:21, 82:21, 84:19, 119:15, 127:8, 129:11, 133:10, 135:1, 147:14, 148:1, 148:8, 161:8, 162:5, 164:3
**JUDGE** [1] - 1:13
**judgement** [2] - 30:18, 31:25
**judges** [3] - 8:22, 9:1, 60:4
**judgment** [1] - 78:15
**judicial** [1] - 128:23
**July** [2] - 96:7, 98:22

**jumble** [1] - 156:15
**June** [2] - 11:12, 98:6
**jurisdiction** [2] -
111:18, 151:15
**jurisdictions** [5] -
8:16, 9:5, 12:23,
12:24, 15:16

## K

**Karen** [2] - 1:22,
164:11
**keep** [9] - 37:19, 46:7,
96:6, 124:10,
125:21, 128:6,
130:16, 130:18,
149:14
**keeping** [1] - 31:13
**KENNEDY** [234] -
3:25, 6:23, 7:22, 8:1,
8:7, 8:10, 8:15, 8:20,
8:24, 9:8, 9:11, 9:14,
9:20, 9:22, 10:3,
10:5, 10:9, 10:12,
10:23, 11:8, 11:12,
11:17, 11:20, 11:25,
12:17, 13:4, 13:7,
13:9, 13:19, 13:22,
13:24, 14:8, 14:14,
14:23, 15:2, 15:5,
15:8, 15:22, 15:24,
16:5, 16:19, 17:3,
17:25, 18:4, 18:24,
19:3, 19:8, 19:13,
19:16, 42:2, 42:16,
43:1, 43:11, 43:16,
43:19, 43:24, 44:1,
44:16, 45:11, 46:3,
46:15, 46:19, 46:22,
47:2, 47:18, 47:20,
48:3, 48:6, 48:8,
48:13, 48:19, 49:6,
49:13, 49:16, 49:18,
50:3, 50:11, 50:13,
50:24, 51:1, 51:10,
51:12, 51:18, 51:21,
51:24, 54:8, 54:19,
54:23, 55:3, 55:9,
55:13, 56:10, 56:16,
56:21, 56:24, 57:11,
57:23, 58:4, 58:9,
58:24, 59:2, 60:3,
60:9, 60:12, 60:22,
61:14, 62:14, 62:23,
63:1, 63:25, 64:11,
65:19, 66:20, 66:23,
67:10, 67:23, 68:1,
68:5, 68:11, 69:17,
69:24, 71:22, 72:5,
72:13, 72:19, 72:21,
73:21, 74:3, 74:6,

74:8, 74:15, 74:20,
74:22, 75:1, 76:2,
77:24, 78:2, 79:20,
85:23, 86:6, 86:23,
86:25, 87:2, 87:5,
87:9, 87:11, 88:24,
94:7, 94:9, 94:11,
94:13, 95:24, 96:8,
96:12, 97:8, 97:25,
99:1, 99:4, 100:2,
100:4, 100:6, 100:8,
100:10, 100:12,
100:16, 100:20,
101:11, 102:5,
102:7, 102:15,
102:19, 103:13,
103:16, 103:22,
104:1, 104:4, 104:8,
105:6, 105:12,
105:21, 106:10,
106:15, 107:2,
107:16, 107:25,
108:3, 109:18,
110:12, 110:24,
111:13, 112:3,
113:17, 113:22,
113:25, 114:19,
115:17, 116:25,
117:8, 117:14,
120:13, 129:20,
129:22, 130:3,
131:2, 131:8,
131:15, 131:20,
131:23, 132:5,
133:25, 136:14,
136:18, 136:21,
136:24, 137:3,
137:8, 137:11,
138:25, 139:2,
145:7, 145:24,
146:2, 146:4,
146:10, 146:12,
146:15, 146:22,
147:2, 160:13,
161:15, 162:13,
162:21, 163:1, 163:9
**Kennedy** [27] - 2:6,
3:24, 4:1, 6:15, 6:20,
13:18, 25:1, 25:11,
36:4, 41:18, 41:25,
44:11, 45:5, 49:1,
79:19, 85:1, 88:23,
89:6, 94:6, 99:25,
109:17, 110:10,
121:16, 129:21,
136:13, 138:24,
163:13
**Kennedy's** [1] - 122:7
**kept** [1] - 124:20
**key** [2] - 118:23,
130:23

**kick** [2] - 70:10, 71:8
**kid** [2] - 23:21, 29:5
**kids** [6] - 21:3, 21:7,
23:23, 27:17, 39:24,
127:9
**kill** [2] - 123:7, 123:24
**kind** [8] - 35:7, 57:5,
73:14, 77:12,
114:19, 134:23,
156:10, 160:1
**knock** [1] - 147:23
**knowing** [2] - 51:3,
121:1
**knowledge** [2] - 68:3,
112:5
**known** [1] - 32:2
**knows** [5] - 22:5, 24:5,
28:13, 37:7, 58:6
**Korean** [1] - 52:11

## L

**labeled** [2] - 104:15,
153:22
**Lamberth** [1] - 4:11
**Lamberth's** [1] - 8:6
**language** [1] - 52:11
**laptop** [6] - 40:25,
42:22, 43:8, 45:25,
81:10, 153:1
**laptops** [5] - 43:10,
43:18, 45:2, 152:10,
152:22
**large** [3] - 43:4, 50:1
**larger** [1] - 159:20
**last** [4] - 48:21,
105:13, 146:24,
149:23
**late** [1] - 11:12
**latest** [1] - 65:6
**latitude** [1] - 76:17
**laughter** [3] - 28:3,
67:9, 100:19
**Laughter** [1] - 93:18
**launched** [1] - 11:2
**Law** [1] - 3:17
**LAW** [1] - 1:18
**law** [5] - 31:9, 134:3,
134:18, 135:8,
135:24
**laws** [1] - 117:9
**lawsuit** [10] - 18:18,
18:19, 21:10, 44:10,
55:21, 62:2, 62:15,
69:4, 70:10, 112:20
**lawsuits** [1] - 5:22,
5:23, 34:15, 34:18,
68:7, 68:8, 68:12,
74:10, 116:12
**lawyer** [2] - 69:6,

77:15
**lawyers** [1] - 57:16
**layer** [2] - 92:12,
92:14, 92:16
**layers** [1] - 92:12
**learned** [2] - 72:10,
100:18
**learning** [1] - 58:11
**least** [15] - 19:14,
25:9, 27:13, 29:18,
30:21, 33:19, 58:9,
69:13, 75:15, 75:20,
75:21, 101:14,
130:13, 135:6,
151:18
**Leave** [1] - 140:5
**leave** [1] - 9:2
**legal** [8] - 7:16, 7:19,
7:23, 10:13, 55:3,
55:6, 61:20, 117:2
**legislative** [1] - 123:20
**legs** [1] - 79:8
**length** [6] - 25:2,
27:10, 33:16, 36:21,
56:25
**length-of-your-arm**
[1] - 33:16
**less** [2] - 27:22, 102:3
**letter** [3] - 61:5,
112:19, 122:11
**letters** [1] - 67:17
**level** [4] - 8:22, 25:10,
33:22, 146:9
**LexisNexis** [1] - 64:15
**liability** [3] - 26:12,
123:16, 123:18
**library** [2] - 20:2,
154:9
**Library** [1] - 153:2
**licensing** [1] - 10:15
**life** [1] - 59:15
**lifetime** [1] - 77:14
**lights** [1] - 128:5
**likelihoods** [1] - 22:4
**likely** [16] - 20:10,
20:21, 21:5, 21:8,
22:1, 22:19, 37:11,
37:17, 37:23, 43:1,
43:7, 53:19, 60:18,
60:19, 69:25, 101:8
**limited** [2] - 99:20,
115:10
**Lincoln** [3] - 3:17,
3:18, 14:19
**LINCOLN** [2] - 1:18,
1:18
**Line** [1] - 86:23
**line** [10] - 76:12,
85:25, 86:10, 86:20,
112:18, 129:11,

136:15, 148:25,
149:3
**LinkedIn** [4] - 64:20,
64:23, 65:11, 73:19
**links** [1] - 111:7
**Linux** [2] - 152:13,
152:23
**list** [7] - 50:7, 56:18,
61:3, 64:25, 78:6,
84:13, 97:11
**listed** [4] - 3:5, 90:21,
92:11, 97:9
**listen** [2] - 59:16, 73:9
**lists** [3] - 44:8, 92:13,
131:4
**Lite** [1] - 133:22
**literate** [1] - 86:3
**litigate** [1] - 67:1
**litigating** [1] - 125:10
**litigation** [16] - 6:16,
10:14, 10:17, 13:10,
35:8, 59:14, 59:19,
82:7, 83:9, 83:11,
96:14, 113:3, 117:4,
117:7, 125:16,
145:13
**live** [5] - 23:24, 23:25,
27:19, 77:4, 134:24
**lives** [11] - 22:9, 22:21,
23:22, 28:17, 28:22,
28:24, 29:12, 39:15,
73:22, 77:6, 78:9
**living** [1] - 29:7
**LLC** [5] - 1:4, 1:15,
3:19, 3:21, 132:8
**loading** [1] - 123:2
**local** [5] - 6:1, 14:13,
14:16, 38:13, 118:10
**locals** [1] - 163:21
**locate** [1] - 145:12
**located** [8] - 15:7,
15:8, 16:6, 16:9,
52:9, 71:3, 72:23,
76:1
**location** [10] - 12:4,
36:8, 49:8, 54:1,
75:1, 75:12, 76:22,
78:2, 151:16, 153:2
**lockers** [1] - 111:9
**logged** [1] - 70:16
**logins** [1] - 71:5
**longitude** [1] - 76:17
**look** [73] - 23:16,
24:13, 25:13, 32:3,
32:5, 35:19, 41:21,
42:17, 49:9, 50:5,
53:4, 53:7, 53:8,
54:12, 55:6, 55:14,
55:22, 57:5, 64:22,
65:4, 65:6, 65:12,

65:16, 65:23, 66:3, 66:6, 66:7, 67:14, 73:15, 78:2, 81:9, 81:15, 82:1, 82:17, 85:5, 85:9, 85:10, 85:13, 86:12, 86:21, 87:13, 88:13, 89:16, 90:4, 90:24, 91:12, 92:15, 93:9, 95:1, 95:13, 96:1, 97:16, 98:1, 98:9, 105:7, 109:6, 112:18, 116:11, 117:15, 119:8, 119:16, 123:5, 123:10, 125:20, 126:8, 130:23, 133:10, 141:14, 144:6, 144:9, 144:20, 145:18, 152:5

**looked** [12] - 56:2, 62:6, 62:7, 70:8, 82:14, 89:6, 89:9, 94:5, 115:17, 119:21, 119:24, 146:8

**looking** [19] - 20:5, 21:14, 34:9, 39:2, 50:14, 50:16, 54:4, 55:25, 70:22, 75:18, 91:23, 91:24, 94:17, 99:21, 117:24, 119:20, 140:24, 144:21, 156:11

**looks** [11] - 21:15, 21:16, 42:13, 50:15, 58:17, 65:9, 82:4, 88:25, 94:12, 95:8, 99:17

**lookup** [4] - 94:17, 94:20, 95:3, 95:25

**loop** [1] - 147:24

**Los** [1] - 1:19

**love** [2] - 33:1, 65:24

**loved** [1] - 54:3

**lowest** [2] - 148:6, 148:9

**lucky** [1] - 163:16

**lunch** [3] - 79:6, 79:7, 79:17

---

## M

**Mac** [2] - 152:11, 153:11

**machine** [6] - 81:23, 81:24, 153:4, 153:13, 154:1

**machines** [1] - 152:10

**macro** [2] - 67:21, 146:8

---

**Madison** [1] - 1:16

**magistrate** [3] - 8:21, 9:1, 60:4

**MAGISTRATE** [1] - 1:13

**mail** [9] - 81:17, 112:23, 115:1, 139:24, 140:16, 153:17, 153:18, 156:20, 162:23

**mails** [1] - 14:18

**main** [3] - 46:6, 69:20, 114:22

**mainstream** [7] - 30:1, 35:7, 51:7, 53:14, 53:15, 68:16, 163:6

**major** [3] - 68:13, 116:12

**majority** [2] - 69:21, 130:12

**man** [1] - 137:2

**management** [1] - 19:5

**Mannion** [1] - 52:1

**manual** [4] - 52:16, 53:12, 54:3, 159:9

**manuals** [1] - 56:6

**married** [1] - 27:17

**masking** [1] - 34:22

**massive** [7] - 30:2, 30:5, 37:11, 39:20, 39:24, 40:2, 40:3

**Mastercard** [1] - 71:6

**match** [2] - 53:22, 78:11

**matched** [5] - 154:2, 154:3, 154:4, 154:6

**matches** [3] - 65:5, 78:10, 78:16

**material** [3] - 27:20, 154:18, 163:7

**math** [2] - 107:7, 108:7

**matter** [7] - 4:8, 123:18, 144:15, 144:18, 144:24, 149:4, 164:9

**MaverickEye** [1] - 155:19

**Maxmind** [18] - 36:3, 36:6, 49:8, 74:25, 75:2, 75:25, 76:10, 76:14, 76:15, 76:21, 132:11, 133:4, 133:6, 134:6, 135:15, 151:9, 151:12, 151:13

**MD5** [1] - 152:2

**mean** [30] - 7:14, 18:21, 27:12, 28:23,

---

36:9, 37:13, 38:22, 39:9, 47:2, 60:16, 60:18, 76:14, 91:9, 101:17, 105:15, 111:13, 114:10, 118:2, 120:4, 129:16, 130:3, 133:11, 135:19, 142:19, 150:24, 157:9, 157:23, 160:3, 160:5

**Mean** [1] - 87:5

**meaning** [1] - 140:19

**meaningful** [1] - 51:4

**means** [4] - 101:18, 105:16, 110:7, 144:10

**meant** [4] - 21:21, 103:2, 103:3

**measures** [1] - 67:14

**mechanical** [1] - 1:24

**mechanism** [1] - 113:25

**media** [7] - 21:14, 53:8, 53:11, 55:24, 76:18, 77:21, 77:25

**Media** [1] - 10:25

**megabytes** [1] - 108:14

**member** [1] - 150:8

**memo** [1] - 17:4

**memory** [1] - 51:2

**men** [2] - 52:13, 127:13

**mention** [1] - 151:9

**mentioned** [2] - 32:25, 33:2

**merely** [2] - 31:9, 33:13

**merits** [2] - 119:9, 119:13

**message** [2] - 113:14, 126:20

**met** [1] - 77:13

**metadata** [3] - 152:4, 152:7, 154:7

**methodology** [1] - 4:20

**MEU** [1] - 155:19

**Microsoft** [1] - 34:16

**Middle** [1] - 70:25

**middle** [1] - 52:13

**midway** [1] - 98:16

**might** [24] - 4:12, 6:17, 20:17, 28:9, 30:19, 39:1, 40:6, 41:5, 41:23, 43:2, 57:19, 59:22, 73:17, 78:18, 81:2, 81:16, 88:22, 104:25, 108:3,

---

156:20, 157:20

**miles** [2] - 134:13

**military** [1] - 59:22

**million** [3] - 70:7, 110:21, 111:22

**mind** [3] - 29:24, 31:14, 128:6

**Mine** [1] - 28:5

**minimal** [1] - 33:22

**minimum** [1] - 19:13

**minimus** [1] - 101:24

**Minnesota** [3] - 8:17, 8:20, 72:6

**minute** [2] - 143:7, 145:16

**minutes** [15] - 55:15, 70:13, 79:8, 80:2, 106:25, 107:8, 109:3, 115:4, 124:14, 124:15, 136:3, 143:5, 143:21, 145:16

**misidentification** [1] - 145:17

**misled** [1] - 135:6

**misses** [1] - 62:13

**misstating** [1] - 133:24

**misuse** [1] - 76:13

**Mitchell** [1] - 1:10

**mix** [1] - 79:1

**modified** [1] - 150:20

**Mole** [1] - 71:18

**mom** [1] - 20:24

**moment** [11] - 8:15, 95:9, 95:10, 95:11, 95:15, 95:18, 95:19, 119:25, 120:1, 120:2, 161:9

**moments** [2] - 119:17, 161:25

**Monday** [1] - 65:14

**money** [4] - 71:3, 96:19, 124:18, 130:15

**monitor** [2] - 19:5, 29:20

**monitoring** [1] - 146:5

**monitors** [2] - 15:10, 69:17

**month** [10] - 12:9, 16:2, 63:4, 66:1, 69:2, 70:2, 90:2, 109:19, 126:17, 129:9

**monthly** [4] - 15:23, 18:22, 35:19, 69:18

**months** [16] - 11:13, 18:13, 19:14, 42:12, 63:14, 68:17, 91:14,

---

97:19, 97:20, 98:7, 98:11, 98:23, 98:25, 102:20, 112:10, 121:1

**morning** [9] - 3:3, 3:17, 3:25, 5:3, 80:19, 80:23, 126:25, 162:7, 162:8

**Morristown** [1] - 1:17

**most** [21] - 5:13, 9:8, 18:10, 29:17, 45:13, 45:22, 59:9, 60:4, 60:10, 69:11, 69:24, 71:24, 80:3, 86:10, 86:20, 96:23, 129:8, 130:3, 130:11, 147:11, 149:12

**mostly** [5] - 15:25, 43:10, 55:22, 82:24

**mother** [1] - 127:9

**Motion** [3] - 112:5, 114:21, 140:5

**motion** [12] - 3:13, 7:4, 7:13, 30:9, 30:17, 60:5, 63:6, 116:13, 132:15, 141:4, 161:17

**motions** [1] - 72:17

**MOTIONS** [1] - 1:6

**motivated** [1] - 125:19

**motivation** [2] - 126:8, 126:9

**move** [10] - 26:22, 57:8, 59:4, 60:1, 61:19, 61:21, 62:20, 63:15, 67:20, 73:5

**moves** [2] - 29:5, 77:20

**movie** [42] - 18:6, 30:1, 35:7, 53:9, 55:16, 55:17, 70:14, 86:18, 100:13, 100:22, 100:25, 101:2, 101:7, 101:16, 101:18, 102:1, 102:17, 102:18, 102:21, 103:11, 103:15, 103:25, 104:2, 104:3, 104:6, 104:10, 105:1, 105:10, 106:11, 107:7, 107:11, 107:20, 107:22, 107:24, 107:25, 108:11, 109:6, 109:8, 116:2, 131:16, 152:22

**movies** [24] - 18:6, 18:11, 19:17, 43:3,

47:8, 51:7, 52:10, 52:12, 53:14, 53:15, 65:18, 65:25, 69:1, 69:3, 70:9, 99:6, 99:8, 106:4, 108:24, 130:10, 131:16, 152:1, 152:17, 152:19

**moving** [2] - 14:2, 66:23

**MPAA** [1] - 34:14

**MR** [414] - 3:17, 3:20, 3:23, 4:2, 4:7, 4:18, 4:24, 5:3, 5:20, 6:1, 6:9, 6:12, 6:14, 8:4, 8:11, 11:6, 11:9, 12:20, 20:4, 20:14, 21:8, 21:21, 21:24, 22:3, 22:10, 22:12, 22:22, 22:25, 23:3, 23:6, 23:9, 23:12, 24:1, 24:4, 24:8, 24:13, 24:17, 24:25, 25:6, 25:14, 25:17, 25:21, 26:1, 26:5, 26:8, 26:10, 26:13, 26:16, 26:20, 26:24, 27:1, 27:3, 27:7, 27:10, 27:22, 28:4, 28:8, 28:15, 28:18, 28:20, 28:23, 29:3, 29:9, 29:17, 30:14, 31:6, 31:12, 32:1, 32:5, 32:17, 32:19, 33:16, 33:25, 34:3, 34:5, 34:11, 34:13, 35:12, 35:16, 36:2, 36:12, 36:17, 36:20, 37:3, 37:23, 38:6, 38:12, 38:17, 38:22, 39:1, 39:16, 40:12, 40:15, 40:20, 40:23, 41:3, 41:13, 41:21, 42:18, 44:19, 44:22, 45:9, 45:23, 51:11, 51:23, 51:25, 52:7, 56:12, 58:16, 60:15, 60:18, 61:4, 61:6, 62:5, 64:3, 65:17, 66:22, 67:2, 71:18, 72:4, 72:7, 74:4, 74:24, 75:6, 75:16, 75:21, 76:7, 77:14, 78:20, 80:1, 80:21, 81:4, 81:13, 82:6, 82:10, 82:13, 82:15, 82:17, 82:21, 82:23, 83:1, 83:4, 83:6, 83:9, 83:11, 83:16, 83:24, 84:1, 84:4, 84:6, 84:9, 84:15,

84:18, 84:21, 84:24, 85:1, 85:6, 85:8, 85:13, 85:16, 85:19, 85:20, 86:5, 87:4, 87:13, 87:18, 87:20, 87:23, 88:2, 88:5, 88:7, 88:10, 88:12, 88:17, 88:20, 89:8, 89:13, 89:16, 89:19, 89:22, 89:25, 90:7, 90:10, 90:13, 90:18, 90:22, 91:1, 91:4, 91:8, 91:12, 91:22, 92:3, 92:6, 92:8, 92:11, 92:18, 92:22, 92:24, 93:1, 93:3, 93:5, 93:8, 93:11, 93:13, 93:16, 93:20, 94:1, 94:4, 95:5, 95:14, 95:22, 96:4, 96:9, 96:13, 99:2, 99:11, 100:18, 101:8, 102:10, 107:15, 108:7, 108:10, 108:12, 109:5, 109:12, 109:15, 109:16, 113:2, 114:9, 114:17, 117:4, 118:2, 118:16, 119:6, 119:10, 119:15, 120:12, 120:19, 121:10, 121:25, 122:8, 122:14, 122:20, 125:7, 125:19, 126:1, 126:5, 126:16, 126:23, 128:3, 128:6, 128:18, 129:7, 130:11, 130:22, 132:3, 132:16, 132:19, 133:6, 133:16, 134:2, 135:13, 135:19, 136:5, 136:6, 137:13, 137:15, 137:18, 137:20, 137:22, 138:1, 138:3, 138:6, 138:9, 138:12, 138:15, 138:18, 138:23, 139:5, 139:8, 139:12, 139:15, 139:18, 139:20, 139:23, 140:1, 140:10, 140:13, 140:17, 140:22, 141:3, 141:6, 141:9, 141:11, 141:15, 141:19, 141:22,

141:24, 142:2, 142:5, 142:8, 142:15, 142:18, 142:22, 142:25, 143:4, 143:7, 143:10, 143:14, 143:17, 143:22, 144:1, 144:6, 144:17, 144:24, 145:4, 146:20, 146:24, 147:1, 147:14, 148:8, 148:11, 148:12, 148:15, 148:21, 148:22, 148:24, 149:7, 149:10, 149:19, 149:21, 150:1, 150:8, 151:1, 151:4, 151:7, 151:9, 151:12, 151:17, 151:20, 151:21, 151:25, 154:15, 154:21, 154:24, 154:25, 155:7, 155:10, 155:11, 155:14, 155:16, 155:20, 155:22, 155:23, 155:25, 156:4, 156:7, 156:10, 157:6, 157:9, 157:22, 158:4, 158:8, 158:12, 158:17, 158:22, 159:1, 159:2, 159:3, 159:4, 159:5, 159:6, 159:7, 159:8, 159:10, 159:11, 159:13, 159:14, 159:16, 159:17, 159:18, 159:20, 159:22, 159:23, 159:25, 160:3, 160:5, 160:6, 160:7, 160:8, 160:11, 160:16, 160:18, 160:22, 160:23, 160:24, 160:25, 161:2, 161:3, 161:5, 161:6, 161:7, 161:8, 161:13, 161:16, 161:24, 162:10, 162:24, 163:3, 163:4, 163:5, 163:16, 163:20, 163:23

**MS** [234] - 3:25, 6:23, 7:22, 8:1, 8:7, 8:10, 8:15, 8:20, 8:24, 9:8, 9:11, 9:14, 9:20, 9:22, 10:3, 10:5,

10:9, 10:12, 10:23, 11:8, 11:12, 11:17, 11:20, 11:25, 12:17, 13:4, 13:7, 13:9, 13:19, 13:22, 13:24, 14:8, 14:14, 14:23, 15:2, 15:5, 15:8, 15:22, 15:24, 16:5, 16:19, 17:3, 17:25, 18:4, 18:24, 19:3, 19:8, 19:13, 19:16, 42:2, 42:16, 43:1, 43:11, 43:16, 43:19, 43:24, 44:1, 44:16, 45:11, 46:3, 46:15, 46:19, 46:22, 47:2, 47:18, 47:20, 48:3, 48:6, 48:8, 48:13, 48:19, 49:6, 49:13, 49:16, 49:18, 50:3, 50:11, 50:13, 50:24, 51:1, 51:10, 51:12, 51:18, 51:21, 51:24, 54:8, 54:19, 54:23, 55:3, 55:9, 55:13, 56:10, 56:16, 56:21, 56:24, 57:11, 57:23, 58:4, 58:9, 58:24, 59:2, 60:3, 60:9, 60:12, 60:22, 61:14, 62:14, 62:23, 63:1, 63:25, 64:11, 65:19, 66:20, 66:23, 67:10, 67:23, 68:1, 68:5, 68:11, 69:17, 69:24, 71:22, 72:5, 72:13, 72:19, 72:21, 73:21, 74:3, 74:6, 74:8, 74:15, 74:20, 74:22, 75:1, 76:2, 77:24, 78:2, 79:20, 85:23, 86:6, 86:23, 86:25, 87:2, 87:5, 87:9, 87:11, 88:24, 94:7, 94:9, 94:11, 94:13, 95:24, 96:8, 96:12, 97:8, 97:25, 99:1, 99:4, 100:2, 100:4, 100:6, 100:8, 100:10, 100:12, 100:16, 100:20, 101:11, 102:5, 102:7, 102:15, 102:19, 103:13, 103:16, 103:22, 104:1, 104:4, 104:8, 105:6, 105:12, 105:21, 106:10, 106:15, 107:2, 107:16, 107:25, 108:3, 109:18,

110:12, 110:24, 111:13, 112:3, 113:17, 113:22, 113:25, 114:19, 115:17, 116:25, 117:8, 117:14, 120:13, 129:20, 129:22, 130:3, 131:2, 131:8, 131:15, 131:20, 131:23, 132:5, 133:25, 136:14, 136:18, 136:21, 136:24, 137:3, 137:8, 137:11, 138:25, 139:2, 145:7, 145:24, 146:2, 146:4, 146:10, 146:12, 146:15, 146:22, 147:2, 160:13, 161:15, 162:13, 162:21, 163:1, 163:9

**multiple** [4] - 40:23, 41:23, 157:4, 157:21

**multiplex** [1] - 156:25

**music** [2] - 51:8, 163:6

**Music** [1] - 116:9

# N

**nail** [1] - 34:9

**name** [41] - 13:11, 21:3, 21:13, 23:14, 29:7, 31:15, 31:19, 31:22, 32:7, 32:9, 32:10, 32:22, 33:5, 33:6, 33:9, 33:11, 35:1, 44:4, 53:6, 54:12, 54:25, 57:6, 58:2, 58:21, 63:15, 64:7, 64:12, 65:23, 77:3, 77:20, 92:19, 92:20, 93:1, 93:24, 96:15, 117:18, 134:10, 148:13, 156:1, 158:6

**named** [5] - 15:6, 23:2, 26:15, 26:16, 51:25

**names** [1] - 155:21

**Napster** [1] - 68:4

**narrow** [2] - 12:9, 12:13

**national** [2] - 5:19, 5:23

**nature** [7] - 5:24, 20:25, 21:15, 34:20, 38:13, 68:25, 107:3

**necessarily** [10] - 17:4, 19:3, 42:3,

47:13, 72:13, 75:11, 76:8, 83:1, 118:6, 120:4
**necessary** [4] - 61:16, 89:5, 94:24, 160:13
**necessity** [1] - 5:24
**need** [18] - 11:14, 24:13, 24:19, 28:10, 34:23, 37:13, 37:18, 66:18, 84:25, 92:16, 113:12, 117:19, 127:14, 127:15, 145:5, 145:6, 149:17, 149:18
**needed** [3] - 12:24, 147:18, 151:19
**needs** [4] - 85:19, 117:12, 144:17, 149:5
**negative** [2] - 134:21, 159:24
**negotiation** [1] - 115:21
**nephew** [2] - 148:10, 148:11
**Netflix** [1] - 70:1
**network** [13] - 15:11, 16:20, 65:2, 147:19, 150:14, 150:15, 152:24, 153:6, 153:14, 153:15, 153:23, 156:17, 156:24
**never** [11] - 5:15, 17:7, 31:23, 64:18, 107:15, 114:13, 130:7, 134:20, 147:10, 151:17, 155:15
**new** [7] - 17:16, 34:15, 70:14, 73:15, 106:5, 163:19, 163:22
**NEW** [1] - 1:2
**New** [23] - 1:11, 6:2, 6:3, 9:15, 51:22, 52:9, 60:2, 60:5, 62:22, 71:19, 71:23, 71:24, 72:3, 72:6, 72:12, 83:2, 83:3, 118:7, 134:24, 134:25, 139:4, 162:4
**next** [6] - 39:2, 49:5, 66:1, 70:21, 92:16, 111:23
**nine** [3] - 42:12, 91:14, 112:24
**Ninth** [3] - 31:21, 35:6, 73:7
**NJ** [2] - 1:17, 2:3
**NJRPC** [1] - 134:20

**none** [2] - 28:20, 159:1
**North** [1] - 2:2
**Northeast** [1] - 82:24
**northeast** [2] - 142:10, 142:11
**Northern** [1] - 34:7
**northwest** [1] - 142:11
**nose** [1] - 128:19
**noted** [1] - 144:5
**notes** [1] - 133:22
**nothing** [5] - 62:6, 122:12, 124:22, 160:8, 161:8
**nothing's** [1] - 115:11
**Notice** [1] - 140:5
**notice** [23] - 30:24, 112:15, 112:23, 113:7, 113:15, 114:11, 114:15, 114:24, 120:16, 121:4, 121:17, 121:19, 122:4, 122:9, 122:10, 123:11, 124:5, 124:24, 125:4, 127:14, 131:1, 131:19, 144:7
**noticed** [1] - 126:24
**notices** [27] - 110:11, 110:13, 110:17, 110:23, 111:8, 111:12, 111:24, 112:1, 113:10, 113:21, 116:4, 120:7, 120:13, 120:21, 120:25, 121:15, 121:22, 123:19, 123:22, 124:3, 124:10, 124:13, 125:11, 127:12, 128:4, 128:23
**notified** [1] - 121:15
**notify** [1] - 60:7
**notifying** [1] - 61:1
**notion** [3] - 7:1, 7:12, 14:25
**now's** [1] - 66:12
**number** [32] - 6:11, 11:14, 16:11, 28:10, 35:17, 41:8, 42:2, 46:10, 49:6, 56:24, 56:25, 68:9, 72:1, 81:2, 81:20, 81:21, 85:17, 92:8, 93:7, 93:25, 101:3, 109:6, 115:17, 135:14, 137:4, 145:14, 148:6, 148:9, 156:6,

156:9, 156:10, 158:10
**NUMBER** [1] - 1:4
**numbers** [13] - 11:19, 23:4, 41:5, 41:8, 41:23, 81:7, 81:9, 82:3, 90:4, 91:13, 91:24, 108:13, 156:2
**numerous** [1] - 30:14

## O

**oath** [3] - 89:4, 89:5, 91:6
**object** [2] - 60:8
**objection** [1] - 118:14
**objective** [1] - 130:24
**obligation** [2] - 32:11, 35:2
**obtain** [2] - 27:14, 154:20
**obviously** [6] - 7:3, 35:17, 72:22, 98:19, 120:2, 149:4
**occasion** [1] - 98:14
**occasional** [1] - 130:14
**occur** [1] - 122:5
**occurred** [2] - 87:3, 87:15
**occurring** [2] - 122:3, 122:4
**October** [3] - 11:6, 11:9, 63:12
**odds** [1] - 99:4
**OF** [2] - 1:2, 1:18
**offhand** [1] - 56:8
**office** [3] - 56:4, 139:7, 145:9
**officer** [1] - 149:22
**OFFICES** [1] - 1:18
**Offices** [1] - 3:18
**Official** [1] - 1:22
**offshore** [1] - 71:4
**often** [11] - 6:5, 9:8, 17:20, 19:11, 20:23, 47:6, 58:25, 63:14, 76:4, 113:14
**oftentimes** [4] - 18:12, 21:15, 78:21, 104:21
**old** [3] - 28:7, 52:14, 68:4
**older** [1] - 39:24
**olds** [1] - 39:22
**once** [20] - 15:13, 16:2, 18:7, 19:17, 32:10, 33:8, 35:2, 36:6, 44:4, 44:7, 50:3, 50:15, 53:17, 54:24, 57:6, 67:10,

100:25, 102:25, 104:10, 143:8
**one** [138] - 3:13, 8:24, 8:25, 9:4, 11:23, 12:20, 14:14, 16:12, 18:6, 20:8, 21:7, 22:13, 22:20, 24:17, 26:6, 27:18, 36:5, 39:2, 40:18, 40:20, 41:19, 42:9, 44:23, 46:20, 47:6, 47:9, 47:11, 48:7, 48:20, 52:4, 52:21, 53:1, 53:2, 54:2, 55:13, 60:17, 61:1, 63:1, 63:18, 66:16, 70:12, 71:22, 75:13, 75:14, 75:15, 75:19, 75:20, 75:21, 76:4, 76:7, 76:9, 76:14, 77:9, 78:4, 78:7, 78:11, 78:13, 80:2, 80:23, 81:5, 81:6, 81:10, 81:25, 82:2, 82:11, 85:20, 86:17, 87:22, 88:3, 88:6, 90:3, 91:4, 95:13, 95:24, 96:2, 96:13, 96:23, 96:25, 97:4, 97:8, 97:11, 98:19, 99:11, 100:18, 101:17, 103:3, 106:19, 112:11, 118:24, 119:22, 119:24, 119:25, 120:1, 120:2, 125:5, 127:9, 129:16, 133:16, 133:25, 135:4, 138:9, 141:13, 142:20, 143:21, 145:8, 145:13, 145:18, 147:11, 148:2, 152:10, 152:14, 152:17, 152:22, 152:23, 153:5, 153:7, 153:10, 153:12, 154:9, 154:15, 155:11, 155:20, 157:1, 157:2, 157:10, 157:13, 157:14, 157:15, 157:17, 157:23, 160:18, 162:6
**one-bedroom** [1] - 78:4
**one-time** [1] - 20:8
**onerous** [1] - 91:6
**ones** [7] - 61:20, 62:9, 63:19, 82:23, 96:24, 111:6, 154:6

**ongoing** [1] - 18:5
**open** [2] - 86:7, 153:14
**OPEN** [4] - 3:2, 79:14, 80:17, 136:9
**opening** [1] - 68:17
**operate** [1] - 62:4
**operates** [1] - 70:1
**operating** [3] - 118:10, 152:12, 152:15
**operation** [1] - 137:2
**opinion** [3] - 4:11, 8:6, 73:11
**opinions** [2] - 8:17, 8:21
**opportunity** [2] - 5:15, 66:14
**opposed** [1] - 23:20
**opposing** [11] - 59:10, 65:20, 66:8, 66:9, 73:13, 78:21, 78:24, 130:14, 134:17, 134:21, 135:2
**opposite** [3] - 40:6, 125:4, 128:14
**option** [4] - 47:21, 69:12, 112:13, 114:8
**order** [14] - 3:6, 3:14, 66:7, 66:8, 66:11, 70:19, 100:24, 117:18, 117:19, 127:15, 130:19, 147:19, 161:18, 163:11
**orders** [5] - 7:4, 7:9, 66:6
**ordinary** [1] - 144:22
**Orenstein** [3] - 9:10, 9:19, 162:5
**Orenstein's** [1] - 73:10
**original** [3] - 32:15, 32:20, 154:6
**originally** [1] - 15:4
**ourselves** [1] - 61:15
**outlets** [1] - 117:9
**outset** [1] - 6:25
**outside** [7] - 10:2, 10:17, 30:19, 55:4, 55:6, 94:25, 111:17
**overall** [1] - 146:5
**oversee** [2] - 5:22, 10:13
**oversight** [2] - 128:20, 128:23
**overstated** [1] - 89:9
**overwhelmingly** [1] - 76:3
**own** [6] - 28:13, 30:11, 100:23, 127:15,

133:9, 152:1
**owned** [1] - 136:24
**owner** [15] - 7:17,
23:17, 23:20, 24:23,
24:24, 26:18, 27:6,
27:21, 28:21, 29:14,
35:25, 36:18, 37:21,
141:19
**owning** [1] - 31:9
**owns** [1] - 137:19

**P**

**p.m** [7] - 79:12, 79:14,
80:15, 80:17, 136:7,
136:9, 164:5
**Pacer** [1] - 162:22
**packet** [5] - 83:16,
83:21, 119:22,
119:24, 153:22
**packets** [7] - 119:17,
120:3, 153:15,
153:16, 153:23,
160:25
**page** [9] - 52:18,
131:4, 131:21,
131:22, 131:24,
132:1, 132:2, 148:16
**Pages** [1] - 1:7
**pair** [1] - 145:10
**papers** [3] - 5:14,
34:2, 132:10
**paperwork** [2] - 145:3,
145:23
**paragraph** [1] - 38:2
**Paragraph** [8] - 26:25,
29:14, 35:22, 37:20,
38:2, 38:18, 38:25
**paralegal** [1] - 57:17
**paralegals** [1] - 64:13
**parallel** [1] - 127:25
**parameters** [2] -
12:12, 15:14
**parent** [1] - 10:25
**Park** [1] - 1:19
**part** [11] - 6:3, 10:15,
16:21, 44:9, 92:17,
117:12, 121:10,
133:17, 134:4,
135:2, 151:14
**parte** [1] - 7:4
**partials** [1] - 102:12
**particular** [41] - 3:14,
4:16, 4:19, 4:23,
4:24, 9:25, 13:20,
14:10, 18:22, 39:20,
46:13, 49:4, 50:2,
52:7, 52:15, 54:14,
54:18, 62:15, 63:18,
66:16, 82:7, 83:9,

83:11, 83:21, 84:6,
87:14, 88:2, 90:14,
103:10, 103:20,
104:5, 104:7,
106:22, 109:25,
141:1, 142:7, 144:4,
144:11, 146:14,
146:15, 160:24
**parts** [1] - 147:19
**Party** [1] - 140:5
**PASQUALE** [115] -
82:6, 82:10, 82:13,
82:15, 82:17, 82:21,
82:23, 83:1, 83:4,
83:6, 83:9, 83:11,
83:16, 83:24, 84:1,
84:4, 84:6, 84:9,
84:15, 85:6, 85:8,
85:13, 85:16, 85:19,
86:5, 87:13, 87:18,
87:20, 87:23, 88:2,
88:7, 88:10, 88:12,
88:17, 88:20, 89:8,
89:13, 89:16, 89:19,
89:22, 89:25, 90:7,
90:10, 90:13, 90:18,
90:22, 91:1, 91:4,
91:8, 91:12, 91:22,
92:3, 92:18, 92:22,
92:24, 93:8, 93:11,
93:16, 93:20, 94:1,
137:13, 137:15,
137:18, 137:20,
137:22, 138:1,
138:3, 138:6, 138:9,
138:12, 138:15,
138:18, 138:23,
139:5, 139:8,
139:12, 139:15,
139:18, 139:20,
139:23, 140:1,
140:10, 140:13,
140:17, 140:22,
141:3, 141:6, 141:9,
141:11, 141:15,
141:19, 141:22,
141:24, 142:2,
142:5, 142:8,
142:15, 142:18,
142:22, 142:25,
143:4, 143:7,
143:10, 143:14,
143:17, 143:22,
144:1, 144:6,
144:17, 144:24,
145:4, 146:20,
148:11, 148:21,
148:24
**Pasquale** [36] - 2:7,
4:3, 4:12, 4:22,
16:16, 79:19, 82:5,

82:19, 83:5, 85:24,
86:2, 87:12, 89:1,
89:3, 91:17, 92:7,
92:20, 93:6, 93:17,
94:15, 95:5, 95:12,
95:20, 118:18,
136:16, 136:23,
136:25, 137:12,
139:3, 139:7, 140:7,
148:2, 148:4, 148:9,
148:12, 148:19
**pasquale** [1] - 89:4
**pass** [5] - 112:23,
128:9, 128:10,
128:16, 128:17
**past** [5] - 33:22, 45:16,
73:23, 147:3, 162:16
**path** [1] - 115:18
**pattern** [2] - 55:19,
57:2
**Paul** [8] - 5:4, 136:25,
141:19, 141:25,
142:6, 142:20,
143:19, 143:24
**PAUL** [1] - 2:2
**pay** [6] - 29:6, 47:9,
70:2, 116:1, 116:2
**paying** [4] - 29:21,
115:23, 130:15,
130:17
**pays** [1] - 29:11
**PC** [1] - 1:18
**PCAP** [24] - 17:11,
49:22, 83:14, 83:15,
83:16, 83:23, 84:3,
84:9, 84:12, 85:10,
85:25, 86:7, 86:9,
86:15, 87:14, 88:13,
90:20, 92:11, 99:21,
140:24, 144:8,
145:20, 148:20,
153:23
**PCAPs** [10] - 4:13,
16:17, 83:12, 84:5,
85:16, 86:17, 88:25,
89:9, 140:18, 140:19
**peer** [2] - 150:14
**peer-to-peer** [1] -
150:14
**penalties** [1] - 115:13
**penalty** [1] - 113:1
**pending** [3] - 11:15,
11:18, 11:20
**Pennsville** [2] - 2:3,
134:16
**Pennsylvania** [4] -
6:2, 118:7, 134:15,
134:16
**people** [45] - 22:20,
29:19, 36:6, 47:7,

47:8, 49:3, 55:24,
56:5, 57:12, 57:17,
58:10, 68:21, 69:2,
69:8, 69:22, 70:9,
70:23, 71:1, 71:9,
71:13, 72:1, 72:7,
76:4, 78:6, 99:5,
103:4, 103:15,
104:3, 104:19,
109:25, 110:22,
111:1, 118:25,
122:24, 122:25,
123:1, 123:12,
123:24, 126:6,
126:14, 126:17,
128:12, 129:9, 150:3
**people's** [2] - 110:8,
123:2
**per** [13] - 40:19, 40:20,
40:21, 86:18, 97:11,
97:12, 108:14,
110:17, 138:16,
138:17, 138:25,
139:1
**percent** [18] - 18:18,
37:16, 46:11, 57:15,
59:6, 60:14, 60:21,
86:13, 101:15,
101:17, 102:18,
105:15, 107:12,
107:13, 123:21,
138:10, 138:15,
162:18
**percentage** [6] -
100:13, 100:20,
101:23, 137:9,
138:7, 138:13
**perfect** [1] - 69:11
**perfectly** [1] - 6:21
**perform** [1] - 4:19
**performance** [2] -
160:20, 160:22
**perhaps** [2] - 24:14,
28:1
**Perino** [4] - 152:9,
152:24, 153:9, 154:2
**period** [10] - 15:16,
20:6, 20:9, 20:18,
35:18, 50:19, 57:2,
109:19, 112:3, 121:1
**perplexed** [1] - 5:7
**person** [33] - 11:23,
22:17, 22:20, 29:15,
29:19, 33:4, 34:21,
37:6, 41:12, 47:6,
47:9, 53:10, 53:20,
64:17, 65:22, 75:4,
77:1, 77:23, 78:7,
78:11, 78:12, 78:13,
81:10, 83:3, 93:23,

98:16, 98:18, 103:3,
125:25, 139:3,
142:4, 144:19,
144:23
**personal** [1] - 89:11
**personally** [2] - 60:16,
90:17
**persons** [1] - 155:2
**phase** [2] - 13:10, 63:6
**PHEX** [2] - 150:19,
150:20
**Philadelphia** [1] - 72:3
**Phillip** [1] - 148:9
**phone** [6] - 14:17,
43:12, 67:17, 77:6,
123:25, 124:1
**phrase** [1] - 38:20
**physically** [1] - 144:5
**pick** [3] - 59:7, 79:17,
85:17
**Picture** [2] - 112:6,
114:21
**picture** [2] - 116:13,
122:16
**pictures** [1] - 152:6
**piece** [19] - 22:17,
32:23, 55:14, 55:18,
65:7, 65:15, 66:2,
86:10, 100:23,
101:19, 106:11,
106:16, 106:22,
108:14, 109:22,
110:4, 144:9,
144:10, 153:16
**pieces** [22] - 100:23,
101:1, 101:4,
101:25, 104:25,
105:2, 105:17,
106:7, 107:4, 107:5,
107:22, 107:24,
108:11, 108:16,
108:17, 108:24,
109:6, 109:11,
109:12, 109:19,
109:22
**pile** [1] - 69:3
**pinpoint** [2] - 77:16,
95:15
**piracy** [4] - 46:7, 69:7,
69:14, 71:14
**pirate** [1] - 71:1
**Pirate** [2] - 71:1,
110:25
**pirating** [1] - 115:20
**Pizza** [1] - 164:2
**place** [10] - 12:2,
15:10, 16:20, 18:15,
66:7, 66:9, 72:25,
114:25, 123:15,
145:21

**placed** [2] - 141:12, 152:6
**places** [2] - 72:12, 80:6
**Plaintiff** [2] - 1:5, 1:20
**plaintiff** [6] - 3:18, 3:21, 7:16, 31:17, 61:18, 132:12
**plaintiff's** [4] - 5:15, 27:4, 30:10, 140:5
**plate** [1] - 13:6
**platform** [2] - 152:15
**plausibility** [4] - 30:16, 31:6, 58:13, 75:7
**plausible** [14] - 27:14, 27:18, 27:19, 27:22, 29:8, 29:9, 30:4, 30:21, 36:24, 37:1, 37:3, 37:4, 52:25
**play** [2] - 91:18, 102:11
**playable** [1] - 102:4
**played** [1] - 14:11
**players** [1] - 116:12
**playing** [1] - 24:4
**plug** [2] - 36:7, 112:17
**plus** [1] - 55:7
**point** [19] - 9:24, 18:15, 21:10, 24:15, 29:18, 41:15, 46:6, 49:6, 50:17, 53:16, 63:4, 75:7, 106:6, 121:1, 121:19, 121:21, 124:19, 126:5, 159:8
**points** [3] - 75:2, 118:23, 147:15
**police** [3] - 76:19, 149:22, 151:15
**pop** [3] - 110:20, 111:19, 111:22
**popular** [1] - 45:13
**popularity** [1] - 68:15
**population** [1] - 72:1
**pornography** [3] - 150:22, 154:16, 155:9
**port** [29] - 41:5, 41:8, 41:22, 81:1, 81:7, 81:8, 81:12, 81:13, 81:20, 81:21, 82:2, 82:12, 92:1, 92:8, 92:10, 92:11, 92:14, 93:23, 156:5, 156:8, 156:10, 156:19, 156:21, 156:22, 156:23, 157:3, 157:11, 157:13, 158:1

**portion** [3] - 101:15, 104:25, 110:20
**portions** [1] - 104:3
**ports** [8] - 81:18, 81:19, 82:6, 156:16, 156:22, 157:7, 157:18, 157:22
**position** [2] - 31:9, 32:2
**positive** [2] - 159:24, 159:25
**possibility** [1] - 39:8
**possible** [16] - 22:16, 43:2, 44:16, 45:4, 45:21, 57:23, 71:9, 76:6, 102:23, 103:4, 103:5, 104:13, 104:18, 107:11, 107:12, 134:15
**possibly** [5] - 76:14, 78:11, 78:18, 107:2, 111:9
**posted** [2] - 64:20, 122:25
**posture** [1] - 31:14
**potential** [1] - 76:13
**practical** [2] - 9:24, 97:22
**practice** [5] - 52:16, 52:18, 53:12, 53:13, 54:5
**Practice** [1] - 56:2
**precedent** [1] - 72:23
**precise** [1] - 76:16
**precision** [1] - 133:24
**preconceived** [3] - 7:1, 7:12, 14:25
**preempted** [1] - 148:2
**prefer** [1] - 76:23
**prejudice** [1] - 59:4
**prepare** [2] - 89:14, 90:25
**prepared** [6] - 91:15, 139:11, 140:8, 140:11, 140:13, 140:15
**prepares** [2] - 140:20, 140:23
**preponderance** [1] - 75:8
**PRESENT** [1] - 2:5
**present** [4] - 3:12, 5:8, 11:15, 135:17
**preserve** [1] - 123:22
**press** [1] - 68:17
**pressure** [1] - 17:15
**presumably** [3] - 17:23, 18:1, 64:9
**pretty** [10] - 40:8, 48:24, 50:15, 72:17,

98:8, 98:20, 106:3, 115:21, 129:14, 149:19
**prevent** [3] - 115:15, 116:21, 124:25
**previous** [1] - 98:24
**primarily** [4] - 5:21, 6:9, 83:7, 85:9
**primary** [1] - 130:23
**Princeton** [1] - 72:3
**principal** [1] - 136:23
**printed** [1] - 25:18
**Privacy** [1] - 117:17
**private** [6] - 73:18, 73:25, 74:4, 128:21, 153:6
**pro** [2] - 6:5, 67:16
**probability** [2] - 52:25, 75:8
**problem** [6] - 22:13, 57:14, 70:18, 71:16, 120:20, 128:8
**problems** [1] - 113:11
**procedural** [4] - 31:14, 32:6, 118:8, 119:8
**procedure** [2] - 118:4, 147:4
**proceed** [14] - 5:7, 13:11, 35:2, 35:4, 53:17, 61:16, 62:18, 66:14, 67:2, 73:12, 74:12, 78:16, 78:19, 79:5
**proceeded** [1] - 61:16
**proceedings** [1] - 164:9
**Proceedings** [1] - 1:24
**process** [9] - 13:13, 66:18, 73:14, 111:16, 112:16, 114:20, 123:15, 128:25, 151:23
**produce** [1] - 56:12
**produced** [2] - 1:25, 31:17
**production** [1] - 10:14
**professionalism** [1] - 161:20
**profile** [7] - 54:1, 54:6, 54:11, 64:17, 64:24, 65:3, 65:11
**program** [31] - 19:1, 19:4, 42:4, 42:6, 42:10, 42:17, 42:18, 42:24, 43:22, 44:9, 44:24, 44:25, 45:25, 46:1, 46:4, 46:11, 47:22, 49:24, 57:3,

74:23, 87:18, 98:5, 98:6, 119:3, 140:18, 141:11, 143:12, 144:2, 151:13
**programs** [6] - 45:14, 46:5, 46:6, 47:24, 48:23, 76:4
**progression** [2] - 105:23, 107:18
**promise** [1] - 130:7
**promptly** [1] - 161:19
**pronounce** [1] - 108:22
**proper** [1] - 117:23
**property** [1] - 10:24
**prosecute** [1] - 134:4
**prosecutor** [1] - 154:21
**protect** [5] - 10:20, 62:1, 74:11, 113:12
**protected** [3] - 76:24, 77:12
**protective** [3] - 66:7, 66:8, 66:11
**protocol** [4] - 17:2, 83:18, 144:6, 156:21
**proven** [3] - 134:23, 135:9, 147:10
**provide** [5] - 6:17, 86:18, 162:4, 162:11, 162:25
**provided** [4] - 4:8, 61:8, 139:10, 162:5
**provider** [2] - 12:8, 38:8, 41:4, 123:4, 125:12, 126:14
**providers** [2] - 9:3, 114:22
**providing** [2] - 78:22, 162:14
**provision** [1] - 123:12
**proviso** [1] - 14:21
**prurient** [1] - 7:24
**public** [6] - 52:18, 54:13, 68:2, 134:11, 153:7, 162:17
**publicly** [4] - 53:15, 64:18, 76:23, 77:5
**pull** [6] - 25:15, 25:22, 51:4, 51:12, 59:8, 65:3
**pulled** [1] - 140:18
**pulling** [1] - 25:25
**punished** [2] - 61:24, 62:19
**purpose** [4] - 77:2, 86:6, 105:25, 111:11
**purposes** [4] - 23:12, 86:19, 104:10, 135:24

**put** [23] - 17:15, 43:15, 54:10, 70:14, 71:25, 79:1, 89:4, 91:6, 121:16, 121:19, 123:13, 126:21, 131:25, 140:1, 140:21, 143:10, 146:18, 148:16, 152:17, 161:22, 162:16, 162:22, 163:11
**puts** [4] - 101:1, 122:12, 135:12, 141:17
**putting** [3] - 70:9, 94:21, 149:2
**puzzle** [2] - 32:23, 101:2

## Q

**qualifications** [1] - 149:17
**qualified** [1] - 159:11
**qualify** [2] - 10:24, 105:12
**quality** [1] - 108:11
**quash** [2] - 3:13, 161:18
**questioning** [3] - 79:23, 79:25, 118:17
**questions** [22] - 5:9, 5:10, 5:11, 5:18, 6:21, 9:4, 14:5, 35:11, 79:24, 80:23, 86:2, 86:4, 88:21, 91:11, 119:16, 135:18, 136:11, 148:3, 155:18, 158:21, 160:9, 161:11
**quicker** [1] - 117:5
**quickly** [1] - 153:11
**quite** [1] - 17:20
**quote** [6] - 27:2, 108:23, 120:19, 122:22, 132:12, 132:13

## R

**radius** [1] - 151:18
**raise** [2] - 77:17, 127:25
**rampant** [1] - 23:1
**ran** [1] - 52:22
**random** [1] - 106:7
**range** [1] - 52:13
**rare** [2] - 98:20, 103:6
**rate** [1] - 66:4
**rather** [5] - 21:6,

39:14, 52:13, 153:7
**rationale** [1] - 145:7
**re** [2] - 101:1
**re-puts** [1] - 101:1
**reach** [1] - 66:9
**reached** [1] - 63:16
**reaches** [1] - 77:21
**read** [8] - 27:2, 32:20, 89:18, 132:10, 147:17, 149:24, 150:25, 151:5
**reading** [1] - 160:1
**real** [4] - 13:13, 30:23, 46:6, 127:17
**reality** [3] - 74:9, 81:10, 82:1
**realized** [1] - 47:25
**really** [36] - 5:11, 7:7, 7:15, 18:7, 31:18, 36:4, 51:3, 54:3, 62:10, 67:1, 71:23, 73:6, 73:25, 79:21, 80:8, 80:9, 90:23, 106:6, 107:12, 108:17, 112:13, 124:6, 124:24, 126:10, 126:12, 129:14, 129:16, 138:18, 145:1, 149:12, 150:16, 161:13
**reason** [11] - 9:22, 21:10, 33:19, 36:24, 59:18, 73:23, 74:10, 74:11, 112:14, 114:19, 117:11
**reasonable** [16] - 10:21, 21:19, 25:3, 27:11, 29:18, 29:22, 34:24, 39:6, 39:13, 40:8, 58:15, 106:3, 107:10, 107:21, 144:23, 147:9
**rebring** [1] - 134:19
**receipt** [1] - 78:25
**receive** [7] - 15:13, 18:12, 68:17, 69:18, 90:6, 90:20, 143:13
**received** [5] - 13:10, 18:5, 67:13, 90:5, 106:22
**receives** [1] - 16:21
**recent** [4] - 9:9, 61:6, 96:2, 96:23
**recently** [4] - 7:6, 34:6, 113:3, 147:11
**receptionists** [1] - 52:20
**RECESS** [3] - 79:12, 80:15, 136:7

**recipient** [1] - 153:18
**recite** [1] - 51:2
**recollection** [1] - 89:12
**recommendations** [1] - 163:20
**reconvene** [1] - 80:11
**record** [25] - 3:4, 7:3, 16:1, 17:11, 26:1, 27:2, 34:17, 49:21, 50:22, 51:16, 55:7, 70:18, 83:15, 97:5, 99:10, 103:16, 106:24, 116:13, 125:24, 134:11, 140:4, 146:13, 148:5, 162:17, 164:9
**recorded** [6] - 1:24, 49:11, 50:19, 144:4, 145:21, 163:2
**recording** [1] - 107:20
**records** [6] - 15:12, 16:23, 16:24, 49:18, 140:15, 155:3
**recreationally** [1] - 54:4
**red** [5] - 115:5, 122:17, 122:18, 122:21, 124:24
**refer** [4] - 38:20, 141:8, 159:9, 163:10
**reference** [1] - 50:6
**references** [2] - 56:25, 91:13
**referring** [4] - 84:11, 86:24, 133:17, 140:4
**refers** [2] - 38:18, 38:22
**reflect** [1] - 26:2
**reflects** [2] - 100:12, 100:20
**regard** [5] - 81:2, 85:18, 88:8, 142:13, 142:16
**regarding** [5] - 18:3, 91:20, 109:19, 116:25, 162:9
**regardless** [1] - 128:15
**regards** [1] - 154:8
**region** [2] - 142:9, 151:20
**register** [1] - 29:7
**registered** [5] - 24:24, 26:18, 29:14, 38:4, 38:7
**registration** [2] - 12:22, 12:25
**regular** [4] - 44:10, 66:15, 103:7, 123:3

**regularly** [1] - 48:16
**rehashed** [1] - 154:5
**rejected** [1] - 148:19
**relate** [1] - 33:18
**related** [1] - 106:21
**relationship** [1] - 38:12
**relatively** [1] - 12:19
**releases** [1] - 106:5
**relevance** [1] - 47:3
**relevant** [3] - 4:19, 46:23, 95:7
**reliability** [2] - 132:11, 132:20
**reliable** [4] - 132:18, 133:13, 134:6, 134:7
**reliance** [1] - 133:9
**relief** [7] - 8:18, 8:21, 9:6, 121:23, 122:3, 122:13, 122:14
**relies** [1] - 132:12
**rely** [6] - 25:9, 48:24, 113:6, 133:7, 133:12, 133:18
**remaining** [1] - 105:17
**remedy** [1] - 117:4, 128:13, 128:14, 129:15
**remember** [4] - 90:3, 91:6, 129:7, 134:13
**remotely** [1] - 65:10
**remove** [4] - 73:19, 128:20, 129:18, 130:6
**removed** [1] - 111:8
**report** [10] - 4:8, 18:2, 41:17, 43:20, 93:3, 97:13, 110:19, 147:17, 153:12, 155:20
**reported** [1] - 97:10
**Reporter** [1] - 1:22
**Reporter/ Transcriber** [1] - 164:11
**reports** [5] - 15:20, 15:25, 18:22, 133:1, 154:4
**represent** [1] - 109:15
**representatives** [1] - 63:8
**representing** [1] - 10:18
**represents** [1] - 110:2
**reputation** [2] - 148:25, 149:3
**request** [3] - 51:16, 61:8, 121:9
**requested** [1] - 8:18
**requests** [1] - 9:6

**require** [5] - 6:4, 61:23, 102:11, 144:14, 150:16
**required** [1] - 123:19
**research** [4] - 27:23, 59:11, 64:21, 64:22
**researching** [1] - 117:2
**reserves** [1] - 161:17
**reside** [1] - 78:6
**residence** [4] - 29:13, 40:19, 40:24, 155:2
**residential** [1] - 78:4
**resides** [4] - 22:2, 36:25, 37:2, 38:3
**resolved** [1] - 61:9
**resources** [6] - 59:14, 62:10, 115:7, 115:10, 116:14, 116:15
**respect** [1] - 120:7
**respectfully** [2] - 66:20, 73:10
**respond** [1] - 96:20
**response** [3] - 52:17, 61:8
**RESPONSE** [3] - 79:10, 80:13, 164:3
**responses** [1] - 125:22
**responsibilities** [1] - 57:13
**responsibility** [1] - 148:3
**rest** [5] - 53:1, 73:8, 79:5, 135:12, 137:22
**retainer** [1] - 135:3
**retention** [1] - 96:3
**return** [1] - 153:20
**reveal** [1] - 154:25
**revealed** [2] - 60:6, 134:10
**reveals** [1] - 158:14
**revenue** [1] - 19:23
**reversed** [1] - 8:25
**review** [9] - 14:2, 48:9, 54:23, 56:11, 57:15, 141:12, 159:9, 160:25, 161:3
**reviewing** [1] - 132:25
**reviews** [2] - 56:15, 56:17
**RIAA** [3] - 34:14, 112:6, 114:21
**rid** [5] - 102:1, 116:2, 124:18, 130:9, 130:14
**rights** [1] - 128:25
**Rightscorp** [5] - 112:4, 112:7,

112:12, 113:19, 120:14
**rigid** [1] - 57:4
**rigorous** [1] - 63:6
**ring** [1] - 129:14
**rings** [1] - 80:20
**ripped** [1] - 123:13
**rise** [7] - 3:1, 79:11, 79:13, 80:14, 80:16, 136:8, 164:4
**risk** [2] - 126:7, 145:17
**riskiest** [1] - 145:14
**River** [6] - 134:14, 137:6, 137:10, 138:22, 141:20, 149:2
**Rivers** [16] - 16:16, 85:23, 95:2, 136:13, 136:14, 136:16, 136:17, 136:23, 138:9, 138:14, 138:19, 139:8, 143:17, 145:7, 145:22, 148:15
**RMR** [1] - 164:11
**rock** [2] - 58:12, 75:18
**role** [3] - 14:11, 94:19, 99:20
**roles** [1] - 4:4
**roll** [2] - 145:2, 145:25
**roll-up-your-sleeves** [1] - 145:2
**room** [1] - 4:2
**roommate** [1] - 23:22
**roommates** [1] - 23:24
**rough** [1] - 75:3
**roughly** [2] - 59:3, 59:5
**round** [1] - 108:13
**routable** [1] - 153:4
**route** [2] - 16:8, 31:3
**router** [1] - 153:6
**routinely** [1] - 111:3
**royalties** [1] - 10:15
**royalty** [2] - 115:24, 116:1
**Rule** [17] - 14:6, 24:22, 30:9, 30:12, 30:15, 30:20, 31:24, 32:1, 32:3, 32:12, 35:9, 58:6, 58:13, 66:24, 67:4, 67:19, 73:23
**rules** [2] - 17:19, 118:11
**Rules** [2] - 61:23, 118:10
**ruling** [1] - 34:18
**run** [9] - 49:7, 52:16, 53:12, 53:13, 70:12, 71:2, 127:6, 145:9,

155:1

*running* [8] - 81:6, 81:11, 81:16, 81:17, 81:24, 82:2, 150:14, 157:15

*Running* [1] - 56:1

*runs* [3] - 54:5, 70:7, 150:13

*Russia* [3] - 70:24, 71:4, 111:19

*Rutgers* [1] - 80:6

---

## S

*safe* [3] - 123:9, 124:20

*sails* [1] - 7:15

*San* [1] - 72:4

*sat* [1] - 16:6

*satisfied* [2] - 58:22, 77:22

*satisfy* [2] - 61:11, 76:25

*satisfying* [1] - 66:24

*save* [3] - 7:20, 122:23, 143:11

*saw* [7] - 11:3, 11:4, 52:14, 52:19, 53:8, 53:9, 72:24

*scale* [1] - 66:4

*scan* [1] - 49:24

*scenario* [3] - 29:8, 29:10, 30:23

*SCHNEIDER* [1] - 1:13

*science* [3] - 158:24, 158:25, 159:1

*screaming* [1] - 65:20

*screen* [2] - 98:12, 98:21

*scripts* [2] - 159:5, 159:7

*Scull* [1] - 5:4

*SCULL* [45] - 2:2, 5:3, 26:1, 33:25, 34:3, 34:5, 80:1, 80:21, 84:18, 84:21, 84:24, 118:16, 119:6, 119:10, 119:15, 120:12, 120:19, 121:10, 121:25, 129:7, 132:16, 132:19, 133:6, 158:22, 159:2, 159:4, 159:6, 159:8, 159:11, 159:14, 159:17, 159:20, 159:23, 160:3, 160:6, 160:8, 160:18, 160:23, 160:25, 161:3,

---

161:6, 161:8, 161:13, 162:24, 163:4

*se* [1] - 67:16

*seal* [1] - 163:11

*search* [10] - 19:1, 64:17, 111:5, 111:7, 150:22, 154:20, 155:6, 155:7, 155:12, 155:14

*seated* [4] - 3:4, 79:15, 80:18, 136:10

*Seattle* [2] - 132:25, 133:1

*second* [6] - 7:14, 13:10, 35:22, 115:1, 145:10, 148:18

*seconds* [4] - 101:25, 106:25, 109:3, 145:15

*secret* [1] - 7:5

*security* [1] - 67:14

*see* [48] - 8:2, 19:21, 23:13, 39:16, 41:22, 42:2, 42:5, 42:16, 42:17, 50:7, 53:14, 54:15, 59:19, 64:17, 64:19, 64:20, 64:24, 65:3, 65:5, 65:6, 66:7, 68:9, 68:19, 70:19, 70:23, 71:20, 72:12, 74:13, 78:3, 84:18, 88:4, 97:1, 98:5, 98:9, 104:21, 105:1, 105:23, 107:18, 108:8, 111:5, 121:17, 142:12, 147:20, 154:13, 155:2, 155:4, 160:17

*seeing* [1] - 147:22

*seek* [1] - 152:25

*seeking* [2] - 63:6, 77:11

*seem* [2] - 31:13, 112:14

*segregating* [1] - 156:14

*sell* [1] - 132:5

*seller* [1] - 132:6

*send* [43] - 14:18, 16:2, 67:17, 86:11, 110:11, 110:18, 110:22, 111:3, 111:24, 112:1, 112:15, 112:19, 113:21, 113:25, 114:2, 114:11, 114:13, 114:24, 115:1, 116:4, 120:8,

---

120:9, 120:10, 120:12, 120:16, 121:22, 125:8, 126:20, 128:4, 128:22, 129:12, 142:19, 143:19, 143:24, 144:1, 145:19, 153:17, 162:19

*sending* [5] - 110:24, 111:11, 113:4, 113:5, 124:10

*sends* [3] - 15:20, 16:25, 41:17

*senior* [1] - 64:24

*sense* [4] - 20:6, 107:23, 130:16, 150:5

*sent* [22] - 83:12, 85:9, 88:13, 89:17, 91:2, 110:16, 110:20, 113:15, 114:16, 120:21, 120:25, 121:3, 121:15, 122:9, 124:5, 136:16, 140:9, 140:16, 152:8, 153:12, 154:1, 154:5

*sentence* [1] - 35:22

*separate* [4] - 21:14, 84:3, 145:6, 159:18

*September* [2] - 17:24, 108:25

*serial* [1] - 50:4

*series* [3] - 90:4, 91:12, 128:19

*serious* [4] - 50:15, 73:4, 73:8, 112:21

*seriously* [4] - 64:3, 126:7, 126:9, 126:10

*serve* [1] - 13:12

*Serve* [1] - 140:5

*servers* [1] - 108:24

*service* [14] - 9:3, 12:8, 66:18, 80:8, 81:15, 113:8, 113:9, 114:22, 124:13, 125:8, 125:11, 125:14, 128:2

*services* [3] - 133:24, 156:13, 157:2

*servicing* [1] - 124:23

*serving* [3] - 14:2, 86:19, 157:1

*set* [4] - 12:18, 145:18, 147:18, 152:16

*sets* [1] - 31:9

*settle* [1] - 129:25

*settled* [2] - 52:2, 61:9

*settlement* [1] -

---

115:22

*settlements* [3] - 67:18, 130:11, 130:12

*settles* [1] - 130:1

*settling* [3] - 130:5, 130:7, 130:8

*several* [4] - 43:4, 51:5, 98:11, 163:20

*severe* [1] - 115:3

*SHA* [1] - 152:2

*shaking* [1] - 129:21

*shape* [2] - 7:11, 17:9

*shared* [1] - 52:5

*sharing* [2] - 76:4, 150:18

*Shark* [2] - 153:13, 153:24

*Shock* [1] - 87:18

*shocked* [1] - 91:10

*short* [4] - 74:14, 128:1, 128:4, 143:6

*shoulder* [1] - 144:21

*show* [13] - 3:6, 3:14, 27:23, 39:11, 44:24, 45:3, 56:13, 68:7, 81:5, 129:3, 134:18, 161:18

*showed* [3] - 76:22, 135:3, 144:20

*showing* [5] - 77:13, 101:19, 109:23, 123:3, 134:15

*shown* [1] - 113:3

*shows* [3] - 78:25, 83:17, 128:24

*shut* [7] - 113:22, 125:7, 125:13, 127:5, 127:6, 127:11, 127:21

*shutting* [1] - 128:5

*side* [2] - 58:16, 118:3

*sign* [12] - 14:12, 56:20, 70:1, 71:6, 71:7, 90:17, 91:3, 115:5, 132:3, 139:16, 143:19, 143:23

*signature* [6] - 83:13, 88:15, 90:15, 139:21, 139:22, 143:10

*signed* [5] - 14:11, 26:22, 85:14, 91:4, 91:24

*significance* [4] - 4:6, 100:11, 109:10, 156:8

*significant* [2] - 37:5, 130:17

---

*signs* [1] - 57:12

*silver* [1] - 146:18

*similar* [3] - 64:14, 153:16, 162:4

*simple* [3] - 94:19, 154:13, 160:16

*simply* [6] - 12:23, 14:12, 34:10, 97:19, 97:22, 160:16

*simultaneously* [2] - 50:9, 50:11

*single* [12] - 11:24, 22:17, 96:2, 96:25, 97:5, 97:8, 97:16, 99:21, 101:12, 104:14, 109:21, 110:5

*singular* [1] - 47:25

*sit* [1] - 155:4

*site* [1] - 123:3

*sites* [8] - 111:3, 111:9, 114:3, 115:19, 115:25, 116:5, 122:25

*sitting* [3] - 41:13, 75:17, 125:1

*situation* [8] - 27:17, 47:7, 57:24, 69:11, 78:14, 125:4, 127:24, 157:4

*situations* [1] - 58:19

*six* [12] - 9:15, 9:16, 11:13, 18:13, 63:14, 97:20, 104:23, 107:8, 109:19, 114:25, 121:1, 131:11

*Six* [1] - 114:23

*six-month* [1] - 109:19

*sixth* [1] - 115:3

*size* [5] - 43:3, 108:15, 108:17, 108:20, 109:8

*skip* [1] - 49:12

*skipped* [1] - 32:14

*slam* [3] - 37:16, 62:8, 62:9

*sleeves* [2] - 145:2, 145:25

*slightly* [2] - 150:4, 150:15

*slow* [3] - 80:8, 80:9, 115:4

*small* [5] - 35:22, 137:2, 137:3, 159:5, 159:7

*snap* [1] - 119:25

*snapshot* [7] - 18:7, 99:15, 99:16, 99:17, 99:18, 99:23, 118:24

**snapshots** [1] - 120:6
**snide** [1] - 91:9
**social** [6] - 21:14, 53:8, 53:10, 55:24, 77:21, 77:25
**soda** [1] - 146:18
**software** [24] - 15:10, 16:19, 16:24, 36:6, 45:10, 45:14, 51:8, 65:1, 65:3, 65:4, 93:7, 132:22, 132:23, 132:25, 133:2, 140:1, 150:11, 151:24, 158:11, 158:15, 159:2, 160:4, 160:14, 160:20
**Solar** [2] - 65:2, 65:7
**solely** [1] - 122:22
**solicit** [1] - 67:18
**solid** [1] - 58:12
**solutions** [1] - 115:18
**solve** [1] - 128:8
**someone** [31] - 19:11, 19:16, 19:21, 20:22, 21:11, 21:22, 22:2, 37:1, 39:3, 39:8, 39:14, 40:7, 41:18, 43:2, 44:6, 56:15, 56:17, 57:12, 67:2, 70:5, 76:19, 78:17, 78:18, 85:19, 94:13, 116:22, 126:3, 143:15, 145:10, 147:16, 155:8
**sometime** [1] - 18:1
**sometimes** [12] - 42:6, 45:14, 47:22, 54:1, 74:1, 95:17, 96:19, 97:12, 97:23, 98:20, 110:16, 134:12
**somewhat** [4] - 12:1, 16:14, 109:9, 150:16
**somewhere** [8] - 11:3, 11:4, 50:22, 51:9, 71:4, 111:20, 111:23, 125:14
**son** [12] - 20:25, 30:17, 30:25, 31:2, 78:8, 78:9, 127:10, 127:20, 136:24, 137:19, 141:19
**song** [1] - 30:1
**soon** [6] - 50:5, 54:11, 58:2, 71:9, 111:20, 147:18
**sophisticated** [5] - 19:4, 40:8, 67:13, 70:6, 72:2
**sorry** [22] - 6:12, 10:7,

16:3, 22:12, 32:18, 45:11, 48:5, 52:6, 80:21, 83:8, 96:4, 100:17, 129:17, 131:10, 139:16, 142:3, 142:18, 146:25, 148:8, 159:16, 160:18, 162:24
**sort** [21] - 5:21, 5:23, 13:9, 14:9, 15:14, 17:3, 18:25, 19:6, 54:6, 74:13, 74:18, 78:5, 78:23, 79:24, 112:16, 124:17, 130:23, 135:20, 146:8, 147:21, 150:6
**sound** [7] - 3:7, 3:9, 17:12, 49:20, 49:21, 80:19, 129:1
**sounded** [1] - 80:19
**sounds** [1] - 128:4
**source** [15] - 82:18, 83:17, 87:15, 87:20, 132:24, 143:13, 143:20, 144:8, 152:19, 153:14, 156:5, 156:6, 159:12, 160:14
**spam** [1] - 112:24
**speaker** [1] - 77:16
**speaking** [1] - 116:9
**speaks** [1] - 7:3
**specializes** [1] - 64:25
**specific** [8] - 4:13, 6:19, 14:6, 15:13, 82:8, 131:15, 147:25, 151:16
**specifically** [3] - 32:23, 128:14, 146:15
**specified** [1] - 92:15
**speculations** [1] - 4:11
**speed** [1] - 103:4
**spend** [6] - 58:10, 96:25, 111:21, 143:2, 143:21, 149:11
**spending** [1] - 110:7
**spent** [2] - 144:21, 149:23
**spits** [2] - 46:12, 47:23
**spoken** [1] - 126:3
**spoliation** [3] - 73:20, 74:1, 74:7
**spot** [1] - 134:19
**spreadsheet** [7] - 56:12, 56:17, 91:24, 162:8, 162:10,

162:14, 162:24
**spreadsheets** [2] - 51:11, 51:14
**spring** [1] - 150:8
**staff** [4] - 10:16, 57:16, 58:5, 64:13
**stage** [8] - 30:20, 32:8, 32:9, 33:3, 33:22, 34:8, 41:16, 95:5
**stages** [3] - 33:1, 63:16, 94:23
**stand** [1] - 87:1
**standard** [4] - 30:16, 31:7, 61:15, 73:1
**standards** [1] - 58:13
**standing** [1] - 4:5
**stands** [1] - 87:2
**star** [1] - 65:25
**start** [11] - 3:11, 3:16, 13:13, 21:10, 28:9, 50:16, 93:19, 115:23, 123:1, 127:13, 136:4
**started** [7] - 11:5, 11:12, 16:7, 63:11, 112:4, 136:19, 136:22
**state** [17] - 6:17, 17:17, 30:10, 35:24, 38:3, 38:7, 38:8, 38:10, 38:15, 46:16, 76:11, 77:9, 116:21, 117:1, 117:21, 134:18, 135:3
**state-of-the-art** [1] - 17:17
**statement** [2] - 61:12, 158:5
**STATES** [2] - 1:2, 1:13
**States** [3] - 69:16, 69:19, 69:20
**states** [5] - 6:8, 71:21, 71:24, 72:7, 131:5
**stating** [1] - 90:16
**statistics** [7] - 39:11, 58:25, 60:13, 61:7, 62:21, 68:7, 69:16
**statute** [2] - 121:21, 125:17
**stays** [1] - 42:10
**steal** [1] - 34:23
**stealing** [1] - 110:8
**stenography** [1] - 1:24
**step** [7] - 15:24, 32:14, 64:3, 64:4, 76:5, 100:21, 105:25
**stereotypical** [1] - 52:12
**Steven** [3] - 2:8, 4:3,

108:4
**still** [7] - 31:17, 31:20, 41:16, 63:16, 68:14, 117:4, 128:14
**stonewall** [1] - 134:22
**stop** [28] - 13:16, 16:3, 18:8, 18:9, 18:10, 18:17, 18:19, 25:8, 34:7, 50:5, 59:19, 69:8, 113:9, 113:14, 115:5, 116:19, 120:17, 121:11, 121:13, 122:6, 122:10, 124:6, 125:5, 126:19, 126:20, 129:11, 129:13
**stopped** [6] - 55:16, 59:20, 113:18, 120:24, 121:6, 121:18
**stopping** [1] - 115:9
**stops** [5] - 30:6, 69:5, 69:7, 69:8, 121:18
**storage** [2] - 43:8, 43:18
**store** [1] - 49:23
**stored** [1] - 140:17
**stores** [1] - 19:5
**story** [1] - 89:7
**straight** [2] - 28:12, 141:1
**strange** [1] - 32:1
**strategy** [1] - 96:14
**street** [4] - 80:7, 80:8, 133:19, 163:22
**Streets** [1] - 1:10
**stretch** [1] - 79:8
**strictly** [1] - 82:17
**strike** [1] - 115:3
**Strike** [125] - 2:6, 3:4, 3:18, 3:21, 3:24, 5:8, 5:19, 6:1, 6:7, 6:16, 8:5, 8:13, 8:18, 9:6, 9:12, 10:7, 10:12, 10:22, 10:24, 15:4, 18:2, 22:8, 22:14, 22:21, 23:19, 27:8, 28:13, 29:12, 35:14, 37:20, 38:4, 41:17, 41:19, 42:13, 43:23, 44:15, 46:16, 46:23, 46:25, 47:15, 48:18, 49:2, 49:15, 50:23, 54:20, 55:7, 56:18, 57:20, 57:25, 58:2, 61:8, 61:11, 62:24, 64:8, 67:21, 67:24, 68:3, 72:16, 73:17, 74:16, 74:17, 77:19,

80:24, 82:4, 82:20, 88:1, 88:19, 90:6, 90:7, 100:3, 105:3, 105:18, 106:12, 108:24, 110:11, 110:19, 112:1, 113:24, 115:14, 116:20, 117:3, 117:12, 121:23, 122:12, 125:4, 125:6, 126:13, 128:21, 129:25, 130:20, 130:25, 131:6, 131:13, 131:18, 132:7, 133:23, 135:16, 136:19, 137:7, 137:10, 138:5, 138:8, 138:16, 138:19, 138:22, 139:12, 139:24, 140:3, 140:8, 140:11, 140:14, 141:22, 141:23, 141:25, 142:4, 143:15, 143:25, 148:20, 149:9, 161:14, 161:20, 163:5
**STRIKE** [1] - 1:4
**Strikes** [1] - 114:23
**strikes** [1] - 114:25
**strong** [1] - 58:14
**strongly** [1] - 62:11
**Studio** [2] - 10:9, 72:23
**stuff** [8] - 29:25, 98:21, 124:3, 125:22, 126:7, 130:16, 142:10, 142:11
**style** [1] - 135:21
**submitted** [2] - 89:1, 149:17
**Subpoena** [1] - 140:6
**subpoena** [27] - 9:2, 13:12, 21:12, 24:20, 52:17, 58:20, 73:17, 77:2, 77:11, 86:11, 86:19, 95:6, 96:3, 96:5, 96:15, 96:20, 97:2, 97:3, 99:20, 112:17, 125:22, 133:20, 145:19, 154:11, 154:22, 154:23
**subpoena's** [1] - 77:19
**subscribe** [1] - 21:2
**subscriber** [112] -

20:7, 20:10, 20:13, 20:22, 20:24, 21:6, 21:9, 21:11, 21:19, 21:21, 22:1, 22:14, 22:18, 23:6, 23:7, 23:10, 24:10, 24:19, 25:4, 25:6, 26:20, 26:23, 27:7, 27:14, 28:23, 29:10, 30:7, 31:15, 31:16, 32:22, 33:5, 33:13, 33:21, 34:24, 36:24, 37:4, 37:12, 37:16, 37:24, 39:7, 39:13, 39:25, 40:4, 40:5, 40:14, 40:16, 44:5, 46:24, 49:4, 53:2, 53:5, 54:7, 57:7, 58:1, 58:20, 58:21, 58:22, 60:8, 60:11, 60:14, 60:15, 60:20, 64:7, 64:16, 65:8, 68:19, 68:20, 75:9, 75:14, 76:1, 76:25, 77:20, 77:22, 86:12, 95:9, 95:11, 95:19, 96:6, 98:24, 100:15, 102:14, 102:18, 102:22, 103:10, 103:21, 104:6, 104:7, 105:4, 105:10, 105:14, 105:15, 105:19, 106:14, 106:17, 107:12, 107:13, 113:7, 114:11, 114:14, 115:1, 120:3, 120:4, 120:5, 120:17, 121:4, 122:10, 126:2, 126:15, 127:4, 127:18, 154:13, 155:1

**SUBSCRIBER** [1] - 1:7
**Subscriber** [2] - 5:4, 26:17
**subscriber's** [4] - 44:4, 64:12, 107:1, 129:18
**subscribers** [13] - 19:24, 19:25, 69:21, 69:23, 112:2, 113:6, 115:11, 119:19, 119:21, 120:8, 124:18, 125:5, 126:25
**subscribing** [1] - 20:1
**subscription** [3] - 70:2, 71:7, 125:14
**substantial** [5] - 6:11,

29:23, 30:3, 101:15, 101:22
**substantially** [1] - 36:23
**substantive** [1] - 13:2
**suburb** [2] - 39:10, 75:11
**suburban** [1] - 53:4
**Subway** [1] - 163:25
**succeeded** [1] - 102:25
**successfully** [1] - 154:8
**sue** [8] - 18:9, 98:18, 111:19, 115:24, 123:20, 123:22, 124:1, 124:21
**sued** [3] - 20:7, 123:6, 123:10
**sufficient** [3] - 7:8, 12:24, 30:12
**suggest** [2] - 5:10, 79:3
**suing** [1] - 124:7
**suit** [1] - 121:13
**Suite** [1] - 1:16
**suits** [4] - 11:4, 98:19, 115:15, 121:12
**summarize** [1] - 74:14
**summary** [2] - 30:18, 31:24
**super** [1] - 78:17
**support** [2] - 132:14, 134:23
**supported** [1] - 96:25
**suppose** [10] - 21:2, 21:4, 30:8, 103:25, 118:21, 118:22, 121:22, 122:9, 125:3, 158:13
**Supreme** [1] - 12:21
**surfing** [1] - 25:24
**survive** [1] - 31:7
**suspicion** [1] - 27:15
**swarms** [2] - 57:1, 65:12
**swatting** [1] - 76:18
**swear** [1] - 65:19
**switched** [1] - 98:16
**switching** [1] - 98:8
**sworn** [1] - 148:2
**synchronized** [1] - 154:3
**system** [33] - 12:1, 15:10, 16:19, 17:16, 64:14, 76:24, 92:1, 92:10, 114:23, 114:25, 123:13, 129:2, 146:5, 146:6, 147:3, 147:7,

152:12, 152:15, 155:21, 155:24, 155:25, 156:1, 156:5, 156:18, 158:1, 158:6, 158:10, 159:14, 159:15, 159:17, 159:22, 160:15
**Systems** [2] - 10:25, 141:20
**Systems's** [1] - 149:3

## T

**T's** [2] - 144:16, 144:19
**takedown** [1] - 123:11
**Takedowns** [1] - 110:15
**TAKEN** [3] - 79:12, 80:15, 136:7
**talks** [1] - 61:9
**tangent** [3] - 31:4, 31:5, 36:10
**tap** [1] - 20:17
**Task** [1] - 150:10
**tax** [1] - 155:3
**TCP** [1] - 92:14
**team** [11] - 11:25, 15:14, 19:5, 55:3, 55:6, 57:18, 70:6, 71:9, 94:14, 94:18, 117:2
**teams** [1] - 63:8
**tech** [3] - 63:8, 65:2, 72:7
**technical** [7] - 79:22, 79:24, 144:14, 144:17, 144:19, 145:2, 159:9
**technically** [1] - 113:7
**techniques** [1] - 75:12
**technologies** [1] - 17:16
**technology** [14] - 4:8, 4:10, 4:12, 4:20, 16:13, 17:18, 77:9, 103:5, 133:8, 133:9, 134:3, 135:25, 150:3, 150:6
**telephone** [1] - 80:20
**tell-your-guy-to-stop -message** [1] - 113:14
**ten** [7] - 39:22, 91:14, 112:24, 124:13, 138:15, 143:21, 145:16
**ten-year-olds** [1] - 39:22

**tend** [1] - 5:25
**tens** [1] - 110:17
**term** [3] - 13:6, 87:23, 100:1
**terminology** [1] - 130:13
**terms** [12] - 16:5, 55:21, 72:9, 72:15, 94:17, 94:21, 106:25, 125:21, 131:2, 131:23, 132:3, 148:4
**test** [5] - 147:18, 151:23, 154:13, 156:3, 160:16
**tested** [13] - 4:8, 4:20, 146:5, 147:4, 147:6, 147:7, 147:11, 147:12, 147:17, 147:20, 152:18, 159:14, 159:20
**testify** [10] - 4:9, 4:10, 4:14, 6:16, 17:13, 36:4, 134:3, 135:10, 146:4, 147:18
**testimony** [3] - 45:12, 119:19, 135:17
**testing** [1] - 135:24
**tests** [1] - 70:12
**textbooks** [1] - 52:15
**THE** [516] - 1:2, 1:13, 1:15, 1:18, 3:1, 3:3, 3:22, 4:1, 4:4, 4:16, 4:22, 5:1, 5:6, 6:7, 6:13, 6:20, 6:24, 7:23, 8:2, 8:5, 8:8, 8:12, 8:16, 8:23, 9:4, 9:9, 9:12, 9:18, 9:21, 10:2, 10:4, 10:7, 10:10, 10:22, 11:3, 11:7, 11:10, 11:14, 11:19, 11:23, 12:15, 13:2, 13:5, 13:8, 13:16, 13:20, 13:23, 14:4, 14:9, 14:21, 14:24, 15:3, 15:7, 15:20, 15:23, 16:4, 16:18, 17:1, 17:23, 18:1, 18:20, 18:25, 19:7, 19:10, 19:15, 20:11, 21:2, 21:17, 21:23, 21:25, 22:7, 22:19, 22:23, 23:2, 23:5, 23:7, 23:10, 23:15, 24:3, 24:6, 24:11, 24:16, 24:21, 25:5, 25:13, 25:15, 25:20, 25:22, 26:3, 26:6, 26:9, 26:11, 26:15, 26:18, 26:21,

26:25, 27:2, 27:6, 27:8, 27:16, 28:2, 28:7, 28:12, 28:16, 28:19, 28:21, 29:1, 29:5, 29:12, 30:8, 31:4, 31:8, 31:24, 32:3, 32:14, 32:18, 33:12, 33:24, 34:1, 34:4, 34:12, 35:10, 35:13, 35:22, 36:9, 36:13, 36:18, 37:1, 37:19, 38:2, 38:9, 38:16, 38:18, 38:25, 39:9, 40:6, 40:14, 40:18, 40:22, 40:25, 41:11, 41:14, 41:25, 42:13, 42:21, 43:9, 43:15, 43:17, 43:20, 43:25, 44:11, 44:17, 44:21, 45:5, 45:24, 46:13, 46:16, 46:20, 46:23, 47:15, 47:19, 48:2, 48:5, 48:7, 48:11, 48:16, 49:1, 49:12, 49:14, 49:17, 50:2, 50:9, 50:12, 50:21, 50:25, 51:9, 51:15, 51:20, 52:6, 54:6, 54:17, 54:20, 55:2, 55:5, 55:10, 56:8, 56:15, 56:17, 56:22, 57:9, 57:19, 57:24, 58:8, 58:18, 58:25, 60:2, 60:4, 60:10, 60:17, 60:21, 60:23, 61:7, 62:21, 62:24, 63:21, 64:2, 64:5, 66:16, 66:21, 67:7, 67:21, 67:24, 68:2, 68:6, 69:15, 69:22, 71:19, 72:9, 72:15, 72:20, 73:20, 74:2, 74:7, 74:13, 74:16, 74:21, 75:15, 75:20, 75:24, 77:19, 78:1, 79:2, 79:11, 79:13, 79:15, 79:21, 80:5, 80:14, 80:16, 80:18, 80:23, 81:12, 82:4, 82:8, 82:11, 82:14, 82:16, 82:19, 82:22, 82:25, 83:2, 83:5, 83:8, 83:10, 83:15, 83:22, 83:25, 84:3, 84:5, 84:8, 84:13, 84:17, 84:20, 84:23, 85:4, 85:7, 85:12, 85:15, 85:17, 86:1, 86:22, 86:24, 87:1, 87:8, 87:10, 87:12, 87:17, 87:19,

87:22, 87:25, 88:4, 88:8, 88:11, 88:16, 88:18, 88:21, 89:1, 89:11, 89:14, 89:18, 89:20, 89:23, 90:5, 90:8, 90:11, 90:17, 90:19, 90:24, 91:3, 91:5, 91:9, 91:15, 92:1, 92:4, 92:7, 92:9, 92:19, 92:23, 92:25, 93:2, 93:4, 93:6, 93:10, 93:12, 93:14, 93:17, 93:19, 93:22, 94:2, 94:5, 94:8, 94:10, 94:12, 95:12, 95:20, 96:5, 96:10, 97:6, 97:23, 98:22, 99:25, 100:3, 100:5, 100:7, 100:9, 100:11, 100:15, 100:17, 101:9, 102:3, 102:6, 102:8, 102:13, 102:16, 103:9, 103:14, 103:18, 103:24, 104:2, 104:5, 105:3, 105:9, 105:18, 106:8, 106:12, 106:23, 107:24, 108:2, 108:6, 108:9, 108:21, 109:10, 109:13, 109:17, 110:9, 110:22, 111:11, 112:1, 113:15, 113:20, 113:24, 114:15, 115:14, 116:20, 117:11, 118:13, 119:5, 119:8, 119:11, 120:11, 120:16, 121:7, 121:20, 122:6, 122:9, 122:19, 125:3, 125:17, 125:24, 126:3, 126:13, 128:1, 129:6, 129:18, 129:21, 129:25, 130:20, 130:25, 131:6, 131:13, 131:18, 131:21, 132:9, 132:17, 133:4, 133:14, 135:16, 136:2, 136:8, 136:10, 136:17, 136:19, 136:23, 137:1, 137:6, 137:9, 137:12, 137:14, 137:16, 137:19, 137:21, 137:24, 138:2, 138:5, 138:7, 138:11, 138:13, 138:16, 138:21, 138:24, 139:1, 139:3, 139:6, 139:10, 139:13, 139:16, 139:19, 139:21, 139:24, 140:4, 140:11, 140:15, 140:20, 140:25, 141:4, 141:7, 141:10, 141:14, 141:16, 141:21, 141:23, 141:25, 142:3, 142:6, 142:12, 142:16, 142:19, 142:23, 143:2, 143:6, 143:8, 143:12, 143:15, 143:18, 143:23, 144:3, 144:14, 144:20, 145:1, 145:5, 145:22, 145:25, 146:3, 146:8, 146:11, 146:13, 146:17, 146:21, 146:25, 148:7, 148:14, 149:8, 149:18, 149:20, 149:24, 150:24, 151:2, 151:5, 151:8, 155:18, 155:24, 156:1, 156:5, 156:8, 157:4, 157:7, 157:20, 157:25, 158:5, 158:9, 158:13, 158:20, 160:9, 161:9, 161:14, 161:17, 162:3, 162:12, 162:18, 162:22, 163:7, 163:10, 163:18, 163:22, 163:25, 164:4
**theft** [1] - 121:11
**themself** [1] - 60:20
**themselves** [3] - 34:22, 114:3, 152:6
**theoretically** [3] - 45:21, 102:23, 124:21
**theories** [1] - 25:9
**they've** [22] - 12:5, 12:6, 29:25, 34:16, 38:7, 47:21, 47:25, 54:10, 64:20, 71:9, 73:25, 76:20, 99:23, 101:6, 104:23, 104:24, 113:22, 124:20, 130:4, 135:5, 142:13
**thinking** [1] - 79:16
**third** [2] - 115:2, 153:1
**Third** [1] - 140:5
**thousand** [5] - 19:24, 75:17, 100:23, 108:5, 109:22
**thousands** [2] - 55:5, 110:17
**threatening** [2] - 128:22, 128:23
**three** [36] - 8:25, 19:17, 21:4, 22:13, 22:16, 22:20, 23:24, 27:17, 27:18, 27:20, 37:10, 39:12, 41:20, 42:24, 43:18, 44:22, 45:1, 45:2, 45:3, 46:21, 47:7, 47:8, 47:11, 58:10, 64:12, 64:25, 81:11, 86:16, 126:16, 127:9, 131:10, 131:11, 138:6, 153:9, 157:16
**Thrones** [3] - 53:10, 53:11, 55:23
**throughout** [4] - 10:17, 12:16, 14:15, 147:8
**throw** [2] - 75:22, 127:16
**throwaway** [1] - 71:6
**throwing** [1] - 113:4
**tiable** [1] - 22:6
**tie** [2] - 54:25, 81:23
**timeframe** [2] - 46:14, 75:4
**timestamp** [4] - 83:17, 87:14, 144:7, 144:11
**Tobias** [1] - 108:21
**today** [6] - 5:7, 45:25, 91:10, 103:6, 118:14, 128:24
**together** [6] - 23:25, 54:10, 55:18, 94:21, 101:1, 116:11
**tolerances** [1] - 134:13
**tomorrow** [1] - 45:25
**took** [6] - 88:13, 89:16, 151:25, 152:23, 153:1
**tool** [3] - 102:10, 127:2, 153:14
**Toolkit** [4] - 134:4, 150:13, 150:21, 151:13
**top** [13] - 7:8, 17:18, 51:1, 51:5, 56:10, 59:2, 60:13, 64:16, 71:25, 96:22, 132:1, 150:13, 150:14
**top-to-bottom** [1] - 64:16
**torrent** [14] - 42:18, 93:1, 108:15, 109:8, 110:13, 111:3, 111:5, 111:17, 114:3, 119:2, 119:3, 152:8, 152:9, 156:21
**torrents** [1] - 152:18
**tortious** [2] - 35:23, 36:15
**total** [2] - 122:18, 138:13
**totality** [1] - 57:5
**town** [2] - 78:25, 134:11
**trace** [2] - 70:24, 99:5
**traced** [2] - 40:9, 40:11
**track** [5] - 15:9, 28:24, 73:3, 135:12, 156:14
**tracking** [2] - 104:9, 104:12
**tracks** [4] - 15:11, 38:7, 92:8, 129:13
**traditionally** [2] - 117:15
**traffic** [1] - 81:19
**training** [1] - 150:10
**transact** [1] - 156:24
**transacted** [1] - 49:22
**transacting** [2] - 154:18, 155:8
**transaction** [2] - 104:14, 144:4
**transcript** [3] - 1:25, 161:19, 164:8
**transcription** [1] - 1:25
**transfer** [1] - 156:20
**transferred** [1] - 87:21
**transitioning** [1] - 9:23
**translation** [1] - 87:6
**transmission** [3] - 87:15, 144:10, 144:12
**transmissions** [4] - 84:10, 84:11, 84:12, 90:14
**transmit** [1] - 113:13
**transmitted** [3] - 85:11, 99:16, 108:16
**transparency** [1] - 110:19
**transport** [1] - 92:14
**trash** [2] - 113:5, 124:11
**travels** [1] - 153:15
**tread** [1] - 134:9
**trend** [2] - 34:6, 46:10
**trial** [7] - 62:25, 63:3, 63:9, 63:17, 119:5, 119:6, 147:4
**trials** [1] - 102:25
**tribunal** [1] - 134:21
**trick** [3] - 44:11, 45:6, 91:18
**tried** [1] - 120:14
**trouble** [2] - 73:17, 112:20
**true** [7] - 40:6, 60:10, 62:7, 73:21, 90:16, 120:11, 121:7
**truly** [1] - 126:10
**trust** [3] - 57:16, 99:22, 113:13
**try** [9] - 47:16, 59:15, 59:16, 69:13, 71:8, 98:2, 117:10, 133:19, 152:25
**trying** [12] - 18:7, 25:17, 28:12, 29:16, 39:12, 46:7, 62:3, 86:1, 87:23, 102:20, 104:17, 109:10
**tube** [4] - 111:8, 115:19, 115:25
**tucked** [1] - 153:6
**Turn** [1] - 144:7
**turn** [7] - 58:7, 110:9, 118:14, 127:22, 129:6, 136:11, 149:8
**turned** [1] - 152:21
**tweak** [1] - 24:14
**tweaked** [1] - 46:11
**tweaks** [1] - 35:20
**tweet** [1] - 65:17
**tweeting** [2] - 54:14, 65:24
**twice** [2] - 19:17, 98:18
**Twitter** [4] - 64:20, 65:17, 65:23, 73:18
**two** [45] - 3:12, 9:14, 9:20, 10:6, 18:6, 24:25, 25:1, 39:11, 41:20, 43:17, 46:20, 47:11, 48:21, 49:19, 71:22, 75:22, 80:2, 81:8, 81:9, 82:1, 86:16, 92:12, 97:18, 98:7, 98:17, 99:4, 101:25, 108:13, 110:12, 112:11, 112:14, 116:8, 129:16, 129:17,

132:10, 133:21, 135:22, 136:18, 137:2, 147:14, 147:15, 152:23, 155:4, 157:12, 157:14
**two-man** [1] - 137:2
**Twombly** [1] - 31:7
**type** [8] - 30:18, 56:19, 77:5, 110:19, 111:5, 115:24, 117:22, 142:25
**types** [5] - 57:1, 65:1, 110:12, 131:16, 137:4
**typical** [2] - 29:10, 39:10
**typically** [3] - 28:5, 29:19, 52:12

## U

**U.S** [3] - 1:10, 16:9, 111:17
**ultimate** [3] - 123:17, 123:22, 124:22
**ultimately** [1] - 117:6
**um-hum** [1] - 36:17
**unclear** [1] - 114:10
**under** [25] - 25:10, 30:12, 31:6, 31:7, 32:12, 34:22, 35:1, 35:9, 39:3, 58:5, 67:15, 73:4, 89:4, 89:5, 89:8, 89:25, 91:6, 106:8, 113:12, 118:10, 125:17, 127:12, 131:2, 156:24, 163:11
**underlying** [2] - 119:14, 132:19
**underneath** [1] - 92:13
**undertook** [1] - 151:23
**unfortunately** [3] - 68:11, 116:14, 145:8
**unidentified** [1] - 126:15
**uniform** [5] - 12:19, 12:21, 13:1, 45:19, 48:1
**uniformity** [2] - 118:4, 118:11
**unilaterally** [1] - 127:11
**unique** [9] - 12:10, 42:19, 54:24, 55:22, 56:1, 65:1, 71:19, 72:12, 100:23

**uniquely** [1] - 39:18
**UNITED** [2] - 1:2, 1:13
**United** [3] - 69:16, 69:18, 69:20
**universal** [1] - 87:4
**Universal** [1] - 116:9
**universe** [1] - 70:15
**University** [2] - 153:2, 154:9
**unless** [4] - 13:17, 42:11, 61:22, 73:5
**unlikely** [4] - 20:19, 20:20, 29:10, 43:14
**unlimited** [1] - 70:3
**unplayable** [1] - 106:7
**unquote** [1] - 122:23
**unreliable** [1] - 48:22
**unusual** [1] - 59:23
**up** [63] - 6:4, 25:15, 25:22, 25:25, 26:22, 41:5, 46:7, 52:18, 53:7, 60:24, 65:4, 65:19, 70:1, 70:4, 70:14, 71:6, 71:7, 74:14, 75:22, 76:10, 77:5, 79:17, 80:7, 81:5, 81:19, 86:7, 86:12, 86:21, 95:8, 96:2, 97:16, 97:18, 99:2, 100:22, 106:8, 107:5, 109:7, 110:20, 111:6, 111:14, 111:19, 111:22, 111:25, 112:18, 114:19, 122:15, 122:20, 123:2, 123:13, 124:14, 127:16, 128:21, 129:3, 132:4, 134:15, 143:4, 145:2, 145:25, 147:18, 154:2, 154:15, 160:10, 163:22
**update** [3] - 17:16, 42:6, 42:11
**updated** [3] - 47:24, 48:23, 158:18
**uploader** [1] - 123:17
**uploads** [1] - 123:6
**useful** [5] - 47:4, 47:12, 48:24, 50:14, 50:16
**user** [2] - 122:24, 123:6
**user-generated** [1] - 122:24
**uses** [6] - 35:14, 133:23, 134:4, 135:8, 150:11

**usual** [1] - 3:10
**UTC** [4] - 86:25, 87:6, 96:7, 144:5
**utilize** [1] - 117:9
**utilized** [1] - 86:21
**utilizing** [1] - 112:15
**uTorrent** [2] - 45:14, 81:24

## V

**validate** [1] - 159:11
**value** [24] - 77:15, 100:1, 100:12, 100:24, 101:3, 101:5, 101:14, 101:16, 101:20, 101:24, 102:3, 104:16, 104:22, 105:7, 105:10, 105:14, 105:24, 106:10, 106:11, 106:21, 106:22, 107:10, 121:8, 129:5
**values** [4] - 101:9, 101:21, 106:9, 106:14
**variety** [1] - 156:22
**various** [6] - 16:21, 16:22, 34:17, 51:13, 115:25, 117:21
**vary** [2] - 12:25, 109:8
**vast** [1] - 130:12
**venue** [1] - 36:11
**verification** [4] - 86:13, 143:8, 145:4, 146:21
**verifications** [1] - 130:23
**verified** [1] - 132:24
**verify** [4] - 14:12, 16:16, 130:20, 136:15
**verifying** [1] - 143:21
**Verizon** [3] - 96:17, 97:5, 120:21
**version** [10] - 46:4, 65:6, 93:6, 93:25, 127:12, 127:17, 156:2, 158:10, 158:18
**versions** [2] - 46:12, 158:15
**versus** [2] - 3:4, 126:25
**viable** [1] - 112:13
**vicarious** [3] - 25:8, 26:11, 26:13
**video** [3] - 30:2, 76:20, 123:3

**view** [3] - 91:5, 92:9, 145:13
**viewers** [1] - 102:11
**violates** [1] - 58:22
**violation** [1] - 58:7
**virtual** [1] - 156:16
**Visa** [1] - 71:6
**visitor** [2] - 20:8, 23:21
**visitors** [1] - 70:7
**visualize** [1] - 156:11
**Vixen** [1] - 111:5
**volume** [3] - 71:24, 72:9, 72:14
**voluntary** [2] - 115:25, 116:3

## W

**wait** [1] - 12:24
**wall** [1] - 70:2
**walls** [1] - 116:2
**wants** [3] - 25:11, 95:24, 130:18
**warnings** [2] - 115:2, 125:8
**warrant** [3] - 154:20, 155:6, 155:7
**warrants** [2] - 155:12, 155:15
**Washington** [4] - 63:2, 63:18, 132:25, 133:1
**watch** [1] - 155:4
**watching** [2] - 37:7, 102:1
**Waters** [1] - 150:10
**wave** [1] - 17:12
**waved** [1] - 115:8
**ways** [2] - 46:8, 49:19
**webs** [1] - 114:3
**website** [17] - 70:6, 70:7, 70:10, 70:14, 70:16, 71:7, 71:13, 131:4, 131:14, 131:15, 131:17, 131:19, 133:6, 133:7, 133:8, 133:12, 133:17
**websites** [12] - 11:1, 68:18, 71:1, 71:6, 110:14, 110:25, 111:17, 130:25, 131:6, 131:8, 131:11
**week** [6] - 14:17, 39:2, 58:11, 66:13, 110:17, 162:7
**weekly** [1] - 15:23
**weeks** [2] - 9:14, 116:8

**welcome** [1] - 4:1
**Western** [1] - 63:1
**Whack** [1] - 71:18
**Whack-a-Mole** [1] - 71:18
**whatsoever** [4] - 124:23, 128:23, 134:8, 161:4
**whereas** [1] - 118:9
**white** [3] - 24:23, 37:21, 115:18
**whole** [6] - 30:1, 71:9, 80:5, 101:18, 103:3, 106:6
**Wi** [3] - 20:16, 20:20, 25:18
**Wi-Fi** [3] - 20:16, 20:20, 25:18
**wife** [8] - 21:5, 22:13, 22:16, 27:18, 27:20, 39:11, 53:3, 75:10
**willing** [2] - 39:5, 124:3
**wind** [2] - 7:14, 70:14
**Wind** [1] - 65:2
**winding** [1] - 70:4
**Windows** [3] - 152:11, 152:12, 152:23
**Winds** [1] - 65:7
**Wire** [3] - 87:18, 153:13, 153:23
**wish** [3] - 10:19, 75:23, 145:8
**witnesses** [5] - 4:3, 5:8, 5:16, 63:5, 80:3
**women** [1] - 52:13
**wonder** [2] - 79:16, 133:11
**wonderful** [1] - 127:2
**wondering** [1] - 14:4
**word** [2] - 14:16, 68:6
**words** [1] - 32:24
**works** [72] - 12:5, 19:14, 20:5, 20:9, 20:19, 27:4, 28:13, 30:4, 34:21, 34:23, 35:17, 36:23, 42:15, 42:24, 43:23, 44:15, 45:8, 46:17, 46:25, 47:1, 47:17, 48:18, 49:4, 49:15, 50:20, 50:23, 55:6, 56:18, 57:20, 67:22, 68:25, 69:7, 69:23, 69:25, 83:23, 85:4, 85:20, 85:24, 88:16, 89:21, 90:1, 90:20, 95:13, 96:1, 96:21, 100:22, 101:2, 101:10, 103:1, 107:3,

*109:15, 109:16,*
*109:20, 115:16,*
*116:5, 122:11,*
*123:3, 124:8, 125:1,*
*125:6, 130:1, 131:7,*
*136:16, 146:6,*
*147:10, 157:5,*
*157:21, 160:15*
**Works** [2] - *91:21,*
*95:21*
**world** [9] - *30:23,*
*69:11, 70:22, 77:4,*
*123:5, 125:2,*
*125:20, 126:19,*
*127:17*
**worldwide** [2] - *69:17,*
*69:19*
**worried** [1] - *36:11*
**worse** [4] - *3:7, 3:10,*
*80:19, 115:10*
**worst** [4] - *12:13,*
*15:15, 18:8*
**worth** [1] - *19:20*
**wrap** [1] - *74:14*
**write** [2] - *17:4, 127:2*
**written** [2] - *17:1,*
*159:4*
**wrote** [1] - *150:12*
**Wyoming** [4] - *134:4,*
*150:11, 150:13,*
*151:13*

## Y

**year** [8] - *18:21, 39:22,*
*98:7, 111:21,*
*137:18, 138:21,*
*146:22, 146:24*
**years** [12] - *10:6, 28:7,*
*34:15, 45:17, 48:21,*
*67:25, 83:6, 114:20,*
*115:7, 136:18,*
*149:22, 164:1*
**yelled** [1] - *76:20*
**yelling** [1] - *65:21*
**yesterday** [1] - *126:4*
**York** [4] - *6:3, 9:15,*
*72:3, 134:25*
**young** [2] - *52:13,*
*52:20*
**yourself** [1] - *113:12*
**YouTube** [3] - *122:24,*
*123:2, 123:3*
**YouTubes** [1] - *123:5*

## Z

**zero** [3] - *75:25,*
*123:17, 135:15*
**zones** [1] - *87:7*